—NONCONFIDENTIAL—

Nos. 2016-2707, 2016-2708

# United States Court of Appeals for the Federal Circuit

VANDA PHARMACEUTICALS INC., AVENTISUB LLC,

*Plaintiffs-Appellees*,

v.

ROXANE LABORATORIES INC.,

*Defendant-Appellant*.

Appeals from the United States District Court for the District of Delaware, in Case Nos. 1:13-cv-01973-GMS & 1:14-cv-00757-GMS, Judge Gregory M. Sleet.

## PRINCIPAL BRIEF OF APPELLANT

Daniel G. Brown
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
(212) 906-1742

Melissa A. Brand
LATHAM & WATKINS LLP
John Hancock Tower, 27th Floor
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

Kenneth G. Schuler
Emily C. Melvin
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
(312) 876-7700

Robert J. Gajarsa
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

February 7, 2017    *Counsel for Defendant-Appellant*

Claim 1 of the '610 patent recites:

> A method for treating a patient with iloperidone, wherein the patient is suffering from schizophrenia, the method comprising the steps of:
>
> determining whether the patient is a CYP2D6 poor metabolizer by:
>
>> obtaining or having obtained a biological sample from the patient;
>>
>> and performing or having performed a genotyping assay on the biological sample to determine if the patient has a CYP2D6 poor metabolizer genotype; and
>
> if the patient has a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount of 12 mg/day or less, and
>
> if the patient does not have a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount that is greater than 12 mg/day, up to 24 mg/day,
>
> wherein a risk of QTc prolongation for a patient having a CYP2D6 poor metabolizer genotype is lower following the internal administration of 12 mg/day or less than it would be if the iloperidone were administered in an amount of greater than 12 mg/day, up to 24 mg/day.

Appx46.

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Nos. 2016-2707, 2016-2708

VANDA PHARMACEUTICALS INC., AVENTISUB LLC

v.

ROXANE LABORATORIES INC.

**CERTIFICATE OF INTEREST**

Counsel for the:

☐ (petitioner)    ☒ (appellant)    ☐ (respondent)    ☐ (appellee)

☐ (amicus)    ☐ (name of party)

Roxane Laboratories Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full name of party represented by me: | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Roxane Laboratories Inc. | N/A | Roxane Laboratories Inc. is a wholly owned subsidiary of Hikma Pharmaceuticals PLC, which is a publicly held corporation traded on the London Stock Exchange under the symbol HIK.L. No other publicly held corporation owns 10% or more of the stock in Roxane. |

4. The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

**Latham & Watkins LLP**:  Michael R. Seringhaus, Timothy J. O'Brien, Damion Jurrens (no longer with firm)

**Potter Anderson & Corroon, LLP**:   Richard L. Horwitz, Bindu Ann Palapura, David Ellis Moore, Stephanie E. O'Byrne

---

| February 7, 2017 | /s/ Kenneth G. Schuler |
|---|---|
| Date | Signature of counsel |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF CONTENTS.................................................................. iii

TABLE OF AUTHORITIES ........................................................ vii

STATEMENT OF RELATED CASES ....................................1

STATEMENT OF JURISDICTION.........................................1

STATEMENT OF THE ISSUES.............................................3

INTRODUCTION .......................................................................4

STATEMENT OF THE CASE................................................9

I.      THE PARTIES, FDA FILINGS, AND INITIATION OF SUIT ...................9

II.     TECHNICAL BACKGROUND ...................................11

        A.      Iloperidone...........................................................11

        B.      Iloperidone Metabolism ....................................11

        C.      Metabolizer Phenotype And Drug Therapy .......................12

        D.      CYP2D6 Genotype And Drug Therapy .............................13

        E.      Laboratory Tests For Determining CYP2D6 Metabolizer Status.......18

III.    ROXANE'S PROPOSED LABEL.................................19

IV.     THE '610 PATENT ..........................................................21

        A.      The Asserted Claims ...........................................21

        B.      The Claimed Methods Require Selecting And Administering Different Dosage Ranges Of Iloperidone Based On And Because Of CYP2D6 Genotype Status ...............................................24

**Page**

  C.  The Claimed Methods Require Administration Of Iloperidone At Specific Dosage Ranges To Both CYP2D6 Poor And Non-Poor Metabolizer Genotypes ...............................................26

V.  THE DISTRICT COURT'S OPINION ...........................................28

SUMMARY OF THE ARGUMENT ....................................................29

ARGUMENT ..............................................................................30

I.  STANDARD OF REVIEW .........................................................30

II.  ROXANE WILL NOT INDUCE INFRINGEMENT OF THE ASSERTED CLAIMS ..................................................................30

  A.  Induced Infringement Requires Proof Of Direct Infringement And Specific Intent.............................................31

  B.  Vanda Failed to Prove Direct Infringement .........................33

    1.  Roxane's Proposed Label Cannot Directly Infringe The Asserted Claims .................................................33

    2.  Dr. Alva Never Practiced The Asserted Claims .......................33

  C.  Vanda Failed to Establish Inducement ...............................36

    1.  Roxane's Proposed Label Does Not Recommend Prescribers Perform Each And Every Step Of The Asserted Claims .......................................................37

      a.  Roxane's Proposed Label Does Not Recommend That Prescribers Perform Genotyping ..........................................................37

      b.  Roxane's Proposed Label Does Not Recommend Prescribers Determine And Administer The Claimed Dosage Ranges To Both CYP2D6 Poor And Non-Poor Metabolizer Genotypes Based On And Because Of CYP2D6 Genotype ..........................40

**Page**

           c.      Roxane's Proposed Label Does Not Recommend Prescribers Obtain A Biological Sample For Genotyping......................43

           d.      Roxane's Proposed Label Does Not Recommend Performance Of Any Of The Additional Steps And Limitations Of The Dependent Claims ...............................................43

     2.     Extraordinary Substantial Non-Infringing Uses Here Preclude A Finding Of Specific Intent As A Matter Of Law........................................................................44

     3.     The Absence Of Evidence Of Culpable Specific Intent And The Objective Statements In The Public Domain Concerning The FANAPT Label Foreclose A Finding Of Specific Intent ..........................................................46

III.    THE ASSERTED CLAIMS ARE INVALID UNDER § 101 ....................47

    A.    The Asserted Claims Are Directed To A Natural Relationship Between Iloperidone, CYP2D6 Metabolism, And QT Prolongation .......................................................47

    B.    The Asserted Claims Lack An Inventive Concept..............................49

    C.    The District Court Erred In Concluding That There Was An Inventive Concept In The Asserted Claims .........................................53

IV.    THE ASSERTED CLAMS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION ........................................................................57

V.    THE DISTRICT COURT'S INJUNCTIONS WERE NOT SUPPORTED BY EQUITY ........................................................................62

    A.    The District Court's General Equitable Power Did Not Authorize Enjoining Approval Of Roxane's ANDA ..........................62

**Page**

    B.    The District Court's Injunction Against Roxane's ANDA
        Product Was Without Evidentiary Support .........................................62

CONCLUSION .......................................................................................................65

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on page 10 of this brief relates to statements from a third-party proceeding that has been maintained as confidential by Vanda Pharmaceuticals Inc.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ........................................................64

*Alcon Research Ltd. v. Barr Laboratories, Inc.*,
745 F.3d 1180 (Fed. Cir. 2014) ........................................................60

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
134 S. Ct. 2347 (2014)......................................................................47

*Allergan, Inc. v. Alcon Laboratories, Inc.*,
324 F.3d 1322 (Fed. Cir. 2003) ..........................................................2

*Allergan, Inc. v. Sandoz Inc.*,
796 F.3d 1293 (Fed. Cir. 2015) ........................................................30

*Apple Inc. v. Samsung Electronics Co.*,
735 F.3d 1352 (Fed. Cir. 2013) ........................................................64

*Ariad Pharmacueticals, Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ........................................................57

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) .................................................49, 55

*Association for Molecular Pathology v. Myriad Genetics, Inc.*,
133 S. Ct. 2107 (2013)...............................................................*passim*

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010) ..........................................................2

*Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S*,
566 U.S. 399 (2012)......................................................................9, 64

*Commercial Security Bank v. Walker Bank & Trust Co.*,
456 F.2d 1352 (10th Cir. 1972) ........................................................62

*DSU Medical Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) ...............................................4, 32, 36

**Page(s)**

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ................................................................63, 64

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*,
No. 2015-2067, --- F.3d ----, 2017 WL 117164 (Fed. Cir. Jan. 12,
2017) ................................................................32, 40, 46

*Endo Pharmaceuticals, Inc. v. Actavis Inc.*,
No. 14-1381, 2015 WL 5580488 (D. Del. Sept. 23, 2015) ...............................49

*Ericsson, Inc. v. D-Link Systems, Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ........................................................33

*Fujitsu Ltd. v. Netgear Inc.*,
620 F.3d 1321 (Fed. Cir. 2010) ........................................................32

*Genetic Technologies, Ltd. v. Merial L.L.C.*,
818 F.3d 1369 (Fed. Cir. 2016) ........................................................49

*Kustom Signals, Inc. v. Applied Concepts, Inc.*,
264 F.3d 1326 (Fed. Cir. 2001) ........................................................26

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
566 U.S. 66 (2012) ................................................................*passim*

*Medgraph, Inc. v. Medtronic, Inc.*,
843 F.3d 942 (Fed. Cir. 2016) ........................................................44

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ................................................................63

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000) ........................................................58

*Rapid Litigation Management Ltd. v. CellzDirect, Inc.*,
827 F.3d 1042 (Fed. Cir. 2016) ........................................................55

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharmaceuticals
Inc., USA*,
821 F. Supp. 2d 681 (D.N.J. 2011) ................................................62

**Page(s)**

*Schumer v. Laboratory Computer System, Inc.*,
  308 F.3d 1304 (Fed. Cir. 2002) .........................................................................26

*Takeda Pharmaceuticals U.S.A., Inc. v. West-Ward Pharmaceutical Corp.*,
  785 F.3d 625 (Fed. Cir. 2015) ............................................................6, 32, 36, 38

*TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc.*,
  529 F.3d 1364 (Fed. Cir. 2008) .........................................................................26

*Warner-Lambert Co. v. Apotex Corp.*,
  316 F.3d 1348 (Fed. Cir. 2003) .....................................................2, 5, 31, 33, 45

## STATUTES AND REGULATIONS

28 U.S.C. § 1292(a) ...................................................................................................2

28 U.S.C. § 1295(a)(1) ..............................................................................................2

28 U.S.C. § 1331 ........................................................................................................2

28 U.S.C. § 1338 ........................................................................................................2

35 U.S.C. § 101 ..........................................................................................................3

35 U.S.C. § 271(b) .............................................................................................2, 29

35 U.S.C. § 271(e)(4) ........................................................................................2, 62

21 C.F.R. § 314.94(a)(8)(iv) ...................................................................................19

## OTHER AUTHORITIES

*CYP2D6 allele nomenclature*, http://www.cypalleles.ki.se/cyp2d6.htm
  (last visited Feb. 7, 2017)....................................................................................12

FDA Letter,
  http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/207
  231Orig1s000ltr.pdf (last visited Feb. 7, 2017)................................................62

## STATEMENT OF RELATED CASES

This appeal arises from a consolidated civil action in which the district court found that Defendant-Appellant Roxane Laboratories Inc. ("Roxane") will infringe, and did not prove invalid, claims asserted (i) by Plaintiff-Appellee Aventisub LLC from U.S. Reissue Patent No. 39,198E (the "'198 patent," now expired) (Civil Action No. 13-cv-1973); and (ii) by Plaintiff-Appellee Vanda Pharmaceuticals Inc. ("Vanda") from U.S. Patent No. 8,586,610 (the "'610 patent") (Civil Action No. 14-cv-757).  No appeal from either consolidated civil action was previously before this or any other appellate court.

The following district court cases concern related patents and may be affected by this Court's decision in this appeal:  *Vanda Pharm., Inc. v. Roxane Labs., Inc.*, No. 15-cv-919 (D. Del.); *Vanda Pharm., Inc. v. Inventia Healthcare Pvt. Ltd.*, Nos. 15-cv-362, 15-cv-921 (D. Del.); *Vanda Pharm., Inc. v. Apotex Inc. and Apotex Corp.*, No. 15-cv-922 (D. Del.); *Vanda Pharm., Inc. v. Lupin Ltd. and Lupin Pharm.*, Inc., No. 15-cv-1073 (D. Del.).

## STATEMENT OF JURISDICTION

The district court's final judgment and injunctions issued on August 25, 2016.  Roxane timely appealed to this Court on September 23, 2016.  This Court

has exclusive jurisdiction under 28 U.S.C. §§ 1292(a) and 1295(a)(1).  The district

court exercised jurisdiction under 28 U.S.C. §§ 1331 and 1338.[1]

---

[1]  The district court found infringement of the '610 patent under 35 U.S.C. § 271(b) after correctly holding that Vanda was ineligible for relief under 35 U.S.C. § 271(e)(4) because Roxane's submission of its ANDA occurred prior to the issuance of the '610 patent and therefore could not be an artificial act of infringement under § 271(e)(2).  *See* Appx30.  Though Roxane's ANDA product had not been approved, marketed, or sold, Vanda did not request at trial, and the district court did not exercise, declaratory judgment jurisdiction for the finding of infringement and injunctions issued here.  *See AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1047-48, 1060 (Fed. Cir. 2010) (declaratory judgment action required because no artificial act of infringement under § 271(e)(2)); *Allergan, Inc. v. Alcon Labs., Inc.*, 324 F.3d 1322, 1332 (Fed. Cir. 2003) (declaratory relief supported after "the day [an] ANDA [is] approved").  Nevertheless, "since the issue[s] ha[ve] been decided by the district court and argued here, and since [they] may arise if [Roxane]'s ANDA is approved," this Court can address the merits of this case. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003).

## STATEMENT OF THE ISSUES

(1)     Whether the district court erred in finding that Roxane will induce infringement of the asserted claims of the '610 patent despite the fact that Roxane's proposed label language is identical to Vanda's brand name drug label and that label has failed to induce a single physician to practice the claimed treatment methods despite millions of doses administered over the past six years.

(2)     Whether the district court erred in holding that the asserted claims of the '610 patent are not invalid under 35 U.S.C. § 101 because they recite an inventive concept even though every step of the claimed methods was well-known, routine, and conventional activity.

(2)     Whether the district court erred in finding that the asserted claims of the '610 patent were supported by adequate written description when the patentees never discussed data to support the dosage ranges they claimed, admitted that the claimed ranges were based on undisclosed studies, and added the claimed ranges only after the FDA required a similar revision in the approved drug label.

(4)     Whether the district court erred in exercising its general equitable power to enjoin FDA approval and use of Roxane's ANDA product when the FDA was not a party to this suit and there was no evidence to show that the, at most, *de minimis* infringing uses for iloperidone would cause harm to Vanda or the public interest.

3

# INTRODUCTION

The district court's finding of induced infringement cannot withstand scrutiny and should be reversed.  Vanda's brand-name iloperidone drug product, FANAPT, has been marketed and sold for *over six years* with the *identical* language that Vanda alleges will induce widespread infringement of the '610 patent if included with Roxane's generic version of that drug.[2]  Yet in that period, FANAPT has been administered millions of times, and there is no evidence that the claimed methods have ***ever*** been practiced.  For the ***one*** instance Vanda identified where the claims were allegedly practiced, Vanda's expert, Dr. Alva, admitted that he performed, at most, just a ***fraction*** of the claimed method.

That abject failure of proof of direct infringement and the corollary universe of non-infringing uses for iloperidone preclude finding that Roxane possessed the "specific intent" to induce physicians to practice the claimed methods of the '610 patent.  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc in relevant part).  Roxane could not possess specific intent to induce infringement of the claimed methods by using the same language from FANAPT's label that has failed to induce physicians to practice the claims over the past six

---

[2]   The iloperidone drug compound and its general use to treat schizophrenia is covered by the '198 patent, which was also asserted against Roxane.  That patent, however, expired on November 15, 2016, and is not a subject of this appeal.  *See* Appx3.

years.   And this Court has held that, "where a product has substantial non-infringing uses" of "97.9%," which is *lower* than the rate of non-infringing uses here, "intent to induce infringement cannot be inferred" as a matter of law. *Warner-Lambert*, 316 F.3d at 1365.

Put simply, if Vanda's label (and, thus, Roxane's proposed label) somehow would induce physicians to practice the claimed methods, Vanda should have been able to identify actual instances of physicians using those methods.  The reason for that failure, however, is straightforward:  while the CYP2D6 genotyping required by the asserted claims of the '610 patent might be relevant for the administration of some drugs, it is not for iloperidone.  That is why insurance providers (including the objective government-run Medicare and Medicaid programs) refuse to cover CYP2D6 genotyping for iloperidone patients and consider the practice "experimental," "investigational, and not medically necessary."  Appx7041-7042 (493-98); *see also* Appx7044 (506-07).   That is why a member of Vanda's Schizophrenia Advisory Board publically advised that there "are no recommendations to test [iloperidone] patients for genetic variants that result in poor metabolism from CYP2D6."  Appx17934.   And that is why published guidance in the industry, including from PharmGKB (the independent industry-leading organization at Stanford University Medical School sponsored by NIH), advise that there are no "require[ments] or recommend[ations]" in the label to

perform "genetic testing" of iloperidone patients. Appx17906-17907; *see* Appx6985-6986 (271-75); Appx18129; Appx19751; *see also* Appx7044 (508-10). In fact, Vanda itself even informed the European Medicines Agency that FANAPT had been used for years in the U.S. "in the ***absence*** of … CYP2D6 genotyping." Appx6915-6916 (139-41); *see* Appx6986; Appx17663.

The district court's strained interpretation of the accused label language to overcome that clear objective evidence violated the tenet that "vague label language cannot be combined with speculation about how physicians may act to find inducement." *Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 632 (Fed. Cir. 2015). When the FDA occasionally recommends the use of CYP2D6 genotyping in connection with administering a drug, it does so explicitly with clear instructions such as "CYP2D6 genotyping should be performed," not by simply mentioning that, in general, "laboratory tests are available" to determine drug metabolizer status—the vague label language the district court rewrote here as an instruction to perform CYP2D6 genotyping. Appx17932; Appx15086. The district court clearly erred in finding that Roxane's product label would induce infringement.

The district court also erred by summarily concluding that the asserted claims pass § 101 muster because they disclose an inventive concept. The "genetic tests" required by the claims and their use to determine the "dosage adjustment

recited in the claims" are not even marginally inventive. Appx20. The required genotyping tests were conventional technology, and it was admittedly well-known that the "preferred dosage of any [CYP2D6-mediated] drug c[ould] be determined through trial-and-error tests." Appx20072 (¶¶ 65-66). Indeed, when administering CYP2D6-mediated drugs, a fifty-percent reduction for poor CYP2D6 metabolizers (as the claims here require) was *routine* practice among physicians and commonly required by regulators. Without reason or explanation, the district court ignored those facts and the Supreme Court's controlling decisions in *Myriad* and *Mayo* to declare the claims eligible under § 101. *See Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107 (2013) (holding similar claims invalid under § 101); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012) (same).

Moreover, just as it erred by reading nonexistent instructions into Roxane's proposed label, the district court erred in finding support in the written description for the asserted claims where there was none. Even if the district court were correct that the patent adequately discloses that poor metabolizers should receive a relative reduction from the proper dose for "normal" metabolizers, there is no description of the specific claimed range for that normal dose ("greater than 12 mg/day, up to 24 mg/day"), nor any explanation for why that range excludes 12 mg/day, which is a widely accepted normal dose of iloperidone. And the court

7

erred in finding adequate support for the claimed range for poor metabolizers (less than 12 mg/day) in the first place. The written description of the '610 patent does not disclose any data supporting iloperidone doses lower than 16 mg/day, and the data that is reported does not show an improvement in side effects for poor metabolizers (including QTc interval) as dose is reduced from 24 mg/day to 16 mg/day. The lack of written description here, however, is not surprising—Vanda only added the specific dosage ranges to the '610 patent claims over five years after prosecution began, once *the FDA informed the plaintiffs* that poor metabolizers of iloperidone (in general, not any particular genotype) should receive one-half of their titrated dose.

Finally, even if the finding of induced infringement were somehow upheld, the district court's injunctions would still have to be dissolved. Because this case occurred outside the Hatch-Waxman procedures that provide for automatic injunctive relief under § 271(e)(4)(A), the court lacked any statutory authority to enjoin the FDA (a non-party agency of the Executive Branch), and Vanda bore the burden to establish an equitable basis for injunctive relief under *eBay*. But Vanda presented no evidence or expert testimony to establish that infringement of the '610 patent (or FDA approval) would lead to non-compensable irreparable harm— which explains the court's failure to cite any. And the notion that monetary damages could be an inadequate remedy or that the burden of an injunction favors

Vanda is decidedly nonsensical in light of the extraordinary non-infringing uses here.  The public interest also clearly weighs against an injunction.  Congress and the public understand that "a single drug may have multiple methods of use, only one or some of which a patent covers," and "contemplate[] that one patented use will not foreclose marketing a generic drug for other unpatented ones."  *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 414-15 (2012).  But the court's injunctions here do just that—they allow a method-of-use patent that covers none (or, at most, a trivial portion) of the actual uses of a drug to foreclose all sales of that drug, effectively extending exclusivity over the drug by nearly twelve years despite that the compound patent already expired.

The district court's validity decisions and finding of induced infringement were not supported by fact or law, and judgment should be entered in Roxane's favor.

## STATEMENT OF THE CASE

## I.    THE PARTIES, FDA FILINGS, AND INITIATION OF SUIT

After FDA approval on May 6, 2009, Plaintiff-Appellee Aventisub LLC ("Aventisub") acquired the rights to FANAPT from Vanda and began domestic sales.  *See* Appx6901-6902 (84-85).  On October 17, 2013, after filing its ANDA, Roxane provided Aventisub notice under § 505(j)(2)(B)(ii) that the '198 patent, which was listed in the Orange Book and owned by Aventisub, was invalid.

**CONFIDENTIAL MATERIAL OMITTED**

Appx6412-6415.  In response, Aventisub filed suit against Roxane on November 25, 2013, claiming infringement of the '198 patent (Civil Action No. 13-cv-1973). Appx7.

The '610 patent subsequently issued to Vanda on November 19, 2013. Appx3.  As the holder of the FANAPT NDA at the time, Aventisub had a financial incentive for the patent to be enforced against Roxane and listed in the Orange Book (as [[      ]] tried to [[          ]] to do), but Aventisub concluded that the [[                    ]] did not [[              ]] to [[    ]] a [[            ]] of [[      ]] that would [[      ]] the [[          ]]. *See* Appx6816; Appx6914-6915 (134-37); Appx7376-7377.  Despite that the patent did not exist when Roxane filed its ANDA, which was still unapproved, Vanda filed suit against Roxane on June 16, 2014, alleging infringement of the '610 patent (Civil Action No. 14-cv-757).  *See* Appx7.  Seven months *after* filing suit, Vanda listed the '610 patent in the Orange Book after it reacquired the FANAPT NDA, and Roxane provided notice to Vanda under § 505(j)(2)(B)(ii) in response, stating that it had no intention to specifically induce infringement.  *See* Appx6414; Appx19696, Appx19698-19700.

## II.    TECHNICAL BACKGROUND

### A.    Iloperidone

Iloperidone is a drug used to treat schizophrenia in adults.  Schizophrenia is a serious condition associated with high rates of morbidity, so a psychiatrist's primary concern when treating a patient with iloperidone is achieving efficacy. *See* Appx7013-7014 (384-85).  Because iloperidone might cause unwanted side effects, physicians rely on their clinical experience to titrate the drug to efficacy (as the FANAPT label mandates) in order to use the lowest possible dose that can control symptoms.  *See* Appx6998 (321); Appx7001 (336); Appx7015 (391-92); Appx7019 (408); Appx15003; Appx15043; Appx17686-17687; Appx17845; *see also* Appx7048 (522) (titration of a drug is "just basic" practice "we teach in medical school").

### B.    Iloperidone Metabolism

The metabolism of iloperidone in the human body occurs through three primary biotransformation pathways: carbonyl reduction, O-demethylation, and hydroxylation.  *See* Appx7; Appx39 (4:37-38).  The latter, hydroxylation, is associated with the enzyme "debrisoquine hydroxylase," which is encoded in the human genome at the CYP2D6 locus.  *See* Appx38-39 (1:29-34, 4:25-26, 4:37-39); Appx7.  The specific paired sets ("alleles") of the four nucleic acids (adenine, guanine, cytosine, and thymine) at that locus (an individual's "CYP2D6

genotype") can vary widely from person to person through a host of deletions, duplications, inversions, translocations, or other "polymorphism[s]." *See* Appx39-40 (4:62–5:20); Appx5390-5391. "The CYP2D6 gene is highly polymorphic, with more than 70 allelic variants described" as of the filing of the '610 patent. Appx39 (4:62-64); *see also* Appx7047 (517-18). The number of known CYP2D6 allelic variants is now over 150, with dozens more suspected. *See* Appx38 (1:64); *CYP2D6 allele nomenclature*, http://www.cypalleles.ki.se/cyp2d6.htm (last visited Feb. 7, 2017).

### C.     Metabolizer Phenotype And Drug Therapy

The observed ability of an individual to metabolize a drug (which correlates to the actual level of the drug or its metabolites in a patient's blood after a period of time) is defined as one of four "phenotypes"—"ultra rapid metabolizer (UM), extensive metabolizer (EM), intermediate metabolizer (IM), and poor metabolizer (PM) phenotypes." Appx38 (1:31-33; 1:53-57); *see* Appx15060-15061; Appx15121. Patients with poor metabolizer phenotypes can potentially suffer extended high concentrations of drugs in either "metabolized or non-metabolized forms," causing "unwanted physiological [side] effects." Appx38 (1:57-61). An "increased concentration of iloperidone or its metabolites" (P88 and P95), for example, ostensibly have been associated with "prolongation of the electrocardiographic QT interval." Appx38 (1:51-52).

In practice, doctors account for patients' individual drug metabolism rates (their phenotypes) and attendant side effects (such as QT interval prolongation) by reviewing a patient's history and titrating to an effective dose while observing symptomatology. *See, e.g.*, Appx6997-6998 (320-21); Appx7015 (391-92); Appx7019 (408); Appx17686-17687; Appx17845. As the prior art cited by the '610 patentees teaches, the "preferred dosage of any drug can be determined through trial-and-error tests." Appx20072 (¶¶ 65-66). For example, in FANAPT's label, the FDA mandates that "[i]loperidone must be titrated slowly from a low starting dose," advises "caution" for use "in patients with known cardiovascular disease," and warns doctors to monitor for clinical symptoms of QT prolongation, "Tardive dyskinesia," "orthostatic hypotension, "Neuroleptic Malignant Syndrome," and a host of other potential adverse effects. Appx15008; *see* Appx15009-15012; Appx15043-15056; Appx15107-15110.

### D.    CYP2D6 Genotype And Drug Therapy

Because a "large number of drugs [we]re known to be metabolized" by it, the CYP2D6 enzyme was the "most extensively" studied drug-metabolizing enzyme, and many artisans had correlated metabolizer *phenotype* for CYP2D6-mediated drugs with some CYP2D6 *genotypes* in order to inform drug dosage and potentially reduce negative side effects for poor metabolizers. *See* Appx38 (1:31-33, 1:58-60, 1:62-63); Appx5393. For example, one prior art patent application

13

described a "novel CYP2D6 [genotype] variant associated with the PM phenotype and method for assessing whether an individual possesses the variant prior to the administration of a drug." Appx38 (1:65–2:1). And another ("Huang") disclosed "methods for screening an individual for variants in the CYP2D6 gene … and tailoring the individual's drug therapy according to his or her phenotypic profile." *Id.* (2:4-8). That prior art reference also taught that "genetic polymorphisms" in CYP2D6 genotype may "impact the selection and dosages of drugs to be used" for a "poorly metabolizing individual" and claimed "a method of selecting dosage of a therapeutic drug" based on "[CYP]2D6 genotype." Appx20066-20067 (¶¶ 5, 10, 15), Appx20091 (cl. 31).

Doctors understand, however, that genotyping was designed only to be a potentially "more convenient" or more "rapid" way to attempt to predict a patient's potential drug tolerance. Appx43 (11:47); Appx20072 (¶¶ 65-66). They know that only phenotyping directly measures what the physician is trying to assess (ability to process a drug), that the effect of every CYP2D6 polymorphism on drug metabolism is not known or necessarily predictive in every circumstance, and that genotyping cannot predict an individual patient's response to any particular dose of a drug since many other factors affect metabolism beyond a single genotype. *See, e.g.*, Appx7015 (390-91); Appx7020-7021 (412-13). The '610 patentees, for instance, were only able to study "two CYP2D6 polymorphisms" that were

"previously associated with poor metabolizing status" (the CYP2D6G1846A polymorphism and the CYP2D6C100T polymorphism) and suggested that others "identify additional CYP2D6 genotypes that result in deceased enzymatic activity" through their own further studies.  Appx39-40, Appx43 (4:24-25, 6:35, 11:37-39). The '610 patentees also explained how "lower CYP2D6 activity in a CYP2D6 poor metabolizer may be due to factors other than [CYP2D6] genotype," such as "other mutations," attendant mutations in other genes correlated to certain CYP2D6 polymorphisms (e.g., "a CYP2D7 gene conversion in intron 1"), or concurrent treatment with drugs that inhibit "CYP2D6 activity."  Appx42 (9:48-56); *see* Appx7272 (996).   And it was known for iloperidone that there were multiple biotransformation pathways that control metabolism (and therefore phenotype), including O-demethylation, which was mediated by the CYP3A4 gene, not the CYP2D6 gene.[3] *See* Appx38-39 (1:29-34, 4:25-26, 4:37-39); Appx7.

Accordingly, it is widely accepted that CYP2D6 genotyping is not clinically effective for determining a patient's appropriate dose of most drugs, including iloperidone in particular.  *See, e.g.*, Appx7041-7042 (495-98).  Instead, physicians titrate to efficacy, and, when needed, use phenotyping tests to determine how a patient is actually processing a drug.  For example, Vanda's infringement expert,

_____

[3]   The P95 metabolite of iloperidone is not directly dependent on the CYP2D6 enzyme either.  The CYP2D6 enzyme creates the "metabolite P94, which is converted to P95 after some additional reactions."  Appx39 (4:40-41).

Dr. Preskorn, admitted that, while neither he nor the doctors he supervises have ever genotyped an iloperidone patient or ever even heard of one being genotyped, he has "phenotyped [patients taking some drugs] by using plasma level concentration[]" tests in his clinical practice. *See* Appx6933 (209-11); Appx6941-6942 (242-45); Appx6988 (282-84); Appx6990 (289-91). Dr. Wolfgang, one of the '610 patentees, also confirmed that he had no personal knowledge of any physician ever using CYP2D6 genotype to determine dosage for iloperidone in a clinical setting. *See* Appx7037 (477-78). And Vanda's Dr. Weiden, a member of its Schizophrenia Advisory Board, advised in published guidance that there "are no recommendations to test patients for genetic variants that result in poor metabolism from CYP2D6"—"[r]ather, clinicians simply need to be aware that this could be the source of inter-individual differences they see in iloperidone tolerability." Appx17934; *see* Appx6920 (158-60).

Objective industry members also confirm that CYP2D6 genotyping is not advisable or useful for iloperidone patients. For example, according to published guidance in "Genetics In Medicine" and by the industry-leading organization PharmGKB (an independent group at Stanford University Medical School that collects and summarizes expert consensus based on clinical evidence and peer-reviewed literature regarding genomics), the FDA's approved label for iloperidone "does not require or recommend genetic testing." Appx6985 (268-69); Appx6985-

16

6986 (270-75); Appx7045 (509-10); Appx18129; Appx19751; Appx17906.  And insurance providers, such as Medicare, Medicaid, Aetna, and Blue Cross/Blue Shield, uniformly refuse to cover CYP2D6 genotype testing for patients taking iloperidone because it is considered "experimental," "investigational, and not medically necessary in conjunction with selection of dosing."  Appx7041-7042 (493-98); *see* Appx7044 (506-07); Appx17699-17700; Appx18080-18081; Appx18093.

In contrast, for any rare instance in which that the FDA believes that risks require CYP2D6 genotyping to safely administer a drug, experts agree that it is recommended in the drug's label by a clear reference to "genotyping" and statement that it "should" be performed.  *See, e.g.*, Appx6983 (263-67); Appx7019 (406-07).  For example, the label for the drug Nuedexta states that, for "patients who may be at risk of significant toxicity due to quinidine" (the CYP2D6-mediated component of the drug) "*genotyping* to determine if they are PMs should be considered prior to making the decision to treat." Appx19735.[4]  The label for the drug Pimozide uses similarly direct language to recommend genotyping:  "At doses above 0.05 mg/kg/day, *CYP2D6 genotyping should be performed*." Appx17932.  As does the label for the drug Tetrabenazine: "Patients *should be genotyped for CYP2D6* prior to treatment with daily doses of tetrabenazine over 50

---

[4]    All emphases in this brief are added unless otherwise noted.

mg." Appx19838.  When such recommendations exist, insurance providers cover CYP2D6 genotyping for drug administration.  *See*  Appx7044  (505-08); Appx17880.

### E.    Laboratory Tests For Determining CYP2D6 Metabolizer Status

As both Roxane's and FANAPT's label state, numerous "[l]aboratory tests are available" for determining whether a patient is a poor metabolizer phenotype. *See* Appx15086; Appx15121.  Such tests include, for example:  (i) measuring the post-administration concentration in the blood of a CYP2D6-mediated drug (such as iloperidone or dextromethorphan, a relatively harmless CYP2D6-mediated compound), that drug's metabolites, or a "multi-drug phenotyping cocktail"; (ii) "biochemical assays to directly measure enzymatic activity"; and (iii) "monitoring transcription and translation levels."   Appx43 (11:55-61); *see* Appx6916-6917 (144-46);   Appx6933-6934   (211-12,   214-15);   Appx6989-6990   (285-89); Appx7020-7022 (409-10, 411-13, 419); Appx17848; Appx17855; Appx19769-19771; Appx19829; Appx19832; Appx16197.  Some genotype tests also attempt to identify patients with CYP2D6 polymorphisms that have been associated with certain phenotype statuses, but do not definitively determine phenotype status, do not cover all potential polymorphisms, and do not assess all the factors that might lead to CYP2D6 poor metabolizer status.  *See, e.g.*, Appx7; Appx 39 (4:37-38); Appx17350 (CYP2D6 genotype test addresses only "14 Variants"); Appx17381

18

("eight alleles").   As discussed, such genotype tests for iloperidone patients in particular are experimental, not recommended, and not covered by insurers.  *See supra* II.D.

## III.   ROXANE'S PROPOSED LABEL

Roxane's Proposed Label is, in all relevant respects, identical to the FANAPT label that has been used by thousands of physicians for over six years to administer millions of iloperidone doses.   *Compare* Appx15066-15102 *and* Appx15103-15124, *with* Appx15001-15020 *and* Appx15041-15065; *see also* 21 C.F.R. § 314.94(a)(8)(iv); Appx6919 (154).

Since CYP2D6 genotyping for iloperidone patients is "experimental," "investigational, and not medically necessary in conjunction with selection of dosing," the Proposed Label does not recommend genotyping for patients receiving iloperidone or using CYP2D6 genotype to select the appropriate dosage of iloperidone.  *See* Appx7041-7042 (493-98): Appx7044 (506-07); Appx7043 (504). The label does not discuss CYP2D6 "genotype," recommend genotyping to determine metabolizer status, or recite the word "gene" or "genotype."  *See* Appx15103-15124; Appx7019 (406).  Instead, consistent with accepted practice, the label mandates that iloperidone "must be titrated slowly from a low starting dose" to an "effective" or "target dosage" of "12 to 24 mg/day administered twice daily," with a "maximum recommended dose is 12 mg twice daily (24 mg/day)."

Appx15103, Appx15105. Such titration does not require or depend on any special information (such as a patient's genotype) and mandates that physicians attain the lowest dose necessary to achieve efficacy—not a dosage correlated to a particular genotype. *See* Appx6996 (316); Appx7001 (336); Appx7018 (401-04). Indeed, even Dr. Alva titrated the dose of iloperidone to 24 mg/day for the one genotypic CYP2D6 *poor* metabolizer he identified (far beyond the claimed dosage range for such patients) and chose an allegedly infringing dose for a non-poor metabolizer based on and because of patient "symptoms," not genotype. *See* Appx7002 (340); Appx7000 (329-332).

The Proposed Label also discusses how some individuals "lack the capacity to metabolize CYP2D6 substrates and are classified as poor metabolizers (PM), whereas the rest are intermediate, extensive or ultrarapid metabolizers." Appx15121. After describing those four drug metabolism *phenotypes*, the label states, as it has since at least 2010, that: (i) "PMs of CYP2D6" (particular *phenotypes*, not genotypes) "have higher exposure to iloperidone" (a measure of *phenotype*, not genotype); (ii) "PMs" (particular *phenotypes*, not genotypes) "should have their dose reduced by one-half"; and (iii) "[l]aboratory tests are available to identify CYP2D6 PMs" (again, particular *phenotypes*, not genotypes). Appx15121; *see* Appx6997 (318); Appx6919 (154); Appx15043, Appx15061. The label also states that "dose should be reduced by one-half" for patients taking

"strong CYP2D6 inhibitors" and for patients taking "strong CYP3A4 inhibitors" (two other factors that affect iloperidone metabolizer *phenotype* status). Appx15105; *see also* Appx15116-15117; Appx42 (9:48-56).

## IV.    THE '610 PATENT

The '610 patent claims priority to a provisional application filed September 30, 2004, issued on November 19, 2013, and expires on November 2, 2027. Appx3.  It is directed to the alleged "discovery that treatment of a patient, who has lower CYP2D6 activity than a normal person, with a drug that is pre-disposed to cause QT prolongation and is metabolized by the CYP2D6 enzyme," i.e., iloperidone, "can be accomplished more safely by administering a lower dose of the drug than would be administered to a person who has normal CYP2D6 enzyme activity."  Appx38 (2:15-21).

### A.    The Asserted Claims

During the first five years of prosecution, none of the '610 claims included any specific dosage of iloperidone for poor metabolizers.  *See* Appx7052 (538-40). On May 24, 2010, based on studies performed by Novartis that were not disclosed or discussed in the '610 patent, the FDA requested that the approved FANAPT prescribing label add the statement that "PMs of CYP2D6 … should have their

21

dose reduced by one-half."[5]  Appx15260; *see* Appx7052 (539).  The '610 patentees

then amended the claims to include the specific claimed dosage range for poor

metabolizers while relying on the new language requested by the FDA to support

the "criticality of th[at] range."  Appx18067, Appx18072; *see* Appx7052 (539-40)

("This dose reduction seems to be motivated by the fact that FDA figured out that

poor metabolizers should have a dose reduction from 24 to 12, and then the

inventors amended the claims.").

Vanda asserted claims 1-9, 11-13, and 16 of the '610 patent against Roxane.

As issued, representative independent claim 1 of the '610 patent recites:

> A method for treating a patient with iloperidone, wherein the patient is suffering from schizophrenia, the method comprising the steps of:
>
> determining whether the patient is a CYP2D6 poor metabolizer by:
>
>> obtaining or having obtained a biological sample from the patient;
>>
>> and performing or having performed a genotyping assay on the biological sample to determine if the patient has a CYP2D6 poor metabolizer genotype; and

---

[5]  Dr. Polymeropoulos, one of the '610 patentees, admitted that the FDA's dose reduction statement for the FANAPT label was supported by analysis of data from Novartis Study 0104 conducted in the 1998-1999 timeframe, not any data or study included in the '610 patent specification.  *See* Appx6905 (99); Appx6913-6914 (132-34); Appx7052 (537); Appx7274 (1001-03); Appx17980-17982; Appx18373-18374.

if the patient has a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount of 12 mg/day or less, and

if the patient does not have a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount that is greater than 12 mg/day, up to 24 mg/day,

wherein a risk of QTc prolongation for a patient having a CYP2D6 poor metabolizer genotype is lower following the internal administration of 12 mg/day or less than it would be if the iloperidone were administered in an amount of greater than 12 mg/day, up to 24 mg/day.

Appx46 (cl. 1).

Asserted independent claims 9 and 13 include elements nearly identical to claim 1, although claim 9 eliminates the final "wherein" clause and claim 13 incorporates the QTc prolongation risk into the "determining" step. *See* Appx46 (cls. 9, 13). All other asserted claims are dependent and include the additional limitations of performing a particular type of amplified genomic sequencing for the CYP2D6G1846A ("1846A") or CYP2D6C100T ("100T") polymorphisms (claim 2), administering iloperidone to poor metabolizers with the specific genotype 1846A (AA), 1846A (AG), 100T (TT), or 100T (CT) (claims 3-6, 11), and administering 6 mg of iloperidone twice daily to CYP2D6 poor metabolizer genotypes or patients at risk for iloperidone-induced QT prolongation (claims 7, 8, 16).

### B.    The Claimed Methods Require Selecting And Administering Different Dosage Ranges Of Iloperidone Based On And Because Of CYP2D6 Genotype Status

By their plain language, the claims require assessing CYP2D6 genotype and then—based on and because of the genotype determined—selecting and administering a dose within the claimed ranges:  a physician must "obtain[] a biological sample," determine genotype, and "*if* the patient has a CYP2D6 poor metabolizer genotype, *then*" administer "12 mg/day or less, *and if* the patients does not have a CYP2D6 poor metabolizer genotype, *then*" administer "greater than 12 mg/day, up to 24 mg/day."   Appx46 (cl. 1); *see, e.g.*, Appx6913 (130-31), Appx7016-7017 (396-98); Appx7374-7375; Appx7445-7448.  Any other reading would vitiate the "if … then" mandate of the claims (along with the purpose of more safely treating patients by reducing QT prolongation risk, *see* Appx46 (cl. 1) ("wherein a risk of QTc prolongation … is lower")).

In the specification, the patentees repeatedly confirm that their "present invention" requires "more safely" administering iloperidone to CYP2D6 poor metabolizers "*based on the patient's CYP2D6 genotype*."   Appx38 (2:19, 2:34-36, 2:49-50); *see* Appx42 (9:32-34) ("[P]atients can be more safely treated with iloperidone if the dose of iloperidone is adjusted *based on the CYP2D6 genotype of each patient*."); Appx43 (11:22-24) ("[T]he dose of iloperidone administered to a patient may be decreased *based upon the patient's CYP2D6 genotype alone*.");

Appx43 (11:25-28) ("*[I]f a patient has a 'poor metabolizer' genotype* … the patient's dose of iloperidone may be reduced ….").

And to obtain allowance during prosecution, the patentees repeatedly and consistently argued that the claimed methods were allowable over prior art that allegedly failed to "teach a method" in "which the effective amount of iloperidone is *determined based on genotype*."  Appx5659; *see* Appx5373-5374; Appx5658 ("Selective *reduction of dosage* … *based on a patient's CYP2D6 genotype* is not taught by [the prior art].")); Appx5659 (the claimed methods require "the selective *adjustment of dosage* of [iloperidone] *based on CYP2D6 genotype*"); Appx5662 (prior art does not teach "administering … *different dosages depending upon the patient's CYP2D6 genotype*"); Appx5661 (prior art does not teach that "dosages of the drug should be *determined ... based on CYP2D6 metabolizer status*").

The district court specifically relied on the required dosage adjustments to find that the patents were not proven invalid here.  For example, to find the claims eligible for patenting under § 101, the court relied on the fact that they required use of a "genetic test" for CYP2D6 genotype to determine the "dosage adjustment recited in the claims."  Appx20.  And in finding the claims not proven obvious, the court relied on the notion that it allegedly would have been "unpredictable whether any *dosage adjustment* would be needed *for CYP2D6 poor metabolizers*."  Appx14; *see* Appx15.

25

### C. The Claimed Methods Require Administration Of Iloperidone At Specific Dosage Ranges To Both CYP2D6 Poor And Non-Poor Metabolizer Genotypes

By their plain language, the asserted claims require a treating doctor to administer iloperidone in different dosage ranges for *both* poor and non-poor CYP2D6 metabolizer genotypes based on and because of their genotype status. *See* Appx7374-7375; Appx7444. The use of the conjunction "and" to join the "if … then" clauses containing the recited dosage requirements incorporates *both* conditions into the claimed method—treating patients of one CYP2D6 genotype in the claimed dosage range of iloperidone is necessary, but not sufficient, to practice the claimed method. *See, e.g.*, *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376 (Fed. Cir. 2008) (the "conjunction 'and'" means both); *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1331 (Fed. Cir. 2001) ("or" has "ordinary meaning as stating alternatives"; "and" means both); *cf. Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1312 (Fed. Cir. 2002) ("or" is not "and" so claimed method satisfied if "any one" of three alternatives is performed).

That outcome from the use of the conjunction "and" in the claims is the straightforward product of logic. For example, if a claimed method for sorting blocks by color read—"if" red "then" place in Bucket 1, *"and* if" blue, "then" place in Bucket 2—placing a red block in Bucket 1 would not practice the claimed

method.  Placing a red block in Bucket 1 does not reveal how a blue block would have been sorted, so does not show that the sorting restriction for blue blocks was part of the sorting method practiced—red blocks must go in one bucket, *and* blue blocks must go in another bucket.  The same logic applies to the claimed methods here.  Treating just one of the recited CYP2D6 genotypes with the respective claimed dosage range does not reveal how the other genotype would have been treated with the other claimed dosage range, so does not show that the dosage range for each genotype was part of the treatment method employed—one genotype must get one dosage, *and* the other genotype must get the other dosage.

The prosecution history also confirms that the claimed methods require the administration of iloperidone at the claimed dosage ranges for both poor *and* non-poor metabolizers.  The patentees expressly added that requirement to permit allowance.  During examination, the patentees attempted to claim a dosage range for just CYP2D6 poor metabolizers.  *See* Appx5650.  The Examiner rejected that attempt on several grounds, and the patentees traversed by amending the claimed methods to require dosage selection because of genotype for non-poor metabolizers too.  *See* Appx5650.  As the patentees explained, the additional limitations specified "what steps must be performed to meet the requirements of claim 1, and how 'treating' is achieved by the claimed method."  Appx5655.  And the patentees argued that the requirement for selecting specific doses for poor *and*

non-poor genotypes overcame prior art that the Examiner relied on to reject the claims under § 102 and § 103, which supposedly did not "expressly or inherently describe administering about 24 mg/day of iloperidone to a patient having normal CYP2D6 enzyme expression *and* administering about 12 mg/day of iloperidone to a patient who is determined based on CYP2D6 genotype to be a CYP2D6 poor metabolizer." Appx5658.

## V.    THE DISTRICT COURT'S OPINION

The district court held that Roxane would induce infringement of the asserted '610 claims and did not prove them to be invalid. Appx13-30 (2016 WL 4490701, at *6-16). The court found, however, that "there are one or more substantially non-infringing uses for Roxane's generic iloperidone that preclude[d] a finding of contributory infringement." Appx30. The court refused to grant an injunction under § 271(e)(4)(A) because "the '610 Patent did not issue" until after the filing date of Roxane's ANDA and, "[u]nder § 271(e)(2), it is an act of infringement to submit an ANDA for 'a drug claimed in a patent … not a provisional patent application or a patent-pending.'" Appx30 (citation omitted). Nevertheless, the court used its "general equitable power … based upon the finding of patent infringement under § 271([b])" to enjoin the FDA from approving and Roxane from manufacturing, using, selling, or importing the ANDA product "prior to the expiration of the '610 Patent." Appx30, Appx33; *see* Appx30-32.

# SUMMARY OF THE ARGUMENT

(1)    Vanda failed to prove the requisite direct infringement or specific intent necessary to sustain the district court's finding of induced infringement. Roxane's Proposed Label states generally that "laboratory tests are available" but does not specifically mention or recommend genotyping tests.   And while Roxane's label states that poor metabolizers—a phenotype, not genotype—should have their dose reduced by half, that statement does not instruct performance of a genotyping test.  Objective evidence confirms that point.  Dr. Alva's testimony did not establish direct infringement; the accused label language does not evince a specific intent to infringe by recommending physicians perform each and every step of the claimed methods; and the universe of non-infringing uses preclude a finding of specific intent as a matter of law.

(2)    The asserted claims are invalid under § 101.  They are directed to the natural relationship between iloperidone, CYP2D6 metabolism, and QT prolongation, and add nothing inventive to those natural laws and phenomena.

(3)    The asserted claims are invalid for lack of written description because nothing in the '610 patent demonstrates possession of the claimed dosage ranges for poor and non-poor CYP2D6 metabolizer genotypes.

(4)    The court's injunctions must be dissolved.   The court's general equitable power did not authorize it to enjoin the FDA, and there was no factual or legal support for the injunction against Roxane's ANDA product.

## ARGUMENT

### I.    STANDARD OF REVIEW

Following a bench trial, legal conclusions are reviewed *de novo* and factual findings are reviewed for clear error.  *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1303 (Fed. Cir. 2015).

### II.    ROXANE WILL NOT INDUCE INFRINGEMENT OF THE ASSERTED CLAIMS

The district court's finding of induced infringement was clearly erroneous. Inducement, even by way of a drug label, requires proof of direct infringement and specific intent.  But Vanda proved neither.

It relied entirely on Dr. Alva's treatment of one patient (a non-poor metabolizer) to establish direct infringement—no one claimed to have treated a poor metabolizer in an infringing manner.  Dr. Alva, however, admitted that he waited almost a year-and-a-half to administer the claimed dosage to that patient after obtaining genotype results that would have mandated the dosage specified in the claims (greater than 12 mg/day) and that he ultimately administered that high dosage to the patient based on and because of increasing symptoms, not genotype.

And, as confirmed by leading publications and industry organizations, the

accused label language plainly does not recommend or encourage physicians to genotype patients—the word "genotype" does not even appear in the label. That is why insurance companies consider such testing "experimental," "investigational, and not medically necessary." Appx7041-7042 (493-98); Appx7044 (506-07). That is also why a member of Vanda's Schizophrenia Advisory Board advised that there "are no recommendations to test patients for genetic variants that result in poor metabolism from CYP2D6." Appx17934; *see also supra* Statement Of The Case II.D.

The error in the district court's finding of induced infringement is clear for another very simple reason. FANAPT has been on the market for six years and administered millions of times, yet Vanda could identify no more than one alleged instance of a physician practicing the claims. As a matter of logic, Roxane's use of the same label language from FANAPT could not prove specific intent to encourage physicians to repeat that one aberrant act. And the infinitesimal rate of potential infringement is nowhere near the 2.1% rate this Court held in *Warner-Lambert*, insufficient to support a finding of specific intent as a matter of law. *See* 316 F.3d at 1365. The district court's judgment of induced infringement should be reversed.

### A.    Induced Infringement Requires Proof Of Direct Infringement And Specific Intent

Induced infringement requires more than the mere "knowledge that an

unaffiliated, third party may infringe" a patent and more than mere "instructions [that] describ[e] the infringing mode." *Takeda*, 785 F.3d at 630-31.  It demands proof that a defendant will "actively and knowingly aid and abet" infringement of a patent by showing (1) direct infringement and (2) that the alleged infringer "possessed specific intent to encourage another's infringement"—two showings absent here.  *DSU*, 471 F.3d at 1306.  Indeed, even "in the Hatch-Waxman Act context," where "it is alleged that [a] drug label induces infringement by physicians," the "existence of direct infringement by physicians" is "necessary to find liability for induced infringement."  *Takeda*, 785 F.3d at 631; *see also Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) ("specific instances of direct infringement" required).

Moreover, "where, as here, it is alleged that the drug label induces infringement by physicians," the patentee bears the burden to prove that the label directly "encourage[s], recommend[s], or promote[s]" the performance of each step of the claimed method.  *Takeda*, 785 F.3d at 631.  Thus, to rely on a drug label to prove specific intent, the "instructions" in the label for physicians must be "unambiguous on [their] face and encourage or recommend infringement" so that "the product labeling that [an ANDA defendant] seek[s] would inevitably lead some physicians to infringe."  *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, No. 2015-2067, 2017 WL 117164, at *8 (Fed. Cir. Jan. 12, 2017).

32

### B.    Vanda Failed to Prove Direct Infringement

The district court relied on two findings to establish direct infringement:  (1) "Roxane's Proposed Label "satisfies claims 1-9, 11-13, 16 of the '610 Patent as construed" and (2) Dr. Alva "identified a patient for whom he exceeded 12 mg/day of iloperidone only after determining through genotyping that that patient was not a poor metabolizer."    Appx25-27.    Neither, however, is proof of direct infringement—a deficiency that independently mandates judgment of noninfringement as a matter of law.

### 1.    Roxane's Proposed Label Cannot Directly Infringe The Asserted Claims

When discussing direct infringement, the district court appeared to conclude that "Roxane's Proposed Label satisfies claims 1-9, 11-13, 16 of the '610 Patent as construed."    Appx25.    But neither Roxane nor Roxane's Proposed Label could directly infringe the asserted *method* claims under settled law.  *See, e.g.*, *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1221 (Fed. Cir. 2014) ("[I]nstructions to perform a patented method do[] not infringe … under § 271(a)."); *Warner-Lambert*, 316 F.3d at 1363 & n.7 (pharmaceutical suppliers do not practice administration steps of a claimed method necessary for direct infringement).

### 2.    Dr. Alva Never Practiced The Asserted Claims

To practice all of the claimed methods, a physician must at least (i) administer a dose of iloperidone in each respective claimed range for *both* poor and

non-poor CYP2D6 genotype patients and (ii) select that dose *based on and because of* CYP2D6 genotype. *See supra* Statement Of The Case IV.B-C. But Dr. Alva, whose testimony was the primary factual basis for the district court's finding of direct infringement, (*see* Appx26-27), did neither.

First, Dr. Alva admitted that he administered an allegedly infringing dose to only *one* of the two classes of claimed CYP2D6 genotypes—a *non-poor* metabolizer. *See* Appx6998-6999 (322-26). Dr. Alva never administered an allegedly infringing dose to a *poor* metabolizer (the critical population the claimed methods are supposedly designed to protect from QT prolongation, *see supra* Statement Of The Case IV.A). To the contrary, Dr. Alva readily admitted that he dosed the only poor metabolizer he identified after genotyping with 24 mg/day of iloperidone, *double* the maximum claimed dosage for such patients. *See* Appx7000 (329-32). Dr. Alva's treatment method was thus the diametrical *opposite* of the claimed method—he administered the doses of iloperidone within the claimed range for non-poor metabolizers to *both* non-poor *and* poor CYP2D6 genotypes, not "different dosages depending upon the patient's CYP2D6 genotype."[6] Appx5662. Dr. Alva did not apply the genetic testing in the "highly

---

[6] In other words, for the example discussed *supra* Statement Of The Case IV.C, Dr. Alva was placing both red and blue blocks in the *same* bucket.

specified way" the district court itself found the claims required when holding them valid under § 101. Appx20.

Second, Dr. Alva did not select and administer his single allegedly infringing dosage of iloperidone based on and because of CYP2D6 genotype. He unequivocally admitted that he selected that dosage for one non-poor metabolizer approximately a *year-and-a-half* after CYP2D6 genotyping and only because the patient's "*symptoms*"—*not genotype*—"required an increase" past 12 mg/day. Appx7002 (340); *see* Appx6998-6999 (322-26); Appx7017 (397). The district court's determination that such actions satisfy the asserted claims renders meaningless the "if … then" language of the claims. That error is underscored by the court's reliance on the lower dosage for poor metabolizers (that Dr. Alva never treated in an infringing manner) for purposes of finding the asserted claims valid. *See, e.g.*, Appx14 (recounting Vanda's argument that it would be "unpredictable whether any dosage adjustment would be needed for CYP2D6 poor metabolizers"); Appx15 (discussing such "unpredictability"); Appx20 (finding inventive concept in use of a "genetic test" for CYP2D6 genotype to determine the "dosage adjustment recited in the claims").

Despite his aberrant use of genotyping for some iloperidone patients (just four of eighteen, *see* Appx7000 (332)), Dr. Alva obviously understood, as everyone else in the field knows, that iloperidone dosage must be titrated to

35

efficacy as the label instructs, not chosen based on and because of CYP2D6 genotype. *See, e.g.*, Appx7017 (397); *see also infra* II.C.1.a-b. Even Vanda's *infringement* expert, Dr. Preskorn, admitted that neither he nor any doctor he supervised had ever "genotyped anybody on iloperidone" in a clinical setting. Appx6941-6942 (244, 246). And Vanda itself told the European Medicines Agency that FANAPT had been used for years in the U.S. "in the ***absence*** of … CYP2D6 genotyping." Appx6915-6916 (139-41); *see* Appx6986; Appx17663.

The district court's finding of direct infringement was therefore little more than an *ipse dixit* conclusion that ignored the clear weight of the evidence. The lack of evidence of direct infringement alone justifies entry of judgment in Roxane's favor.

## C.    Vanda Failed to Establish Inducement

In addition to the lack of proof of direct infringement here, there was no basis for the district court to find that Roxane's Proposed Label induces performance of the method steps with the requisite "specific intent" to induce such infringement. *DSU*, 471 F.3d at 1305. Vanda failed to prove with preponderant evidence that the accused label language would "encourage" or "recommend" a direct infringer (a psychiatrist or other physician) to perform each step of the claimed methods. *Takeda*, 785 F.3d at 631.

36

### 1.     Roxane's Proposed Label Does Not Recommend Prescribers Perform Each And Every Step Of The Asserted Claims

Contrary to the district court's curt conclusion, the accused label language does not "encourage, recommend, or promote" that doctors should practice each and every element of the claimed methods. The label does not recommend that prescribers: (1) genotype iloperidone patients; (2) select and administer the claimed dosage ranges for *both* CYP2D6 poor and non-poor metabolizer genotypes *based on and because of* CYP2D6 genotype; (3) obtain a biological sample for genotyping a patient; or (4) perform any additional step required by the dependent claims.

#### a.     Roxane's Proposed Label Does Not Recommend That Prescribers Perform Genotyping

The district court determined that the label "recommends that practitioners perform or have performed a genotyping assay to determine whether patients are CYP2D6 poor metabolizers. JX-13 at § 12.3." Appx25. But the lone evidence cited by the court, § 12.3 of the label, merely states that "[l]aboratory tests are available to identify CYP2D6 PMs." Appx15086; Appx15121. Even if the phrase "laboratory tests" exclusively referred to "genotyping tests" (which it does not), simply stating that such tests "are available," Appx15121, does not recommend their performance. Experts for both sides testified that such language merely informs physicians that laboratory tests exist—not that they are recommended.

Appx6945 (257-59) (Dr. Preskorn admitting that the phrase "laboratory tests are available" means that "laboratory tests exist to test for PM status"); Appx7043 (503-04) (Dr. Ratain explaining how "[t]he label does not recommend genotyping"). "Merely 'describ[ing]' … an infringing mode is not the same as 'recommed[ing],'" and "vague label language cannot be combined with speculation about how physicians may act to find inducement." *Takeda*, 785 F.3d at 631-32 (citation omitted). Indeed, doctors understand that genotyping is of no clinical value for treating patients with iloperidone, which is why, in practice, they review a patient's history and titrate to an effective dose while observing symptomatology—just like even Dr. Alva did here. *See, e.g.*, *supra* II.B.2; *supra* Statement Of The Case, II.C-E; Appx6995 (312); Appx6997-6998 (320-21); Appx7000 (329-32); Appx7002 (340); Appx7015 (390-92); Appx7019 (408); Appx17686-17687; Appx17845. The district court even found that, "as a practical matter, doctors may not rely on genotyping tests because of the resources and time they require." Appx28.

Put simply, the salient inquiry is whether the label "encourage[s], recommend[s], or promote[s] infringement." *Takeda*, 785 F.3d at 631. Here, objective evidence answers that question with an unambiguous "no." Dr. Weiden, a member of Vanda's Schizophrenia Advisory Board, published an article regarding iloperidone that explicitly advised there "are *no recommendations to test*

patients for genetic variants that result in poor metabolism from CYP2D6." Appx17934; *see* Appx6920 (158-60). The NIH-sponsored organization PharmGKB, which summarizes recommendations in drug labels with regard to genetic testing, concluded that the approved iloperidone labeling "does not require *or recommend* genetic testing." Appx18129; Appx19751; *see* Appx6984-6985 (268-69); Appx7045 (509-10). Authors conducting an independent and blinded review of approved drug labels agreed. *See* Appx6985-6986 (271-75); Appx17906-17907. Vanda admitted to the European Medicines Agency that FANAPT had been used for years in the U.S. "in the ***absence*** of … CYP2D6 genotyping." Appx6915-6916 (139-41); *see* Appx6986; Appx17663. And the trial record indisputably showed that insurers (including Medicare and Medicaid) will not cover genotyping for iloperidone treatment because it is considered "experimental," "investigational, and not medically necessary in conjunction with selection of dosing." Appx7041-7042 (493-98); Appx17699-17700; Appx18080-18081; Appx18093.

Moreover, when genotyping tests are recommended, the FDA says so explicitly with label language such as "CYP2D6 genotyping should be performed"—it does not use ambiguous language such as "laboratory tests are available." Appx17932; *see supra* Statement Of The Case, II.D. That is why, out of millions of doses of FANAPT administered according to the accused label

language, Vanda could only identify just *one* instance in which a physician allegedly practiced the claims and only four instances when iloperidone patients had even been genotyped in the first place (all aberrant activities by Dr. Alva, who never treated a poor metabolizer in accordance with the claims). *See* Appx6999-7000 (329-32).

Inducement by a drug label requires "instructions [that] are unambiguous on their face and encourage or recommend infringement." *Eli Lilly*, 2017 WL 117164, at *8. Vanda adduced no evidence satisfying that burden—the only evidence directed to that inquiry shows that objective observers agree that the accused label language does not "recommend" performance of the genotyping step recited in the asserted claims. That alone merits reversal and entry of judgment in Roxane's favor.

> b.    *Roxane's Proposed Label Does Not Recommend Prescribers Determine And Administer The Claimed Dosage Ranges To Both CYP2D6 Poor And Non-Poor Metabolizer Genotypes Based On And Because Of CYP2D6 Genotype*

Nothing in the Proposed Label recommends any specific dose (i) *based on and because of* CYP2D6 genotype for (ii) *both* poor and non-poor metabolizers.

First, as repeatedly established at trial, physicians follow the mandate in the accused label language to titrate to efficacy rather than select a dose based on and because of genotype—just as Dr. Alva did and insurers, industry leaders, and Dr.

Weiden (from Vanda's Schizophrenia Advisory Board) believe is appropriate. *See supra* II.B.2; *supra* Statement Of The Case II.D; Appx6996-6997 (316-18), Appx7012-7013 (379-81), Appx7016-7018 (394-98, 400-03); Appx15069 (instructing that physicians "must" titrate); *see also* Appx7048 (522-23) ("[W]hen you administer a drug, you titrate to efficacy, you titrate to toxicity, that's just basic."). Indeed, the "target" and "maximum recommended dose" of iloperidone listed in the label are entirely untethered to any particular CYP2D6 genotype. Appx15066, Appx15069. And even Dr. Preskorn, Vanda's *infringement* expert, admitted that he and the doctors he supervise have *never* genotyped an iloperidone patient in clinical practice to attempt to determine an appropriate dosage. *See* Appx6990 (289).

The Proposed Label merely states generally that "PMs should have their dose reduced by one-half." Appx15086; *see also* Appx15070. That statement does not even recite any specific dosage to be administered—it refers only to the dosage *already selected* for a poor metabolizer through the mandated titration process. *See* Appx15086; *see also* Appx15069 (instructing that physicians "must" titrate to the proper effective dose of iloperidone).

Second, even assuming that such a statement somehow encourages doctors to select and administer the claimed 12 mg/day or less of iloperidone to *poor* metabolizers based on and because of some undisclosed CYP2D6 genotype, there

is absolutely nothing in the label that directs doctors to select and administer iloperidone doses of "greater than 12 mg/day" to CYP2D6 *non-poor* metabolizers based on and because of a genotyping test.  Appx46 (cl. 1).  The label's target dosage range *includes* 12 mg/day, a normal dose the claimed methods oddly (but expressly) *exclude* from the dosage range for non-poor metabolizers.  *See supra* Statement Of The Case III.  Accordingly, Roxane's proposed label cannot induce performance of administering a dose of *greater than 12 mg/day* to a non-poor metabolizer.  Indeed, Dr. Alva admitted that 12 mg/day was a standard dose and was, in fact, the dose he administered for approximately *eighteen months* after genotyping the one non-poor metabolizer he supposedly treated in an infringing manner.  Appx6998-6999 (321-26); *see also* Appx7000 (329-32); Appx7002 (340).

In addition, even if the proposed label somehow instructs the administration of the claimed doses based on and because of genotype, neither Dr. Alva nor any of Vanda's other experts ever suggested that it induced them to actually practice the claimed methods—a fundamental failure of proof.  For example, Dr. Alva admitted that he administered a supposedly infringing amount of iloperidone only because of a concern about efficacy, not genotype.  Appx7002 (340); *see* Appx6998-6999 (321-26); *see* Appx7017 (397).  And Dr. Preskorn admitted that he had no "historical" evidence that the label language induced doctors to perform genotyping—just his subjective litigation-induced opinion that he never actually

42

followed in practice.  Appx6941-6942 (244-46).

      c.      *Roxane's Proposed Label Does Not Recommend Prescribers Obtain A Biological Sample For Genotyping*

The district court never addressed or explained how Roxane's Proposed Label recommended physicians to take biological samples to perform CYP2D6 genotyping, as required by all asserted claims.  There is no finding addressing that step of the claimed methods in the court's opinion.  That failure, at minimum, requires remand, but the record is clear that there is no such recommendation. Vanda did not even attempt to identify one.  *See* Appx7312.  Indeed, the accused label language recommends obtaining a biological sample for monitoring of blood potassium levels in certain patients, but never directs the same for assessing CYP2D6 genotype—it never even mentions "genotype."  *See* Appx6944 (255-56), Appx7043 (504); Appx15107.

      d.      *Roxane's Proposed Label Does Not Recommend Performance Of Any Of The Additional Steps And Limitations Of The Dependent Claims*

The district court failed to make any requisite factual finding that Roxane's Proposed Label will induce prescribers to practice the limitations added by the dependent claims.  The court never addressed: (i) the specific genotyping assay required by claims 2-6 and 8; (ii) the specific genotypes required by claims 3-6 and 11; and (iii) the specific dosing regimens required by claims 7, 8, 12, and 16.  *See*

Appx25-28.[7]   Vanda also failed to present any adequate evidence that such elements would be practiced.   *See* Appx7380.   Accordingly, judgment of noninfringement for at least the dependent claims should be entered.   *See, e.g.*, *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 947-48 (Fed. Cir. 2016) (all elements of a method claim must be practiced to infringe, even if there are multiple actors performing each element).

### 2.   Extraordinary Substantial Non-Infringing Uses Here Preclude A Finding Of Specific Intent As A Matter Of Law

Even assuming there are some instructions in the Proposed Label to perform some steps of the claimed methods, the extraordinary non-infringing uses of iloperidone foreclose any finding of specific intent as a matter of law.  The district court appropriately found that Roxane had established a number of substantial and non-infringing uses that are entirely consistent with the labeling.   Appx30.  Millions of doses of FANAPT accompanied by the accused label language were administered for over six years, yet Vanda has only identified doses given to (at most) just *one* patient as potentially practicing the claimed methods during that

---

[7]   The district court also failed to find or explain how the accused label instructs prescribers (as required by claims 1-8, 13, and 16) to administer the claimed dosage range to a CYP2D6 poor metabolizer genotype patient because of or to lower the "risk of QTc prolongation."   When discussing the risk of QT prolongation, the label only requires "[c]aution" for patients taking CYP2D6 inhibiting drugs and others with "reduced activity of CYP2D6"—not any particular dose.  Appx15071.

period.[8]  Contrary to the district court's belief that such substantial non-infringing uses are irrelevant to inducement, Appx28-29, that infinitesimal rate of alleged infringement, well below 0.01% by any measure, forecloses a finding of specific intent as a matter of law:  "Especially where a product has substantial non-infringing uses," such as at a "97.9%" rate (far *lower* than the rate of non-infringing uses here), "intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent."  *Warner-Lambert*, 316 F.3d at 1365.  That conclusion is also the straightforward product of logic:  Roxane could not specifically intend for its label to induce acts of infringement that identical language in the FANAPT label failed to induce for millions of doses administered over six years.  Any other conclusion would be nonsensical, particularly because there is no evidence to show that the one alleged act of infringement Vanda identified would ever be repeated.  The district court's finding of induced infringement should therefore be reversed.

---

[8]  All of Vanda's experts besides Dr. Alva admitted that they had never practiced the claimed methods and that they had never even heard of an iloperidone patient being genotyped in a clinical setting.  *See supra* Statement Of The Case II.D.

### 3. The Absence Of Evidence Of Culpable Specific Intent And The Objective Statements In The Public Domain Concerning The FANAPT Label Foreclose A Finding Of Specific Intent

The district court acknowledged that specific intent was required for induced infringement but made no finding (and cited no evidence to support finding) that Roxane specifically intended to induce infringement. *See* Appx23-27. Its entire analysis was limited to three sentences reciting background legal principles followed by an *ipse dixit* conclusion that Roxane's Proposed Label induces infringement. *See* Appx28-29. The court never even made the predicate finding it believed to be necessary—that "the proposed label instructs users to perform" *every* step of the claimed methods. Appx28. That alone merits judgment in Roxane's favor.

Moreover, there is nothing in the record from which "to infer … an affirmative intent to infringe." *Eli Lilly*, 2017 WL 117164, at *7. The plethora of objective evidence from the public domain uninfluenced by litigation uniformly indicates that the accused label language does not recommend genotyping or determining iloperidone dosage based on and because of CYP2D6 genotype. *See supra* II.C.1.a-b; *supra* Statement Of The Case II.D, III. Even Vanda's schizophrenia consultant admitted publicly (before this litigation began, of course) that there are "*no recommendations* to test [iloperidone] patients for genetic variants that result in poor metabolism from CYP2D6." Appx17934; *see*

46

Appx6920 (158-60). Vanda's post-hoc, litigation-induced arguments cannot overcome the clear weight of the evidence here that objectively demonstrates the lack of any specific intent by Roxane to induce infringement of the '610 patent.

## III.   THE ASSERTED CLAIMS ARE INVALID UNDER § 101

The asserted claims are invalid under § 101 as a matter of law because they are directed to "laws of nature" or "natural phenomena" and do not recite an additional "inventive concept"—something more than "well understood, routine, conventional activity previously engaged in by scientists who work in the field." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014); *Myriad*, 133 S. Ct. at 2116; *Mayo*, 566 U.S. at 72-80; *see also* Appx7382-7389; Appx7450-7452; Appx7046-7053 (516-41).

### A.   The Asserted Claims Are Directed To A Natural Relationship Between Iloperidone, CYP2D6 Metabolism, And QT Prolongation

The '610 patent is directed to the alleged "*discovery* that treatment of a patient, who has lower CYP2D6 activity than a normal person, with a drug that is pre-disposed to cause QT prolongation and is metabolized by the CYP2D6 enzyme," i.e., iloperidone, "can be accomplish[ed] more safely by administering a lower dose of the drug than would be administered to a person who has normal CYP2D6 enzyme activity." Appx38 (2:15-21). The district court correctly held that such a "discovery" is nothing more than a natural "relationship between iloperidone, CYP2D6 metabolism, and QTc prolongation." Appx18-20.

As the patentees explained, their "invention describes an association between genetic polymorphisms in the CYP2D6 locus, corresponding increases in the concentrations of iloperidone or its metabolites, and the effect of such increases in concentrations on corrected QT (QTc) duration relative to baseline." Appx38 (2:34-38). That is no different than the natural laws found ineligible in *Myriad*—merely having "found the location of a gene associated with increased risk of [reduced CYP2D6 activity or QT prolongation] and identified mutations of that gene that increase the risk" are discoveries that, even if believed to be "[g]roundbreaking, innovative, or … brilliant," "f[a]ll squarely within the law of nature exception" of § 101. 133 S. Ct. at 2117. That is true regardless of whether the '610 patentees engaged in an "iterative process" of studying CYP2D6 genotypes and metabolite levels that required "extensive research efforts"—"extensive effort alone is insufficient to satisfy the demands of § 101." *Id.* at 2118. And it is also irrelevant that those of skill in the art may not have "know[n] the precise correlations between metabolite levels and likely harm" that the patentees supposedly discovered as indicators of proper dosage adjustments of iloperidone and QT interval correlation—that too, is merely the application or discovery of immutable natural laws and phenomena. *Mayo*, 566 U.S. at 74-80.

At bottom, the asserted claims "would, if valid give [Vanda] the exclusive right to isolate an individual's [CYP2D6] gene[]" and use the natural correlation

between that gene and metabolization rates to determine a dose of iloperidone—the natural product of dose titration, which is impossible to call "'a product of invention unless we borrowed invention from the discovery of the natural principle itself.'" *Myriad*, 133 S. Ct. at 2113, 2117. Indeed, the laws of nature and natural phenomena here are indistinguishable from others found to fail § 101 scrutiny. *See, e.g.*, *Genetic Techs., Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373-75 (Fed. Cir. 2016) (detecting a coding region of DNA based on relationship to non-coding regions); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1373-74 (Fed. Cir. 2015) (detecting paternally inherited cffDNA); *Endo Pharm., Inc. v. Actavis Inc.*, No. 14-1381, 2015 WL 5580488, at *6 (D. Del. Sept. 23, 2015) (lowering drug dosage based on creatinine clearance directed to natural law).

## B.    The Asserted Claims Lack An Inventive Concept

The patentees claimed nothing inventive beyond the natural correlations they supposedly discovered between CYP2D6 genotype, dose reduction, and the occurrence of QT prolongation. The fundamental building blocks of the patentees' "discovery" were "well-understood, routine, [and] conventional," *Mayo*, 566 U.S. at 79-80, and "well known in the field of genetics," *Myriad*, 133 S. Ct. at 2112. As the patentees themselves explained: (i) iloperidone was known to be a CYP2D6-mediated drug for the treatment of schizophrenia; (ii) "[m]utations in the CYP2D6 gene ha[d] been associated with … poor metabolizer (PM) phenotypes"; (iii)

genotyping tests were already used for determining CYP2D6 status, including poor

metabolizer status; (iv) poor metabolizers of iloperidone were known to experience

"an increased concentration of iloperidone or its metabolites" that was linked to the

"unwanted physiological effect[]" of "prolongation of the electrocardiographic QT

interval"; and (v) the two specific polymorphisms (CYP2D6G1846A and

CYP2D6C100T) that the patentees studied were "previously associated with poor

metabolizing status" for CYP2D6-mediated drugs.  Appx46, Appx38-40 (cl. 11,

1:29-61, 4:24-25, 6:35); *see also* Appx10062; Appx10234; App6909 (115-16);

Appx6910-6911 (120-21); Appx7047-7051 (517-36); Appx7271 (990).

Beyond those well-known facts, the claimed inventions contain only two

supposedly inventive elements: (i) determining dosage based on metabolizer status

and (ii) administering the specific claimed doses.  But, first, using genotype to

select and determine dosage based on metabolizer status was conventional and

routine activity.  The patentees admitted that it was known to be "desirable to

determine whether a patient is a poor metabolizer … prior to [a drug's]

administration" because of the potential for "unwanted physiological effects in [a

drug's] metabolized or non-metabolized forms."  Appx38 (1:58-61).  And the prior

art discussed in the '610 patent expressly confirmed that it was well-known,

routine activity for researchers and scientists working in the field to "assess[]

whether an individual possesses the [CYP2D6] variant [associated with the PM

50

phenotype] prior to the administration of a drug" that was CYP2D6-mediated and "tailor[] the individual's drug therapy according to his or her [CYP2D6] phenotypic profile," including adjusting dosage for PMs based *on CYP2D6 genotype* to reduce potential negative side effects associated with CYP2D6-mediated drugs. Appx38 (1:62-2:11); *see* Appx20091 (cl. 31); Appx7047-7048 (517, 521-24); *see also* Appx6256-6267; Appx6273-6274; Appx7222-7223 (935-36); Appx7272 (993-96). The FDA even requires studies to determine the appropriate dose adjustments based on CYP2D6 status, which Novartis conducted for iloperidone in 1998-1999. *See* Appx7385-7386; Appx7390-94; Appx6905 (99); Appx6910-6911 (117-24); Appx6913-6914 (132-34); Appx7048-7049 (524-25); Appx7051-7052 (533-38); Appx7270 (985-86); Appx17979-17981; Appx17998-17999; Appx18001-18002; Appx18135-18138; Appx18341, Appx18373-18374. That "kind of experimentation was absolutely common and would be performed for any drug … for which CYP2D6 is an important metabolic route of elimination." Appx7051 (534). Titrating a drug to efficacy that accounts for metabolizer status during the process was "just basic" practice taught to every doctor "in medical school." Appx7048 (522-23).

Second, the specific dosage ranges that the patentees claimed were merely the product of routine activity and common knowledge. As Huang (the prior art cited by the patentees) taught, medical researchers knew that the "preferred dosage

51

of any [CYP2D6-mediated] drug can be determined through trial-and-error tests."
Appx20072-20073 (¶¶ 65-66); *see also* Appx7048-7051 (522-36); Appx18055-18056.   Dose adjustments, including 50-percent reductions for CYP2D6 poor metabolizers, were routine and known by physicians and regulators alike.  *See, e.g.*, Appx7047-7051 (517-25); Appx7051-7052 (533-38); Appx7271-7272 (989, 993-94); Appx16562; Appx18135, Appx18138-18139; Appx18149; Appx17998-17999, Appx18001-18002.  And the 12 mg/day dividing line between the claimed dosage ranges here was well-understood in the field as a standard dose for iloperidone from which to start titration, so that the decision "whether to give 12 milligrams or less or to give greater than 12 up to 24" was simply "common sense"—"just completely conventional … routine experimentation" based on well-known "routine medical practice" and "routine clinical pharmacology."  Appx7048 (521-22); *see, e.g.*, Appx6919 (153-54), Appx6998 (321); Appx42 (9:34-42) (directing those of skill in the art to start from the normal dose "known in the art"); Appx6260-6262.  Put succinctly:

> It[] [was] well described in the literature that poor metabolizers of … CYP2D6 often require dose reductions of drugs.  … The exact amount of dose reduction needs to be determined through routine studies.  But … [prior art] article[s] … say[] … dose reductions around 50 percent were generally recommended for poor metabolizers of CYP2D6.

Appx7048 (523-24); *see also* Appx18149.[9]

## C.    The District Court Erred In Concluding That There Was An Inventive Concept In The Asserted Claims

The district court held that there was a "combination of elements … sufficient to ensure that the claims amount to significantly more than just a natural law" because it believed that they concerned "only a specific patient population based upon their genetic composition" and required "applying genetic tests in a highly specified way" that was "not routine or conventional."  Appx20.  As an initial matter, the claimed methods do not apply to "only a specific patient population"—they reach all potential iloperidone patients, both poor and non-poor metabolizers.[10]

In any case, the inventive aspects the court divined from the claims are the very natural laws at issue here and are indistinguishable from those held ineligible in *Myriad* and *Mayo*.  Discovering impaired metabolism rates of iloperidone and an increased risk of high serum levels of iloperidone or QT prolongation in a

---

[9]    For the same reasons discussed in these sections, the district court also erred in holding the asserted claims nonobvious because the results of the patentees' study were not predictable—which they clearly were.  *See* Appx7389-7392; Appx7452-7453.  In any case, the district court's underlying findings for obviousness were not incorporated into its decision under § 101, which is a separate legal inquiry.

[10]    The district court construed the term "CYP2D6 poor metabolizer genotype" with sweeping breadth to include, at Vanda's urging, *any* "genotype that results in decreased activity of the CYP2D6 protein."  Appx6161 n.1.

"specific patient population based upon their genetic" polymorphisms in the CYP2D6 gene is no different than the patent-ineligible discovery of the correlation between "[m]utations in the[] [BRCA] genes" and the increased risk of breast cancer in *Myriad*. Appx20; 133 S. Ct. at 2112, 2117-18. And discovering the exact supposed serum levels of iloperidone or its metabolites that (allegedly) required administering certain doses of iloperidone for particular patients because of the CYP2D6 genetic correlation to drug metabolism is no different than the patent-ineligible discovery of the exact serum levels of thioguanine ("230 pmol" or "400 pmol per $8 \times 10^8$ red blood cells") that required the administration of an increased or decreased dose of thiopurine in *Mayo*. *See* 566 U.S. at 73-74, 79-80.

In fact, the district court's determination that "the process of using [a] genetic test to inform the dosage adjustment recited in the claims was not routine or conventional," Appx20, appears to be directly foreclosed by *Mayo*. Just like the claims here, the ineligible *Mayo* claims were directed to methods for "the calibration of … dosages" for a drug to improve efficacy and decrease toxic side effects by determining whether to adjust the dosage upward or downward based on metabolism rates that were measured by "individualized metabolite" levels— exactly the same natural law correlation and process the '610 patentees used and followed but claimed exclusively for themselves. *See* 566 U.S. at 75-80; *see also* Appx46 (cl. 1); Appx7046-7047 (516-17). Such methods, however, merely

"inform a relevant audience about certain laws of nature" and the "additional steps" of adjusting dosage and administering the proper dosage "are not themselves natural laws but neither are they sufficient to transform the nature of the claim" because they are "well understood, routine, conventional activity already engaged in by the scientific community." *Mayo*, 566 U.S. at 78-80.

Nor is the "combination of elements," Appx20, in the claims similar to that found inventive in *Rapid Litigation Management Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042 (Fed. Cir. 2016), as the district court concluded. In *CellzDirect*, the individual well-known steps of the claims were "not directed to the ability of hepatocytes to survive multiple freeze-thaw cycles," a law of nature, but "[r]ather, … to a new and useful laboratory technique for preserving hepatocytes." *Id.* at 1048. "Through the recited steps, the patented invention achieve[d] a better way of preserving hepatocytes." *Id.* Here, to the contrary, the combined steps of the claimed methods are directed to the natural laws of identifying risk of a harmful condition by testing for genotype and selecting dosage of a drug based on and because of that risk—there is no claim to a "new and useful laboratory technique" or new and useful technology. *Id.*

The district court's belief that the asserted claims will "not preempt biological sampling or genotyping" was also misplaced. Appx20. "[T]he absence of complete preemption does not demonstrate patent eligibility," *Ariosa*, 788 F.3d

55

at 1379, and any preemption concern is directed to the claimed invention and the natural law or phenomena at issue, not a narrow fraction of a claimed method (such as "biological sampling") or the general field of invention (such as "genotyping"), *see Myriad*, 133 S. Ct. at 2117-18; *see also Mayo*, 566 U.S. at 88 ("[E]ven a narrow law of nature … can [impermissibly] inhibit future research."). And there are serious preemption concerns here. As construed and applied by Vanda and the district court, the claimed methods do not require a dose adjustment in response to genotyping—treating with a claimed dosage range for any reason after genotyping would suffice. *See* Appx26-27; Appx7427. Administering a claimed dosage chosen based on and because of conventional and routine titration would become infringing merely because a doctor obtains information about a patient's genotype, regardless of whether dosage was adjusted in response to it. Indeed, the claimed methods would broadly preempt simply *testing for CYP2D6 genotype*—continuing to administer a properly titrated dose of iloperidone to a patient who was not genotyped yet (which is nearly all patients) would suddenly become infringing because of and at the moment CYP2D6 genotyping was performed if that dose fell within the claimed range for the patient's respective genotype. The claims would also reserve exclusively to Vanda the mere idea that a properly titrated dose of iloperidone could be safer to give to a patient based on the (alleged) immutable natural correlation between the patient's CYP2D6 genotype and iloperidone

metabolism rate.  Thus, the claims here are clearly invalid under § 101, particularly if Vanda's theory of infringement were upheld.

## IV.  THE ASSERTED CLAMS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION

The written description of the '610 patent does not "reasonably convey" that the patentees were in "possession" of the specific dosage ranges recited in the claims.  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc); *see, e.g.*, Appx46 (cl. 1); Appx7393-7397; Appx7453-7455.

First, nowhere does the specification disclose a range of "greater than 12 mg/day, up to 24 mg/day," for non-poor metabolizers recited in the claims—a failure the district court never even addressed.  Appx46 (cl. 1); *see* Appx20-22 (discussing only dosage for poor metabolizers); Appx7397 (arguing that the claimed ranges for both genotypes were not disclosed); Appx7454 (same).  The only "normal dosage" expressly disclosed in the written description is "24 mg per day."  Appx42 (9:42-44).  For all other possibilities, the patentees simply state that a normal "starting point" could be any "acceptably safe and effective" dose for normal metabolizers that is "known in the art and [is] disclosed, for example, in U.S. Pat. No. 5,364,866."  Appx 42 (10:58-64).  But as Vanda's expert Dr. Alva admitted, however, the standard normal starting dose "known in the art" was 12 mg/day, which is expressly excluded from the claimed range for non-poor metabolizers.  *See* Appx46 (cl. 1); Appx6998 (321).  And the '866 patent provides

an astoundingly broad range of acceptable doses—"0.01 to 50 mg/kg of body weight per day," which could equate to 0.6 to 4,000 mg per day for an average 60-80 kilogram individual.  Appx20019 (36:52-55).

Nothing, therefore, supports the conclusion that the patentees were in possession of the claimed dosage range for non-poor metabolizers.  That specific range was never disclosed in the written description; it arbitrarily excludes the standard 12 mg/day starting dose "known in the art"; and it represents an ambiguously miniscule sliver of the effective dosage range taught in the '866 patent.  *See, e.g.*, *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1328 (Fed. Cir. 2000) (specific range not disclosed as part of original invention lacked adequate written description even when "carved out" of broad range that "disclosure revealed").

Second, the district court erred in holding that the claimed dosage range for poor metabolizers was adequately disclosed.  In the only study discussed in the written description, the patentees administered doses of 16 mg/day and 24 mg/day to poor metabolizers—far beyond the claimed range of 12 mg/day or less.  *See* Appx40 (5:28-34).  And many of the poor metabolizers the patentees supposedly identified in that study had *less* QTc prolongation than non-poor metabolizers at both of those dosage levels—the precise opposite result that would be required to convey to a person of ordinary skill in the art that decreasing dosage was beneficial

for poor metabolizers. *See* Appx41-42 (8:50-65, 9:1-17 (Tables 6 and 7)); *see also* Appx7271-7274 (991-93, 1000-03). Indeed, several poor metabolizers receiving 16 mg/day *already* had a negative QTc change, and nothing in the specification suggests that further reducing the dose to below 12 mg/day as claimed would benefit those patients. *See* Appx41-42 (8:50-65, 9:1-17 (Tables 6 and 7)); Appx7271-7272 (992-95). Nothing, therefore, indicates to a person of ordinary skill in the art that the patentees actually possessed knowledge (or the alleged invention) of how a 12 mg/day or lower dose affected poor-metabolizers compared to non-poor metabolizers. *See, e.g.*, Appx7051-7053 (535-42); Appx7119-7123 (630-45).

To conclude otherwise, the district court erroneously relied on irrelevant data and overlooked the full extent of the claimed range for poor metabolizers that had to be supported by adequate disclosure. The court ignored the data in Tables 6 and 7 that showed no real benefit to poor metabolizers from reducing their dosage and analyzed only one column of data that merely "disclose[d] a trend for higher QTc prolongation," Appx21-22, which says *nothing* about how *reducing* dose affects poor-metabolizers, let alone at what dose an acceptable result is achieved. The "1.5 to 3.5 reduction in dose" for poor metabolizers that the court found supported by the data was also premised on "intermediate biomarkers," not actual iloperidone dosage levels. Appx22. And, even assuming such an indirect analysis

were appropriate, for the only disclosed standard dose of iloperidone (24 mg/day, *see* Appx42 (9:42-44), the resulting dosage range would be between 6 and 16 mg/day, which exceeds the claimed range.

The court's reliance on *Alcon Research Ltd. v. Barr Laboratories, Inc.*, 745 F.3d 1180 (Fed. Cir. 2014), to find adequate written description was also misplaced. In *Alcon*, this Court found an actual reduction to practice was unnecessary for adequate written description when the specification provided exemplary formulations, concentrations, and classes of a drug, along with accelerated stability testing data to support each element of the claimed invention. *Id.* at 1190-91. Here, in contrast, the asserted claims recite a particular dosage range that is not disclosed in the specification or supported by the data discussed and that is directly contradicted by the data that is presented.

At bottom, artisans are simply left to guess from the written description how the patentees derived or whether they were actually in possession of the specific dosage ranges they claimed. The answer, though, was revealed at trial: one of the '610 patentees, Dr. Polymeropoulos, admitted that the dosage ranges discussed in the accused label language originated from the Novartis "Study 0104," which was *not* disclosed or discussed in the '610 patent specification. *See* Appx6905 (98-99), Appx6913-6914 (132-34), Appx7052 (537); Appx17979-17981; Appx18341, Appx18373-18374. Even Vanda's expert, Dr. Guengerich, admitted that the effect

of the claimed dose reduction could not be determined "strictly from the patent" but rather was the result of the subsequent "more extensive" clinical trial. Appx7274 (1001-02). Along with the fact that specific dosage ranges were only added to the claims five years after filing and after FANAPT was approved with a target dose of 12 mg/day to 24 mg/day, those admissions clearly demonstrate that the claimed ranges were not the product of invention by the '610 patentees or in their possession at the time of filing. Indeed, the '610 patentees relied on the "criticality" of the FDA's statements regarding dosing to support adding a specific dosage range to the claims during prosecution. Appx18067, Appx18072.

Moreover, the conclusion that the asserted claims lack adequate written description is inescapable if they are somehow valid under § 101 because they require some sort of unconventional, inventive iloperidone dosage based on genotype. The unstated dosage requirements for the claimed metabolizer populations could not be unknown, unconventional, and therefore inventive under § 101, but well-known, conventional, and therefore adequately disclosed in the written description by references to background knowledge of skilled artisans for § 112 purposes.

# V. THE DISTRICT COURT'S INJUNCTIONS WERE NOT SUPPORTED BY EQUITY

## A. The District Court's General Equitable Power Did Not Authorize Enjoining Approval Of Roxane's ANDA

Without statutory authorization under 35 U.S.C. § 271(e)(4), the district court was not free to enjoin the FDA from approving Roxane's ANDA before the expiration of the '610 patent. The court's "general equitable power" in this civil suit between two private parties could not empower it to enjoin a non-party agency of the Executive Branch. *See, e.g.*, *Commercial Sec. Bank v. Walker Bank & Trust Co.*, 456 F.2d 1352, 1355-56 (10th Cir. 1972); *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA*, 821 F. Supp. 2d 681, 697 (D.N.J. 2011), *remanded on other grounds,* 748 F.3d 1354 (Fed. Cir. 2014). That is particularly true here because the FDA has independently determined that litigation for the '610 patent should not delay approval of iloperidone ANDAs filed before the patent issued and was submitted to the agency. *See* FDA Letter at 2 n.1, http://www.accessdata. fda.gov/drugsatfda_docs/appletter/2016/207231Orig1s000ltr.pdf (last visited Feb. 7, 2017). Moreover, mere regulatory approval by the FDA could not cause irreparable harm to Vanda—without use by physicians, there could be no infringement of the asserted claims.

## B. The District Court's Injunction Against Roxane's ANDA Product Was Without Evidentiary Support

The district court's curt conclusion that the four *eBay* factors were satisfied

here was spun from whole cloth and cannot justify the "drastic and extraordinary remedy" of an injunction against Roxane's ANDA product. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006) ("traditional equitable principles do not permit … broad classifications" and rules untethered to specific facts).

The court's finding that future sales of Roxane's ANDA product would cause non-compensable irreparable harm had no basis in fact. Because Vanda (incorrectly) anticipated the availability of an automatic injunction under § 271(e)(4)(A), it never submitted evidence to support such a finding. There was no testimony (expert or otherwise) or documentary proof to establish any threat of price erosion, loss of market share, loss of sales, or reduction in goodwill due to future infringement of the '610 patent. And Vanda never explained how monetary relief could not adequately compensate for any unauthorized use of the claimed methods—which, as a matter of logic, it could since, even assuming direct infringement by Dr. Alva, any properly apportioned damages here would be *de minimis*. Indeed, the district court never cited any record evidence to support its injunction analysis.[11] *See* Appx31.

---

[11]  The court's only non-legal citation was to six lines of *attorney argument* on one page of Vanda's post-trial brief that discussed just *ninety seconds* of irrelevant testimony (out of five days of trial) in which an employee witness broadly claimed that any "generic" would deplete Vanda's research funding but never explained

The court's conclusory findings that Roxane "ha[d] not demonstrated it would suffer hardship" and the "public interest would not be disserved" because of an injunction were also erroneously proclaimed as fact without any substantive analysis or record support.[12] *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1341 (Fed. Cir. 2012) (if summary declarations that the *eBay* factors favored an injunction were adequate, "we would be back to the general rule" of automatic injunctions *eBay* overruled). The significant financial harm that Roxane would suffer if not permitted to market its ANDA product overwhelmingly outweighs the, at most, *de minimis* harm from any extraordinarily rare occurrence of infringement of the '610 patent (if it ever happens at all). And the public interest weighs decidedly against an injunction here. As the Hatch-Waxman Act demonstrates, the public has a strong interest in the availability of generic drugs, and Congress "contemplate[d] that one patented use will not foreclose marketing a generic drug for other unpatented ones." *Caraco*, 566 U.S. at 415. That is particularly true where, as here, the public's access to a generic iloperidone product has been restricted despite extraordinary non-infringing uses and the

---

how infringement *of the '610 patent* instead of the '198 patent (which covered the iloperidone compound itself and was asserted at trial) would do so. *See* Appx31-32 (citing Appx7326 (citing Appx6909 (113:5-114:11))); *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013) (causal nexus required).

[12]  The court also legally erred by shifting the burden to Roxane to prove that "it would suffer hardship" from an injunction. Appx31; *see eBay*, 547 U.S. at 391 (plaintiff bears the affirmative burden to prove an injunction is due).

expiration of the patent covering the iloperidone compound and its general use to treat schizophrenia.

## CONCLUSION

The Court should reverse or vacate the district court's infringement judgment, validity holdings, and injunctions as discussed above.

Dated:  February 7, 2017

Daniel G. Brown
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
(212) 906-1742

Melissa A. Brand
LATHAM & WATKINS LLP
John Hancock Tower, 27th Floor
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

Respectfully submitted,

*/s/ Kenneth G. Schuler*
Kenneth G. Schuler
Emily C. Melvin
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
(312) 876-7700

Robert J. Gajarsa
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Defendant-Appellant*

# ADDENDUM

# TABLE OF CONTENTS
## Addendum Pursuant to Federal Circuit Rule 28(a)(11)

| Page No. | Date | Description |
|---|---|---|
| Appx1 | 08/25/2016 | Memorandum, Nos. 13-1973, 14-757 (D.I. 193) |
| Appx33 | 08/25/2016 | Order, Nos. 13-1973, 14-757 (D.I. 194) |
| Appx34 | 08/25/2016 | Final Judgment, No. 13-1973 (D.I. 195) |
| Appx35 | 08/25/2016 | Final Judgment, No. 14-0757 (D.I. 28) |
| Appx36 | 08/19/2013 | U.S. Patent No. 8,586,610, *Methods for the Administration of Iloperidone*, Wolfgang et al. (JX 1) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VANDA PHARMACEUTICALS INC. )
and AVENTISUB LLC, )
)
                    Plaintiffs, )      Civil Action No. 13-1973-GMS
)                                       Civil Action No. 14-757-GMS
                    v. )                (Consolidated)
)
ROXANE LABORATORIES, INC., )
)
                    Defendant. )

## **MEMORANDUM**

### I.    **INTRODUCTION**

In this consolidated patent infringement action, plaintiffs Vanda Pharmaceuticals Inc.

("Vanda") and Aventisub LLC ("Aventisub") (collectively "the Plaintiffs") allege infringement by

Roxane of U.S. Reissue Patent No. 39,198 ("the '198 Patent") and U.S. Patent No. 8,586,610 ("the

'610 Patent"). The two actions were consolidated for purposes of trial on April 13, 2015. The court

held a five-day bench trial in this matter on February 29, 2016 to March 4, 2016. (D.I. 171–176.)

Presently before the court are the parties' post-trial proposed findings of fact and post-trial briefs

concerning the validity of the patents-in-suit and whether Roxane's proposed products infringe the

'610 Patent. (D.I. 178, 179, 184, 185.)

Pursuant to Federal Rule of Civil Procedure 52(a), and after having considered the entire

record in this case and the applicable law, the court concludes that: (1) all asserted claims of the

patents-in-suit are valid; (2) Roxane's proposed products induce infringement of the asserted claims

of the '610 Patent; (3) Roxane's proposed products do not contributorily infringe the asserted claims

of the '610 Patent; and (4) each of the parties' Rule 52(c) motions are granted in part and denied in

part. These findings of fact and conclusions of law are set forth in further detail below.[1]

## II.    FINDINGS OF FACT[2]

### A.    The Parties

1.    Plaintiff Vanda is a Delaware corporation with its principal place of business at 2200 Pennsylvania Ave NW, Washington, DC 20037.

2.    Plaintiff Aventisub is a Delaware corporation with its principal place of business at 3711 Kennett Pike, Suite 200, Greenville, DE 19807.

3.    Defendant Roxane is a Nevada corporation with its principal place of business at 1809 Wilson Road, Columbus, OH 43228.

4.    The court has subject matter jurisdiction as well as personal jurisdiction over all parties.

### B.    Background

5.    Genotyping assays are currently commercially available to identify CYP2D6 poor metabolizers.

6.    Genotyping assays are laboratory tests.

7.    The generic iloperidone described in the Roxane ANDA is literally within the scope of claim 3 of the '198 Patent and infringes claim 3 of the '198 Patent provided that the claim is not proved invalid.

8.    Extrapyramidal side effects ("EPS") are undesired side effects of antipsychotic medications.

9.    Atypical antipsychotics have fewer extrapyramidal side effects than typical antipsychotics.

### C.    The Patents-in-Suit

10.    The '198 Patent, entitled "Heteroarylpiperidines, Pyrrolidines and Piperazines and Their Use as Antipsychotics and Analgesics," issued on July 18, 2006, and names Joseph T.

---

[1] Roxane concedes infringement of claim 3 of the '198 Patent, provided that the claim is not proved invalid. (D.I. 129.)

[2] Prior to trial, the parties submitted an exhibit of uncontested facts in conjunction with their Pretrial Order. (D.I. 154, Ex. 1.) The court takes most of its findings of fact from the parties' uncontested facts. The court has also reordered and renumbered some paragraphs, corrected some formatting errors, and made minor edits for the purpose of concision and clarity that it does not believe alters the meaning of the paragraphs from the Pretrial Order. Otherwise, any differences between this section and the parties' statement of uncontested facts are unintentional.

The court's findings of fact with respect to matters that were the subject of dispute between the parties are included in Part III of this opinion ("Discussion and Conclusions of Law"), preceded by the phrase "the court finds" or "the court concludes."

**Appx2**

Strupczewski, Grover C. Helsley, Yulin Chiang, Kenneth J. Bordeau, and Edward J. Glamkowski as the inventors.

11.     The '198 Patent was filed on November 15, 2000, and is a reissued patent of U.S. patent no. 5,364,866, filed on October 30, 1992.

12.     The '198 Patent claims priority to U.S. Patent Application No. 07/354,411, filed on May 19, 1989.

13.     The '198 Patent expires on November 15, 2016.

14.     Aventisub is the owner by assignment of the '198 Patent.

15.     Vanda holds an exclusive worldwide license to the '198 Patent.

16.     The '610 Patent, entitled "Methods for the Administration of Iloperidone," issued on November 19, 2013, and names Curt D. Wolfgang and Mihael H. Polymeropoulos as the inventors.

17.     The '610 Patent claims priority to U.S. Provisional Application No. 60/614,798, filed on September 30, 2004.

18.     The '610 Patent expires on November 2, 2027.

19.     Vanda is the owner by assignment of the '610 Patent.

20.     Vanda has standing to sue for infringement of the '610 Patent.

### 1.  The Asserted Claims

*a. '198 Patent, Claim 3*

Claim 3 of the '198 Patent reads:

A compound as claimed in claim 1, which is 1-[4-[3-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]-propoxy]-3-methoxyphenyl]ethanone or a pharmaceutically acceptable acid addition salt thereof. The nonproprietary name for 1-[4-[3-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]- propoxy]-3-methoxyphenyl]ethanone is "iloperidone."

*b. '610 Patent, Claims 1-9, 11-13, and 16*

Claims 1-9, 11-13, and 16 of the '610 Patent read:

A method for treating a patient with iloperidone, wherein the patient is suffering from schizophrenia, the method comprising the steps of: determining whether the patient is a CYP2D6 poor metabolizer by: obtaining or having obtained a biological sample from the patient; and performing or having performed a genotyping assay on the biological sample to determine if the patient has a CYP2D6 poor metabolizer genotype; and if the patient has a CYP2D6 poor

3

metabolizer genotype, then internally administering iloperidone to the patient in an amount of 12 mg/day or less, and if the patient does not have a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount that is greater than 12 mg/day, up to 24 mg/day, wherein a risk of QTc prolongation for a patient having a CYP2D6 poor metabolizer genotype is lower following the internal administration of 12 mg/day or less than it would be if the iloperidone were administered in an amount of greater than 12 mg/day, up to 24 mg/day.

2.      The method of claim 1, wherein the performing or having performed the genotyping assay step comprises: extracting or having extracted genomic DNA or mRNA from the biological sample, and sequencing or having sequenced CYP2D6 DNA derived from the extracted genomic DNA or from the extracted mRNA, wherein the sequencing or having sequenced step further comprises: amplifying or having amplified a CYP2D6 region in the extracted genomic B-2 DNA or mRNA to prepare a DNA sample enriched in DNA from the CYP2D6 gene region; and sequencing or having sequenced the DNA sample by hybridizing the DNA sample to nucleic acid probes to determine if the patient has a CYP2D6 poor metabolizer genotype; and wherein the CYP2D6 poor metabolizer genotype is one of the CYP2D6G1846A genotype or the CYP2D6C100T genotype.

3.      The method of claim 2, wherein the CYP2D6 poor metabolizer genotype is one of the CYP2D6G1846A (AA) genotype or the CYP2D6G1846A (AG) genotype.

4.      The method of claim 3, wherein the CYP2D6 poor metabolizer genotype is the CYP2D6G1846A (AA) genotype.

5.      The method of claim 2, wherein the CYP2D6 poor metabolizer genotype is one of the CYP2D6C100T (TT) genotype or the CYP2D6C100T (CT) genotype.

6.      The method of claim 5, wherein the CYP2D6 poor metabolizer genotype is the CYP2D6C100T (TT) genotype.

7.      The method of claim 1, wherein the step of internally administering iloperidone to the patient in an amount of 12 mg/day or less comprises internally administering iloperidone to the patient in an amount of 6 mg or less b.i.d.

8.      The method of claim 2, wherein, if the patient has a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount of 6 mg b.i.d.

9.      A method of treating a patient who is suffering from a schizoaffective disorder, depression, Tourette's syndrome, a psychotic disorder or a delusional disorder, the method comprising: determining if the patient is a CYP2D6 poor metabolizer by obtaining or having obtained a biological sample from the patient, and performing or having performed a genotyping assay on the biological sample to determine whether the patient has a CYP2D6 poor metabolizer genotype, and if the patient is a CYP2D6 poor metabolizer, then internally administering iloperidone to the patient in an amount of up to 12 mg/day, and if the patient is not a CYP2D6 poor metabolizer, then internally administering iloperidone to the patient in an amount of greater than 12 mg/day, up to 24 mg/day.

11.     The method of claim 9, wherein the CYP2D6 poor metabolizer genotype is one of: B-3 CYP2D6G1846A (AA), CYP2D6G1846A (AG), CYP2D6C100T (TT), or CYP2D6C100T (CT).

**Appx4**

12.     The method of claim 9, wherein the method comprises: if the patient is a CYP2D6 poor metabolizer, then internally administering the iloperidone to the patient in an amount of 6 mg b.i.d.

13.     A method of treating a patient who is suffering from a schizoaffective disorder, depression, Tourette's syndrome, a psychotic disorder or a delusional disorder, the method comprising: determining if the patient is at risk for iloperidone-induced QTc prolongation by obtaining or having obtained a biological sample from the patient, and performing or having performed a genotyping assay on the biological sample to determine whether the patient has a CYP2D6 poor metabolizer genotype, wherein the presence of a CYP2D6 poor metabolizer genotype indicates risk for iloperidone-induced QTc prolongation, and if the patient is at risk for iloperidone-induced QTc prolongation, then internally administering iloperidone to the patient in an amount of up to 12 mg/day, and if the patient is not at risk for iloperidone-induced QTc prolongation, then internally administering iloperidone to the patient in an amount of greater than 12 mg/day, up to 24 mg/day.

16.     The method of claim 13, wherein the method comprises: if the patient is at risk for iloperidone-induced QTc prolongation, then internally administering the iloperidone to the patient in an amount of 6 mg b.i.d. claims 1-9, 11-13, and 16 of the '610 Patent.

## D.     FANAPT® and Roxane's ANDA

20.     FANAPT® (iloperidone) is an atypical antipsychotic approved for the treatment of patients with schizophrenia. Vanda offers for sale and sells FANAPT® in the United States.

21.     On May 6, 2009, the Food and Drug Administration ("FDA") approved Vanda's new drug application 22-192 for FANAPT® (iloperidone) in its 1 mg, 2 mg, 4 mg, 6 mg, 8 mg, 10 mg, and 12 mg strengths under § 505(b) of the Federal Food, Drug, and Cosmetic Act (the "FFDCA"), 21 U.S.C. § 355(b), for the treatment of schizophrenia ("FANAPT® NDA").

22.     Vanda owns the FANAPT® NDA.

23.     The prescribing information for FANAPT® ("FANAPT® Label") states in part that "FANAPT® tablets are indicated for the treatment of adults with schizophrenia." § 1.

24.     Schizophrenia is a psychotic disorder.

25.     The FANAPT® Label states in part that "FANAPT is associated with prolongation of the QTc interval." § 1.

26.     The FANAPT® Label states in part that "Prolongation of the QTc interval is associated in some other drugs with the ability to cause torsade de pointes-type arrhythmia, a potentially fatal polymorphic ventricular tachycardia which can result in sudden death." § 1.

27.     The FANAPT® Label states in part that "The recommended target dosage of FANAPT tablets is 12 to 24 mg/day administered twice daily." Dosage and Administration.

28.     The FANAPT® Label states in part that "The maximum recommended dose [of FANAPT® (iloperidone)] is 12 mg twice daily (24 mg/day)." § 2.1.

29.     The FANAPT® Label states in part that "FANAPT dose should be reduced by one-half for poor metabolizers of CYP2D6." § 2.2.

30.     The FANAPT® Label states in part that "Iloperidone is metabolized primarily by 3 biotransformation pathways: carbonyl reduction, hydroxylation (mediated by CYP2D6) and O-demethylation (mediated by CYP3A4)." § 12.3.

31.     The FANAPT® Label states in part that "Approximately 7% - 10% of Caucasians and 3% - 8% of black/African Americans lack the capacity to metabolize CYP2D6 substrates and are classified as poor metabolizers (PM), whereas the rest are intermediate, extensive or ultrarapid metabolizers." § 12.3.

32.     The FANAPT® Label states in part that "PMs of CYP2D6 have higher exposure to iloperidone compared with EMs and PMs should have their dose reduced by one-half. Laboratory tests are available to identify CYP2D6 PMs." § 12.3.

33.     The '198 Patent and the '610 Patent are listed in connection with FANAPT® in FDA's publication, "Approved Drug Products with Therapeutic Equivalence Evaluations," referred to as the "Orange Book." The '610 Patent was listed in the Orange Book on or about January 15, 2015, after both of these lawsuits were filed.

34.     Roxane filed Abbreviated New Drug Application No. 20-5480 (the "Roxane ANDA") under § 505(j) of the FFDCA to obtain approval to commercially manufacture and sell generic iloperidone tablets in 1 mg, 2 mg, 4 mg, 6 mg, 8 mg, 10 mg, and 12 mg strengths for the treatment of schizophrenia, prior to the expiration of the '198 Patent and the '610 Patent.

35.     On October 17, 2013, Roxane sent Novartis and Aventisub II Inc. a Patent Notice pursuant to § 505(j)(2)(B)(ii) asserting that the claims of the '198 patent are invalid under 35 U.S.C. § 103.

36.     On May 6, 2015, Roxane sent Vanda a Patent Notice pursuant to § 505(j)(2)(B)(ii) asserting that Roxane's iloperidone label does not induce infringement of any claim of the '610 Patent and that the claims of the '610 Patent are invalid under 35 U.S.C. §§ 101 and 103.

37.     If the Roxane ANDA is approved, Roxane will sell generic iloperidone tablets in 1 mg, 2 mg, 4 mg, 6 mg, 8 mg, 10 mg, and 12 mg strengths for the treatment of schizophrenia in the United States.

38.     By law, Roxane's label for its generic iloperidone product must include information from the label for the reference listed drug "except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v).

39.     The prescribing information proposed in the Roxane ANDA states in part that "Iloperidone tablets are indicated for the treatment of adults with schizophrenia." § 1.

40.     The prescribing information proposed in the Roxane ANDA states in part that "Iloperidone is associated with prolongation of the QTc interval." § 1.

6

41.     The prescribing information proposed in the Roxane ANDA states in part that "Prolongation of the QTc interval is associated in some other drugs with the ability to cause torsade de pointes-type arrhythmia, a potentially fatal polymorphic ventricular tachycardia which can result in sudden death." § 1.

42.     The prescribing information proposed in the Roxane ANDA states in part that "The recommended target dosage of iloperidone tablets is 12 to 24 mg/day administered twice daily." Dosage and Administration.

43.     The prescribing information proposed in the Roxane ANDA states in part that "The maximum recommended dose [of iloperidone] is 12 mg twice daily (24 mg/day)." § 2.1.

44.     The prescribing information proposed in the Roxane ANDA states in part that "Iloperidone dose should be reduced by one-half for poor metabolizers of CYP2D6." § 2.2.

45.     The prescribing information proposed in the Roxane ANDA states in part that "Iloperidone is metabolized primarily by 3 biotransformation pathways: carbonyl reduction, hydroxylation (mediated by CYP2D6) and O-demethylation (mediated by CYP3A4)." § 12.3.

46.     The prescribing information proposed in the Roxane ANDA states in part that "Approximately 7% to 10% of Caucasians and 3% to 8% of black/African Americans lack the capacity to metabolize CYP2D6 substrates and are classified as poor metabolizers (PM), whereas the rest are intermediate, extensive or ultrarapid metabolizers." § 12.3.

47.     The prescribing information proposed in the Roxane ANDA states in part that "PMs of CYP2D6 have higher exposure to iloperidone compared with EMs and PMs should have their dose reduced by one-half. Laboratory tests are available to identify CYP2D6 PMs." § 12.3.

48.     By letter dated October 17, 2013 ("Roxane Notice Letter"), Roxane notified Aventisub that Roxane had filed the Roxane ANDA seeking approval to manufacture, use, offer to sell, and sell a generic version of FANAPT® (iloperidone) in 1 mg, 2 mg, 4 mg, 6 mg, 8mg, 10 mg, and 12 mg strengths for the treatment of schizophrenia before the expiration of the '198 Patent.

49.     Plaintiffs assert infringement of the following claims against Roxane: claim 3 of the '198 Patent and claims 1-9, 11-13, and 16 of the '610 Patent.

50.     Plaintiffs commenced Civil Action No. 13-1973 regarding infringement of the '198 Patent on November 25, 2013, within 45 days from Aventisub's receipt of the Roxane Notice Letter.

51.     Plaintiff Vanda commenced Civil Action No. 14-757 regarding infringement of the '610 Patent on June 16, 2014.

## III.    DISCUSSION AND CONCLUSIONS OF LAW

The court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§

1331 and 1338(a).  Venue is proper under 28 U.S.C. §§ 1391(b), (c), and (d), and 1400 (b).  After

having considered the entire record in this case, the substantial evidence in the record, the parties' post-trial submissions, and the applicable law, the court concludes that: (1) all asserted claims of the patents-in-suit are valid; (2) Roxane's proposed products induce infringement of the asserted claims of the '610 Patent; and (3) Roxane's proposed products do not contributorily infringe the asserted claims of the '610 Patent. The court's reasoning follows.

### A. Obviousness

#### 1. The Legal Standard

Under 35 U.S.C. § 103(a), a patent may not be obtained "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art" ("POSA"). 35 U.S.C. § 103(a). Obviousness is a question of law that is predicated on several factual inquires. *See Richardson-Vicks v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997). Specifically, the trier of fact is directed to assess four considerations: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) secondary considerations of non-obviousness, such as commercial success, long-felt but unsolved need, failure of others, acquiescence of others in the industry that the patent is valid, and unexpected results. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"A patent shall be presumed valid." 35 U.S.C. § 282(a). A party seeking to challenge the validity of a patent based on obviousness must demonstrate by "clear and convincing evidence"[3] that the invention described in the patent would have been obvious to a person of ordinary skill in

---

[3] "Clear and convincing evidence is evidence that places in the fact finder 'an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Alza Corp v. Andrx Pharms., LLC*, 607 F. Supp. 2d 614, 631 (D. Del. 2009) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

**Appx8**

the art at the time the invention was made. Importantly, in determining what would have been obvious to one of ordinary skill in the art, the use of hindsight is not permitted. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 421 (2007) (cautioning the trier of fact against "the distortion caused by hindsight bias" and "arguments reliant upon *ex post* reasoning" in determining obviousness). In *KSR*, the Supreme Court rejected the rigid application of the principle that there should be an explicit teaching, suggestion, or motivation in the prior art, the "TSM test," in order to find obviousness. *See id.* at 415. The *KSR* Court acknowledged, however, the importance of identifying "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id.* at 418.

"Obviousness does not require absolute predictability of success," but rather, requires "a reasonable expectation of success." *See Medichem, S.A. v. Rolado, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting *In re O'Farrell*, 853 F.2d 894, 903–04 (Fed. Cir. 1988)). To this end, obviousness "cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). Moreover, while the Federal Circuit has noted that pharmaceuticals can be an "unpredictable art" to the extent that results may be unexpected, it also recognizes that, per *KSR*, evidence of a "finite number of identified, predictable solutions" *KSR Int'l Co.*, 550 U.S. at 421, "might support an inference of obviousness." *Ortho–McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).

### 2. The Level of Ordinary Skill in the Art

With regard to the '198 Patent, the parties agree that a person of ordinary skill in the art working in the field of the '198 Patent would have an advanced degree in medicinal chemistry

and/or pharmacology with some experience with the design and/or synthesis of antipsychotic drugs.[4]

With regard to the '610 Patent, a person of ordinary skill in the art would: (1) understand pharmacogenetics; or (2) have a degree in medicine, pharmacy, pharmacology, or a related field and practical experience in the field of psychiatry and/or clinical pharmacology, including pharmacogenomics. While the parties disagree, the court concludes that the parties' definitions of a person of ordinary skill in the art do not differ in a meaningful way.[5]

### 3. Nonobviousness of the '198 Patent

Roxane challenges the validity of claim 3 of the '198 Patent, arguing that it is obvious in light of the prior art as of the May 19, 1989 priority date. (D.I. 185 at 10.) The parties agree that at the time of the invention, a person of ordinary skill in the art would have recognized the need for an atypical antipsychotic. Tr. at 672:15–22; 719:22–720:12 (Sargent); 596:5–8 (Ratain); 767:22–768:2 (Strupczewski); 822:4–13 (Bartlett); 893:21–894:6 (Roth). According to Roxane, in 1989, after Janssen Pharmaceuticals announced the discovery of risperidone, a person of ordinary skill in the art searching for an atypical antipsychotic would focus on two compounds, which it labels compounds A and B, because they were known antipsychotics that resembled risperidone. (D.I. 179 at 34.) In particular, Roxane claims that a publication in the *Journal of Medicinal Chemistry* by Robert Duncan and Grover C. Helsley (JX-40), would teach a person of ordinary skill in the art to look to Compounds A and B. Dr. Sargent testified that the discovery of risperidone would lead a person of ordinary skill back to Helsley to experiment with a closely-related compound,

---

[4] *See* Tr. at 676:7–15 (Sargent); 820:5–13 (Bartlett).

[5] The parties disagree about the level of skill of ordinary skill in the art. Roxane contends that a skilled artisan would understand pharmacogenetics because the '610 Patent is about pharmacogenetics, Tr. at 512:6–12 (Ratain); the Plaintiffs contend that the '610 Patent is about methods of treating schizophrenia patients using iloperidone, and thus a skilled artisan would need to be qualified to administer antipsychotics to patients but would not need a pharmacogenetics background. The difference is insignificant, however. Roxane's expert admits his opinion would not change under either articulation. Tr. at 515:20–23 (Ratain). (*See* D.I. 178 at 17.)

Compound A. Indeed, Compound B was investigated as a potential antipsychotic following the publication of Helsley under the name "lenperone." Finally, according to Dr. Sargent, a person ordinarily skilled in the art could easily modify a butyrophenone compound such as Compound A or B by replacing its benzoyl moiety with a benzisoxazole moiety. (D.I. 185 at 14); Tr. at 692:10–12, 693:10–17 (Sargent). Thus, Roxane contends that a person of ordinary skill in the art had both a lead compound and the motivation to modify the lead compound.

In contrast, the Plaintiffs dispute that Compound B would lead a person of ordinary skill in the art to Compound A. (D.I. 84 at 14.) The Plaintiffs note that lenperone had caused extremely serious side effects, such that the skilled artisan would avoid it and its related compounds. Tr. at 910:5–12 (Roth). In an open-label clinical trial published in 1975, the ten patients treated with lenperone experienced nineteen serious cardiac side effects. Tr. at 908:7–910:3 (Roth) (citing PX-137 (Harris (1975)); 754:10–16 (Sargent). Lenperone was also associated with moderate sedation. Tr. at 754:17–755:6 (Sargent). Moreover, according to the Plaintiffs, lenperone was known to induce catalepsy. Tr. at 904:24–905:3, 906:12–18 (Roth) (citing JX-66).

The Plaintiffs further assert that Compound A was not known to be an antipsychotic. Rather, it was known to have tranquilizing activity and strong sedative effects, neither of which suggests its use as an antipsychotic. Tr. at 898:20–903:23 (Roth) (citing DTX-143; JX-40; JX-63; JX-66). In addition, Dr. Roth testified that Compound A would not be expected to have atypical antipsychotic activity. Tr. at 898:20–903:23 (Roth). Finally, even if a skilled artisan happened to start with Compound A in 1989, the Plaintiffs argue that there would be no motivation to make the bioisosteric substitution out of the many possible modifications to butyrophenones that were known. Tr. at 825:24–830:1 (Bartlett); 664:24–665:11 (Sargent); 839:16–25 (Bartlett).

The court does not find Dr. Sargent's testimony to be credible. Medicinal chemists spent decades and considerable resources trying to find a successor to clozapine, including Dr. Sargent, Tr. at 719:11–21 (Sargent); 894:3–7 (Roth), yet there is no evidence that anyone actually acted in the way that his theory predicts. Tr. at 760:7–11 (Sargent). Instead, the court is persuaded by the Plaintiffs' argument that a person ordinarily skilled in the art in 1989 seeking to synthesize a new atypical antipsychotic would start with a compound known to have atypical activity, which would exclude Compound A. (D.I. 184 at 14–15.) *See Daiichi Sankyo Co. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1354 (Fed. Cir. 2010) (it is the "possession of promising useful properties in a lead compound that motivates a chemist to make structurally similar compounds."). As the Federal Circuit has cautioned, the reason to select a compound as a lead compound depends on more than just structural similarity, but also knowledge in the art of the functional properties and limitations of the prior art compounds. *See Eli Lilly*, 471 F.3d at 1377–79.

In addition, Roxane fails to demonstrate that benzisoxazole modifications were then known to solve any of the demonstrated side effects associated with Compound B. *See Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007) (finding it necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound). The court concludes that Roxane's argument is highly influenced by hindsight bias. *See Daiichi Sankyo Co.*, 619 F.3d at 1354 ("the attribution of a compound as a lead compound after the fact must avoid hindsight bias; it must look at the state of the art at the time the invention was made to find a motivation to select and then modify a lead compound to arrive at the claimed invention.") (citing *Ortho–McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008)).

### 4. Nonobviousness of the '610 Patent

12

Here, the court feels it necessary to provide a brief background about the claimed invention. Genetic mutations for the enzyme CYP2D6 are associated with an increased risk of iloperidone-induced QTc prolongation. JX-1. Many people are CYP2D6 poor metabolizers. JX-1 at 1:53–61. This can alter both the performance and side-effect profile of the drug. *See, e.g.*, Tr. at 912:3–7 (Roth). Iloperidone is metabolized into the P95 metabolite by the enzyme CYPD26. The claimed invention relies on the relationship between the ratio of P95 and P88 metabolites in the iloperidone metabolic pathway in the blood and the risk of QTc prolongation in iloperidone patients. JX-1.

Roxane asserts the '610 Patent invention is obvious because a POSA would have known to study the implications for iloperidone metabolism of mutations in the genes for the CYP2D6 enzyme. (D.I. 179 at 22.) Roxane relies on the prior art teachings from E. Mutlib & J. T. Klein, "Application of Liquid Chromatography/Mass Spectrometry in Accelerating the Identification of Human Liver Cytochrome P450 Isoforms Involved in the Metabolism of Iloperidone," in light of 1999 FDA Guidance for Industry. JX-68; DTX-118. According to Roxane, Mutlib taught that iloperidone had completed Phase II clinical trials as a potential atypical antipsychotic with a lower risk of side effects. Tr. at 528:14-529:3 (Ratain); JX-68 at 1285. Mutlib also taught that CYP2D6 was important in the metabolism of iloperidone. Tr. at 530:23-531:13 (Ratain). Mutlib reported the results of a study of the metabolism of iloperidone in human liver microsomes to define its metabolic pathways, Tr. at 531:14-20 (Ratain); JX-68 at Abstract, and Mutlib disclosed that metabolites 2 and 4 were formed by CYP3A4 and by the polymorph CYP2D6, respectively. Tr. at 531:21-23 (Ratain); JX-68 at Abstract. Dr. Ratain testified that, because it was known that CYP2D6 is important for the metabolism of iloperidone, a person ordinarily skilled in the art would be motivated to study it further. Tr. at 532:22–25 (Ratain) (citing JX-68).

Roxane also reasons that the '610 Patent is obvious because the FDA would have required clinical pharmacology studies to examine how the drug is metabolized. Tr. at 115:9-16 (Polymeropoulos), 977:24-979:4 (Guengerich); 533:1-24 (Ratain); DTX-76; DTX-118. Roxane posits that as of September 2004, these types of studies would be performed for any drug for which CYP2D6 was an important metabolic route of elimination. Tr. at 534:6-11 (Ratain). This process is exactly what Novartis did in its iloperidone clinical program. Tr. at 534:12-16 (Ratain).

The Plaintiffs respond that the prior art does not teach that CYP2D6 is important in iloperidone metabolism in the body (in vivo). (D.I. 84 at 11); Tr. at 967:7–25, 968:13–17 (Guengerich). According to the Plaintiffs, although Mutlib discloses that CYP2D6 plays a role in metabolizing iloperidone in vitro, the authors did not recover any meaningful in vivo results. Tr. at 592:18–593:14 (Ratain); 967:7–969:1 (Guengerich). The FDA warns that "When a difference arises between findings in vitro and in vivo, the results in vivo should always take precedence over studies in vitro." DTX-118. Vanda further contends the prior art suggested that CYP2D6 was not important in the metabolism of iloperidone. *See, e.g.,* PX-154; JX-95; DTX-53.

Moreover, the Plaintiffs argue that it is often the case that no dosage adjustment is needed for CYP2D6 poor metabolizers. (D.I. 184 at 12.) *See, e.g.,* DTX-122 at 9; Tr. at 607:2–17, 607:25–608:4 (Ratain). According to the Plaintiffs, it was unpredictable whether any dosage adjustment would be needed for CYP2D6 poor metabolizers, much less the amount of adjustment needed to achieve the pharmacokinetic profile seen in normal metabolizers. *See, e.g.,* Tr. at 605:7–606:3 (Ratain) (citing JX-95 at 11); 609:15–610:24 (Ratain) (citing JX-79 at 7); 938:6–16 (Roth). Nor was it clear that a dose adjustment would reduce QTc prolongation, claim the Plaintiffs, because not all side effects are dose-dependent. Tr. at 939:16–22 (Roth); 1008:6–10 (Guengerich). Furthermore, the Plaintiffs contend that because QTc side effects were so risky, a person ordinarily

skilled in the art would be deterred from further investigation. Tr. at 939:2–15 (Roth) ("when we saw prolongation of a QT interval that was induced by a drug, we stopped the drug. We did not give -- we did not lower the dose. We stopped it.").

The court concludes that the level of clinical testing required and inherent unpredictability in this field make certain that the invention was not obvious. The court is particularly persuaded by the fact that Novartis abandoned iloperidone in development because of QTc prolongation. Tr. at 85:14–18 (Polymeropoulos); 366:11–368:4 (Economou); 529:23–530:3 (Ratain) (citing DTX-53). Even if Mutlib provided a basis for a POSA to focus a study on the implications for iloperidone metabolism of mutations in the genes for the CYP2D6, it would have been impossible to predict the results. Tr. at 915:22–916:2, 919:10–13 (Roth). A solution is not obvious simply because it was obvious to conduct experiments to try to solve the problem. *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) ("[S]elective hindsight is no more applicable to the design of experiments than it is to the combination of prior art teachings."). In conclusion, the '610 Patent is not invalid as obvious.

### 5. **Secondary Considerations of Nonobviousness**

Roxane has failed to make a *prima facie* showing of obviousness under § 103. However, even if Roxane had met its burden, the Plaintiffs effectively make the case that secondary considerations weigh against a finding of obviousness. *See Graham*, 383 U.S. at 17–18. Specifically, the Plaintiffs offer evidence of a long-felt need. As the Plaintiffs points out, Novartis abandoned iloperidone and sold it to Vanda for an up-front payment of $500,000. Tr. at 84:6–85:13 (Polymeropoulos). Subsequently, Vanda was able to get FDA approval for iloperidone, based at least in part on Polymeropoulos's and Wolfgang's invention to reduce the side effects associated with QTc prolongation in order to safely treat patients suffering from schizophrenia. Tr. at 84:15–

22 (Polymeropoulos). After iloperidone was approved, Novartis paid Vanda $200,000,000 to reacquire rights to iloperidone and to market FANAPT® in the U.S. Tr. at 84:6–85:13 (Polymeropoulos). The forty-fold increase in Novartis's valuation of the franchise is highly indicative of non-obviousness. While Roxane argues that schizophrenia continues to be difficult to treat, (D.I. 85 at 11), the court's analysis must consider whether the claimed invention represents an improvement from the prior art at the time, not whether the problem has been totally eliminated.

## B. Subject Matter Eligibility of the '610 Patent

### 1. The Legal Standard

Section 101 describes the general categories of patentable subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. There are, however, exceptions to these broad classifications. Under § 101, "laws of nature, natural phenomena, and abstract ideas" are not patentable. *Diamond v. Diehr*, 450 U.S. 175, 185 (1981). The contours of these exceptions have been the subject of much debate in recent years. *See id.* ("[W]e tread carefully in construing this exclusionary principle lest it swallow all of patent law. At some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." (internal citation and quotations marks omitted)).

The Supreme Court's decision in *Alice* reaffirmed the framework first outlined in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.,* 132 S. Ct. 1289 (2012), used to "distinguish[ ] patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, what else is there in the claims before us? To

16

answer that question, we consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application.

*Id.* (quoting *Mayo Collaborative Services,* 132 S. Ct. at 1296–98 (internal citations, quotations marks, and alterations omitted). Thus, the court must determine (1) if the patented technology touches upon ineligible subject matter, and (2) whether there are sufficient inventive elements such that the invention is "'significantly more' than a patent on an ineligible concept." *See DDR Holdings, LLC v. Hotels.com, L.P.,* 773 F.3d 1245, 1255 (Fed. Cir. 2014) (quoting *Alice,* 134 S. Ct. at 2355); *see also Alice,* 134 S. Ct. at 2354 ("[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept.").

## 2. The CYP2D6 Reaction

Roxane's subject matter ineligibility argument is based upon the contention that the '610 Patent is directed toward a patent ineligible subject, specifically a law of nature that it applies in a way that is routine and conventional. Roxane asserts that the patent embodies two laws of nature: (1) that mutations in the CYP2D6 genes can alter enzymatic activity, and (2) that a patient's CYP2D6 enzymatic activity affects their metabolism of iloperidone. Tr. at 621:19–622:2 (Ratain). Thus, according to Roxane, all of the method-of-treatment claims depend on natural processes. (D.I. 184 at 9.) To this, Roxane insists that the Plaintiffs merely add a dose adjustment to reduce the risk of a side effect, which Roxane claims is routine and conventional activity. (D.I. 185 at 10); Tr. at 521:6-522:10 (Ratain). According to Roxane, a person ordinarily skilled in the art would naturally discover the invention in performing FDA-mandated studies. (D.I. 179 at 17); Tr. at 604:13–19 (Ratain). Roxane's expert, Dr. Ratain, cited the prior art teaching from Goodman & Gilman's textbook as support for this view. DTX-79.

17

**Appx17**

The Plaintiffs respond that § 101 forbids patent claims "directed to" patent-ineligible concepts, not claims that merely "*involve* a patent ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions involves a law of nature and/or natural phenomenon . . . ." *See Enfish, LLC v. Microsoft Corp.*, No. 2015-1244, 2016 WL 2756255, at *4 (Fed. Cir. May 12, 2016). The Plaintiffs argue that they have not sought to claim the use of biological sampling, or genotyping, or the relationship between iloperidone, CYP2D6 metabolism and QTc prolongation. (D.I. 178 at 23–24.) According to the Plaintiffs, the '610 Patent was not the result of routine and conventional testing. Specifically, the Plaintiffs' expert, Dr. Charles McCulloch, testified that clinical-study design is not routine or conventional. *See* Tr. at 629:15–21, 649:19–650:7 (McCulloch). The Plaintiffs also cite evidence that adjusting the dose for CYP2D6 poor metabolizers does not actually lower the risk of QTc prolongation for many drugs, including for antipsychotics that are structurally similar to iloperidone. *See* Ex. A, Guengerich ¶¶ 84–144, 155–60; Ex. B, Roth ¶¶ 144–62. Finally, the Plaintiffs point out that the U.S. Patent Office explicitly considered subject matter eligibility of the '610 Patent claims in light of *Mayo Collaborative Services*, and upheld the patentability of the claims after specific doses were added to the claims. Tr. at 521:6-21 (Ratain); JX-94 at 21; JX-20 at 2; DTX-82 at 2.

The court is persuaded that the asserted claims depend upon laws of nature. The '610 Patent describes the invention in terms of multiple natural relationships:

> The present invention describes an association between genetic polymorphisms in the CYP2D6 locus, corresponding increases in the concentrations of iloperidone or its metabolites, and the effect of such increases in concentrations on corrected QT (QTc) duration relative to baseline.

JX-1 at 2:34-38. The claims depend on the relationship between iloperidone, CYP2D6 metabolism, and QTc prolongation.

The issue is whether the claims incorporate some additional step sufficient to transform the claims, making them valid. In *Mayo Collaborative Services*, the Supreme Court considered patent claims describing the relationship between the ways in which thiopurine compounds are metabolized by the body and determined that this was a law of nature. *Id.* at 1297. The court found that to this law of nature, the claims merely added an "administering" step, a "determining" step, and a "wherein" step. *Id.* The Court wrote that the "determining" step in that case instructed the practitioner to determine the level of the relevant metabolites in the blood, "through whatever process the doctor or the laboratory wishes to use." *Id.* Thus, this step told doctors "to engage in well-understood, routine, conventional activity previously engaged in by scientists who work in the field." *Id.* at 1298. The Court wrote: "We need not, and do not, now decide whether were the steps at issue here less conventional, these features of the claims would prove sufficient to invalidate them." *Id.* at 1302.

The patent-at-issue in this case addresses natural relationships to which the claims add conducting CYP2D6 genotyping tests to determine the appropriate dose of iloperidone to reduce QTc-related risks. According to Roxane, these dosage adjustment limitations steps were routine and conventional activity. (D.I. 179 at 17.) Roxanne argues that Dr. Ratain testified that while exact dose reduction may not necessarily be ascertained without doing studies, the studies to determine the correct dose adjustment were routine. Tr. at 524:24-525:4 (Ratain). The Plaintiffs disagree, arguing that the tests to determine the dosage adjustments were far from routine; indeed Novartis' clinical trials attempted but failed to determine the relationship between QTc prolongation and CYP2D6 metabolism, a discovery it was highly motivated to find. Tr. at 617:18–618:19 (Ratain).

19

**Appx19**

The court finds that while it may have been conventional to investigate for side-effects, Roxane has not proven by clear and convincing evidence that the precise test and the discovered results were routine or conventional. The court finds it persuasive that the dosage step in the '610 Patent does not apply to all patients, but only a specific patient population based upon their genetic composition. The dosage step requires applying genetic tests in a highly specified way. Moreover, the process of using this genetic test to inform the dosage adjustment recited in the claims was not routine or conventional and amounted to more than a mere instruction to apply a natural relationship. This combination of elements is sufficient to ensure that the claims amount to significantly more than just a natural law. As the Federal Circuit instructed in *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, No. 2015-1570, 2016 WL 3606624 (Fed. Cir. July 5, 2016), a "particular 'combination of steps'" can lead to valid patent claims that depend upon a natural relationship. *Id.* at *4 (quoting *Diehr*, 450 U.S. at 188). This is true even though the individual steps may have been well known. *Id.* at *7 "To require something more . . . would be to discount the human ingenuity that comes from applying a natural discovery in a way that achieves a 'new and useful end.'" *Id.* (quoting *Alice*, 134 S. Ct. at 2354). Finally, the court is persuaded that the concern articulated in *Mayo* that "patent law not inhibit further discovery by improperly tying up the future use of laws of nature" does not apply here, because the '610 Patent will not preempt biological sampling or genotyping. *Mayo Collaborative Servs.*, 132 S. Ct. at 1301; (D.I. 178 at 24). Thus, the patent-at-issue is not invalid for lack of patentable subject matter.

### C.    Written Description of the '610 Patent

#### 1.    The Legal Standard

To meet the written description requirement of 35 U.S.C. § 112, the application must show that, as of the filing date, the applicants were in possession of the invention in question. *See Vas-*

*Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991). "[T]he test for sufficiency is whether the disclosure of the application relied upon *reasonably conveys* to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (emphasis added). Although an exact definition of "possession" can be elusive, in essence, "the specification must describe an invention understandable to [a] skilled artisan and show that the inventor actually invented the invention claimed." *Id.* To this end, support in the written description must be based on what actually is disclosed, and not on an obvious variant of what is disclosed. *See id.* at 1352 (citing *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571–72 (Fed. Cir. 1997)). Whether the written description requirement is met is a question of fact. *Id.* at 1351 (citing *Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1575 (Fed. Cir. 1985)). The party challenging the sufficiency of a written description must establish by clear and convincing evidence that the claim is invalid or not entitled to an asserted filing date. *See Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329–30 (Fed. Cir. 2008).

## 2. Dosage Range

Roxane argues that there is no support for a dosage range of 12 mg/day or less. (D.I. 185 at 11–12); Tr. at 535:24–536:2, 5419–17 (Ratain); 630:6–9 (McCulloch). Specifically, Roxane contends that the data in the patent do not support the asserted claims. Tr. at 630:4–9; 631:11–632:11 (McCulloch); 535:20–536:2 (Ratain). Dr. McCulloch testified that the 12 mg/day or less dosage threshold in the '610 Patent is not supported because the claims are based on indirect relationships that lack statistical significance. Tr. at 637:23–25 (McCulloch).

The Plaintiffs dispute this assertion. (D.I. 184 at 25.) The Plaintiffs point out that the '610 Patent discloses a trend for higher QTc prolongation among genotypic CYP2D6 poor metabolizers

given a 24 mg daily dose. Tr. at 647:22–648:2 (McCulloch) (citing Table 6 of the '610 Patent (JX-1 at 8:50–66)). In addition, Drs. Polymeropoulos and Wolfgang determined that the intermediate biomarkers for CYP2D6 poor metabolism are the ratios of P88 to P95 concentrations in the blood, correlated to higher QTc, and thus support the conclusion that genotypic CYP2D6 poor metabolizers had increased risk of QTc prolongation. Tr. at 976:19–977:13 (Guengerich) (citing JX-1 at col. 10). According to the Plaintiffs, the '610 Patent explicitly discloses the appropriate dosage range based on the P88 to P95 ratio in the blood. (D.I. 84 at 13.) *See, e.g.*, JX-1 at 11:25–28; 9:42–47 ("an individual with a genotype associated with decreased CYP2D6 activity may receive a reduced dosage of 18, 12, or 6 mg per day"); 9:34–42. Table 3 of the '610 Patent demonstrates that CYP2D6 poor metabolizers have 1.5 to 3.5 times higher P88 concentrations than non-poor metabolizers, which supports a 1.5 to 3.5 reduction in dose for CYP2D6 poor metabolizers. JX-1 at 70:50–60; Tr. at 106:16–107:17 (Polymeropoulos).

The court must agree with the Plaintiffs that this data is sufficient to support possession of the claimed dosage range, even if not statistically significant. The patent need only "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm. Inc.*, 598 F.3d at 1351 (en banc). Indeed, the statute does not recognize "examples or an actual reduction to practice." *Alcon Research Ltd.* v. *Barr Labs., Inc.*, 745 F.3d 1180, 1190 (Fed. Cir. 2014) (quoting *Ariad*, 598 F.3d at 1350)). Thus, Roxane has failed to prove that the '610 Patent is invalid for lack of written description.

### D.  Infringement

#### 1.  The Legal Standard

The determination of whether an accused method infringes a claim in a patent has two steps: (1) construction of the claim to determine its meaning and scope; and (2) comparison of the properly

construed claim to the method at issue. *See Tanabe Seiyaku Co. v. United States Int'I Trade Comm'n,* 109 F.3d 726, 731 (Fed. Cir. 1997) (citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996)). The patent owner has the burden of proving by a preponderance of the evidence that "every limitation of the patent claims asserted to be infringed is found in the accused [method], either literally or by an equivalent." *SmithKline Diag., Inc. v. Helena Lab. Corp.,* 859 F.2d 878, 889 (Fed. Cir. 1988). Under this standard, a patent owner does not have to produce definite proof of infringement, but must instead demonstrate that "infringement was more likely than not to have occurred." *See Warner-Lambert Co. v. Teva Pharms., USA, Inc.,* 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005) (citing *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 261 F.3d 1329, 1336 (Fed. Cir. 2001)). The application of a patent claim to an accused product is a fact-specific inquiry. *See Kustom Signals, Inc. v. Applied Concepts, Inc.,* 264 F.3d 1326, 1332 (Fed. Cir. 2001).

In the ANDA context, 35 U.S.C. § 271(e)(2)(A) provides that it shall be an act of infringement to submit an ANDA "if the purpose of such submission is to obtain approval . . . to engage in the commercial manufacture, use, or sale of a drug . . . claimed in a patent or the use of which is claimed in a patent before the expiration of such patent." 35 U.S.C. § 271(e)(2)(A). More specifically, as it relates to the instant matter, 35 U.S.C. § 271(b) states that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Inducement requires "actively and knowingly aiding and abetting another's direct infringement." *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,* 911 F.2d 670, 675 (Fed. Cir. 1990). In the Hatch-Waxman context, "[s]tatements in a package insert that encourage infringing use of a drug product are alone sufficient to establish intent to encourage direct infringement" for purposes of inducement to infringe under 35 U.S.C. § 271(b). *Abraxis Bioscience, Inc. v. Navinta, LLC*, 640 F. Supp. 2d

553, 570 (D.N.J. 2009), rev'd and vacated on other grounds, 625 F.3d 1359 (Fed. Cir. 2010) (citing *AstraZeneca LP v. Apotex, Inc.,* 623 F.Supp. 2d 579, 570 (D.N.J. 2009). *See 3M Co. v. Chemque, Inc.,* 303 F.3d 1294, 1305 (Fed. Cir. 2002) (defendant who is aware of a patent and supplies a product to a customer with instructions for use, which when followed lead to infringement, has encouraged acts constituting direct infringement).

Importantly, however, mere knowledge of possible infringement does not constitute inducement. Rather, the patentee must prove that the defendant's actions "induced infringing acts *and* that [the defendant] knew or should have known that [its] actions would induce actual infringement." *See Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553 (Fed. Cir. 1990). In ANDA cases, the court must consider whether "the proposed label instructs users to perform the patented method," as well as whether the proposed label encourages others to practice the patented method. *AstraZeneca LP v. Apotex, Inc.,* 633 F.3d 1042, 1060 (Fed. Cir. 2010) (citing *Vita-Mix Corp. v. Basic Holdings, Inc.,* 581 F.3d 1317, 1329 n.2 (Fed. Cir. 2009).

With respect to contributory infringement, under 35 U.S.C. § 271(c), "[w]hoever offers to sell or sells within the United States or imports into the United States a component of patented . . . manufacture, combination or composition, or a material . . . for use in practicing a patented process, constituting a material part of the infringement, knowing the same to be especially made or especially adapted for use in infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use," shall be considered "a contributory infringer." 35 U.S.C. § 271(c). The Federal Circuit has clarified that, to establish contributory infringement, the patent owner must prove that: (1) there is direct infringement; (2) the accused infringer had knowledge of the patent at issue; (3) the component has no substantial noninfringing uses; and (4) "the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.,* 620

F.3d 1321, 1326 (Fed. Cir. 2010). *See also Lucent Techs. Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1320 (Fed. Cir. 2009).

## 2. **Direct Infringement**

As a preliminary matter, Roxane argues there is no evidence of direct infringement of the '610 Patent. (D.I. 185 at 2.) Direct infringement is a required element to establish induced infringement. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010). To satisfy the direct infringement requirement, the patentee "must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.,* 501 F.3d 1307, 1313 (Fed. Cir. 2007) (citing *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1275–76 (Fed. Cir. 2004)). The Plaintiffs contend that Roxane's Proposed Label for iloperidone is the same as Vanda's FANAPT® Label and establishes that Roxane's product will infringe the asserted claims. Tr. at 368:11–16 (Economou); 373:15–374:4 (Smith); 569:21–23 (Ratain).

The evidence at trial demonstrated that Roxane's Proposed Label satisfies claims 1–9, 11–13, 16 of the '610 Patent as construed in the court's *Markman* order. (D.I. 125.) Roxane's Label recommends that practitioners use iloperidone to treat patients suffering from schizophrenia. JX-13 at § 1. The label recommends oral administration of iloperidone tablets at 12 to 24 mg/day to non-genotypic CYP2D6 poor metabolizers and 12 mg/day or less to genotypic CYP2D6 poor metabolizers. JX-13 at § 2.1-2.2. It also recommends that practitioners perform or have performed a genotyping assay to determine whether patients are CYP2D6 poor metabolizers. JX-13 at § 12.3. Section 5.2 of the label states that in an open-label study, "iloperidone was associated with QTc prolongation of 9 msec at an iloperidone dose of 12 mg twice daily," that "under conditions of metabolic inhibition for both 2D6 and 3A4, iloperidone 12 mg twice daily was associated with a

mean QTc increase from baseline of about 19 msec," and therefore "caution is warranted when prescribing iloperidone . . . in patients with reduced activity of CYP2D6." JX-13 at § 5.2. Section 12.3 states that "PMs of CYP2D6 have higher exposure to iloperidone compared with EMs and PMs should have their dose reduced by one-half." JX-13 at § 12.3; Tr. at 231:20–234:4 (Preskorn). The court is persuaded that the testimony presented at trial demonstrated by the preponderance of the evidence that when the label states that "laboratory tests" are available to identify poor metabolizers, the label is referring to "genotyping tests." Tr. at 567:5–568:2 (Ratain); 234:15–235:13 (Preskorn); 174:7–24, 198:4–200:7 (Kricka). Tr. at 190:14–193:12 (Kricka); 235:18–23, 236:15–19 (Preskorn) (all commercially available laboratory tests to determine whether a patient is a genotypic CYP2D6 poor metabolizer involve genotyping). Under 35 U.S.C. § 271(e)(2)(A), it is an act of infringement to file an ANDA application "for a drug claimed in a patent or the use of which is claimed in a patent." 35 U.S.C. § 271(e)(2)(A). Thus, Roxane's submission of a paragraph IV certification for the '610 Patent is an act of infringement. *See, e.g., Bristol-Myers Squibb Co.* v. *Royce Labs.*, 69 F.3d 1130, 1131 (Fed. Cir. 1995) ("Inclusion of a paragraph IV certification in an ANDA, however, is deemed an act of infringement.").

Roxane argues that it is impossible for its products to infringe the asserted claims because doctors do not actually administer a genotyping test and administer up to 12 mg/day of iloperidone to genotypic CYP2D6 poor metabolizers and therefore do not infringe all of the claims. (D.I. 185 at 2.) The Plaintiffs disagree, relying on the testimony of Dr. Alva. (D.I. 184 at 6–7.) Dr. Alva's patient records and testimony confirm that he has practiced the steps of the '610 Patent claims. (*Id.*) He testified that he genotypes his patients and he specifically identified a patient for whom he exceeded 12mg/day of iloperidone only after determining through genotyping that the patient was

not a poor metabolizer. Tr. at 322:7–326:17 (Alva). The court found Dr. Alva's testimony credible. Thus, the court finds that there is sufficient evidence to establish direct infringement.

### 3. **Induced Infringement**

The Plaintiffs argue that Roxane's proposed products induce infringement of the '610 Patent because Roxane's proposed product labels instruct users to perform each element of the claimed patented method. (D.I. 184 at 1.) According to the Plaintiffs, Roxane's Proposed Label recommends that prescribers perform each step of the claimed methods, including genotyping their patients and administering up to 12 mg/day of iloperidone to genotypic CYP2D6 poor metabolizers. (*Id.*)

Roxane responds that the dosage reduction on the label is merely educational language and that its label does not encourage a physician to perform or dose a patient based on a CYP2D6 genotyping test. (D.I. 185 at 3.) Roxane relies on the testimony of Dr. Kaye. Dr. Kaye testified that there is no mandate for genetic testing and that the language "should have their dose reduced by half" is not a recommendation or suggestion to reduce the dosage in CYP2D6 PMs. Tr. at 462:1-464:11 (Kaye). The court did not find the testimony of Dr. Kaye to be credible. Roxane's other expert, Dr. Ratain, and the Plaintiffs's expert, Dr. Preskorn, testified that these words have their plain meaning and are a recommendation to reduce the dosage in this patient population. Tr. at 539:15–25, 548:12–16 (Ratain); 231:14–19 (Preskorn). The court rejects Roxane's argument that this information is merely informative.

Roxane contends that while the '610 claims require genotyping testing, the label does not specify that the tests to determine poor metabolizers must be genotyping tests. (D.I. 185 at 3.) Poor metabolizers can also be identified by laboratory tests that determine a patient's phenotype, such as measuring iloperidone concentrations. Tr. at 144:13-146:5 (Polymeropoulos); 211:14-215:7

27

**Appx27**

(Kricka); 285:14-289:8 (Preskorn); 409:13-410:17, 411:17-413:16, 419:10-12 (Kaye); DTX-19 at 2; DTX-20 at 4; DTX-356; DTX-501; DTX-502; JX-36 at 7. According to Roxane, the label itself describes metabolizer status by reference to serum levels of iloperidone—a measure of phenotype—not by reference to any allele or genetic variant. Tr. at 407:13-408:1 (Kaye); JX-11 at 21. Dr. Kaye explained that he had never genotyped a patient in connection with prescribing iloperidone. Tr. at 381:21-382:4 (Kaye). He further explained that a physician would not genotype a patient in order to determine what dose of a drug to use, because "genotyping does not predict efficacy or dose response." Tr. at 390:17-392:7 (Kaye). According to Dr. Kaye, phenotyping is more clinically helpful than CYP2D6 genotyping. Tr. at 412:11-413:16 (Kaye). In addition, Roxane posits that its label mandates titration to efficacy to determine the appropriate dosage. (D.I. 179, ¶ 13.) Dr. Kaye testified that in accordance with the label's titration requirement, physicians always titrate to efficacy rather than rely on genotyping. Tr. at 394:9-398:3, 400:6-403:20 (Kaye).

The evidence presented at trial suggests that as a practical matter, doctors may not rely on genotyping tests because of the resources and time they require. However, to determine whether there is induced infringement, the court is tasked with interpreting whether the label "encourage[s], recommend[s], or promote[s] infringement." *Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp.,* 785 F.3d 625, 631 (Fed. Cir. 2015). Roxane argues that because some prescribers of iloperidone will not follow the steps of the '610 Patent by not genotyping their patients, there are substantial noninfringing uses and Roxane does not induce infringement. The court rejects this argument. "The pertinent question is whether the proposed label instructs users to perform the patented method. If so, the proposed label may provide evidence of [Roxane]'s affirmative intent to induce infringement." *AstraZeneca LP v. Apotex Corp.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010). Moreover, the existence of a substantial non-infringing use does not preclude a finding of

inducement. *Erbe Elektromedizin GmbH v. Canady Tech. LLC,* 629 F.3d 1278, 1284 (Fed. Cir. 2010); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012) (holding that the district court's conclusion that a finding of a substantial non-infringing use precludes a finding of induced infringement was legal error). The court concludes that Roxane's label induces infringement of the '610 Patent.

### 4. Contributory Infringement

In contrast, the Plaintiffs have not established contributory infringement. 35 U.S.C. § 271(c). Here, the Federal Circuit's opinion in *Toshiba Corp. v. Imation Corp.* is instructive on the distinction between contributory and induced infringement. 681 F.3d 1358. An accused infringer may escape liability for contributory infringement if his product is capable of substantial non-infringing use. *Id.* at 1362. On the other hand, if the accused infringer encourages infringing use, the fact that his product is capable of substantial non-infringing use will not save him from inducement liability. *Id.* at 1365–66.

The Plaintiffs contend that Roxane's proposed products contribute to infringement because their proposed labels would contribute to direct infringement of the asserted claim and Roxane's products have no substantial noninfringing uses. The court cannot agree. The evidence presented at trial demonstrates that a physician could prescribe iloperidone without practicing the claims of the '610 Patent by not using a genotyping test. Tr. at 257:4-258:6 (Preskorn), 407:13-406:11 (Kaye), 503:22-504:3 (Ratain); JX-11 at 21. The burden is on the Plaintiffs to prove that there is not a substantial noninfringing use and the Plaintiffs have not met this burden. In this case, the testimony at trial established that the noninfringing uses are not "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp.*, 581 F.3d at 1327.

In conclusion, Roxane's generic iloperidone as described in the Roxane ANDA would, if marketed, induce infringement of claims 1-9, 11-13, and 16 of the '610 Patent. However, there are one or more substantially non-infringing uses for Roxane's generic iloperidone that preclude a finding of contributory infringement. Thus, Roxane does not contribute to the infringement of the '610 Patent.

### E.    Remedies

Pursuant to 35 U.S.C. § 271(e)(4)(B), the court finds that Roxane, its officers, agents, attorneys, and employees, and those acting in privity or concert with any of them, should be enjoined from engaging in the commercial manufacture, use, offer to sell, or sale with the United States, or importation into the United States of Roxane's ANDA Product prior to the expiration of the '198 Patent. 35 U.S.C. § 271(e)(4)(B). The court finds that the Plaintiffs are not entitled to relief pursuant to 35 U.S.C. § 271(e)(4)(A) for the '610 Patent because the '610 Patent did not issue until after the effective date of any FDA approval of the Roxane ANDA of Roxane's ANDA No. 20-5480. Section 271(e)(4)(A) explicitly protects a patent that has already issued at the time of the ANDA's submission. *See Endo Pharm. Inc. v. Amneal Pharm., LLC*, No. 12 CIV. 8060 (TPG), 2016 WL 1732751, at \*4 (S.D.N.Y. Apr. 29, 2016). Under § 271(e)(2), it is an act of infringement to submit an ANDA under § 355(j) for "'a drug claimed in a patent or the use of which is claimed in a patent.' Notably, the subject of the sentence is 'a patent,' not a provisional patent application or a patent-pending." *Id.* at \*3.

While the Plaintiffs are ineligible for the relief set forth in § 271(e)(4), the court has the general equitable power to issue an injunction based upon the finding of patent infringement under § 271(a)-(c). *See, e.g., eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). Before the court can enjoin Roxane, the Plaintiffs must demonstrate that such relief would be fair and equitable

pursuant to the Supreme Court's analysis in *eBay*. A patent owner prevailing on the merits in a patent infringement suit is not automatically entitled to an injunction. *eBay*, 547 U.S. at 390. Rather, courts apply traditional equitable principles to determine: (1) whether the patentee would be irreparably harmed without an injunction; (2) whether the patentee has an adequate remedy at law; (3) whether the balance of hardships favors an injunction; and (4) whether granting the injunction is in the public interest. *Id.* at 391. The court will apply these considerations to the facts of this case.

Here, it is clear that Vanda would be irreparably harmed without an injunction. "Where a plaintiff and an infringer directly compete in the same market, an injunction may be warranted to protect the plaintiff from irreparable harm." *Endo Pharm. Inc.*, 2016 WL 1732751, at *5 (citing *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013)). Allowing generic products such as Roxane's into the market will no doubt cause harm to Vanda. Without an injunction, Plaintiffs would suffer an incalculable loss of market share and Roxane's generic iloperidone would erode the price for Fanapt®. Vanda would also suffer irreparable harm from being unable to use lost Fanapt® revenue to invest in research and development of new clinical indications for and formulations of Fanapt® and development of other drugs. These irreparable harms would be the direct result of Roxane's sales. (D.I. 178 at 26.) There is no other adequate remedy because these harms are and would continue to be difficult to quantify. On the other hand, Roxane has not demonstrated it would suffer hardship. Therefore, the balance of hardships weighs in favor of enjoining Roxane. Finally, the court finds that the public interest would not be disserved by a permanent injunction. *eBay*, 547 U.S. at 391. Vanda holds a valid patent and the Federal Circuit has "long acknowledged the importance of the patent system in encouraging innovation. Indeed, the 'encouragement of investment-based risk is the fundamental purpose of the patent grant,

**Appx31**

and is based directly on the right to exclude.'" *SanofiSynthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (quoting *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 599 (Fed. Cir. 1985)).

In conclusion, the four *eBay* factors weigh in favor of issuing an injunction. The Plaintiffs are entitled to a permanent injunction restraining and enjoining Roxane, their officers, agents, servants, employees, attorneys, affiliates, divisions, subsidiaries, and those persons in active concert or participation with any of them from infringing the '610 Patent or inducing anyone to do the same, including the manufacture, use, offer to sell, sale, distribution, or importation of any generic iloperidone product described in the Roxane ANDA, or any amendments or supplements thereto until the expiration of the '610 Patent on November 2, 2027.

## IV. CONCLUSION

In sum, the court finds that (1) all asserted claims of the patents-in-suit are valid; (2) Roxane's proposed products induce infringement of the asserted claims of the '610 Patent; (3) Roxane's proposed products do not contributorily infringe the asserted claims of the '610 Patent; and (4) each of the parties' Rule 52(c) motions are granted in part and denied in part.

Dated: August 25, 2016

UNITED STATES DISTRICT JUDGE

**Appx32**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VANDA PHARMACEUTICALS INC., )
and AVENTISUB LLC, )
                            )
       Plaintiffs, )     Civil Action No. 13-1973-GMS
                            )     Civil Action No. 14-757-GMS
       v. )     (Consolidated)
                            )
ROXANE LABORATORIES, INC., )
                            )
       Defendant. )
                            )

## ORDER

At Wilmington this 25ᵗʰ day of August, 2016, IT IS HEREBY ORDERED THAT:

1. Roxane's ANDA Product infringes claim 3 of the '198 Patent.

2. Roxane's ANDA Product infringes claims 1–9, 11–13, and 16 of the '610 Patent, except with respect to the Plaintiffs' claim of contributory infringement.

3. Claim 3 of the '198 Patent is not invalid as obvious.

4. Claims 1–9, 11–13, and 16 of the '610 Patent are not invalid as obvious.

5. Claims 1–9, 11–13, and 16 of the '610 Patent are not invalid for lack of written description.

6. Claim 1–9, 11–13, and 16 of the '610 Patent are not invalid for failure to claim patentable subject matter.

7. Pursuant to the court's equitable power, Roxane is hereby enjoined from engaging in the commercial manufacture, use, offer to sell, or sale with the United States, or importation into the United States of Roxane's ANDA Product prior to the expiration of the '610 Patent (November 2, 2027) or any applicable exclusivities and extensions.

8. The effective date of any Food and Drug Administration approval of Roxane's ANDA No. 20-5480 shall be a date not earlier than the latest of the expiration of the '610 Patent or any applicable exclusivities and extensions.

9. The Clerk of Court is directed to enter final judgment in favor of the plaintiffs.

10. The parties' Rule 52(c) motions are GRANTED IN PART AND DENIED IN PART.

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| VANDA PHARMACEUTICALS INC., and AVENTISUB LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 13-1973-GMS ) **CONSOLIDATED** |
| ROXANE LABORATORIES, INC., | ) ) |
| Defendant. | ) ) ) |

## JUDGMENT

This action came before the Court for a five-day bench trial on February 29, 2016. The

issues have been tried and the parties filed Proposed Findings of Facts and Conclusions of Law

(D.I. 178, 179) and Post Trial Briefs (D.I. 184, 185). The court issued a Memorandum (D.I. 193)

and Order (D.I. 194) ("Bench Opinion") on August 25, 2016. Therefore,

IT IS HEREBY ORDERED AND ADJUDGED that, in accordance with this Court's

Bench Opinion, final judgment be and is hereby entered in favor of plaintiffs VANDA

PHARMACEUTICALS INC. and AVENTISUB LLC ("Vanda") and against defendant

ROXANE LABORATORIES, INC. ("Roxane"), finding that:

1. Roxane's ANDA Product infringes claim 3 of the '198 Patent; and

2. Roxane's ANDA Product infringes claims 1-9, 11-13, and 16 of the '610 Patent, except with respect to the plaintiffs' claim of contributory infringement.

Dated: August _25_, 2016

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VANDA PHARMACEUTICALS INC., )
and AVENTISUB LLC, )
)
        Plaintiffs, )
)   C.A. No. 13-1973-GMS
v. )   **CONSOLIDATED**
)
ROXANE LABORATORIES, INC., )
)
        Defendant. )
)

## JUDGMENT

This action came before the Court for a five-day bench trial on February 29, 2016. The

issues have been tried and the parties filed Proposed Findings of Facts and Conclusions of Law

(D.I. 178, 179) and Post Trial Briefs (D.I. 184, 185). The court issued a Memorandum (D.I. 193)

and Order (D.I. 194) ("Bench Opinion") on August 25, 2016. Therefore,

IT IS HEREBY ORDERED AND ADJUDGED that, in accordance with this Court's

Bench Opinion, final judgment be and is hereby entered in favor of plaintiffs VANDA

PHARMACEUTICALS INC. and AVENTISUB LLC ("Vanda") and against defendant

ROXANE LABORATORIES, INC. ("Roxane"), finding that:

1. Roxane's ANDA Product infringes claim 3 of the '198 Patent; and

2. Roxane's ANDA Product infringes claims 1-9, 11-13, and 16 of the '610 Patent,
   except with respect to the plaintiffs' claim of contributory infringement.

Dated: August ⎽2̲5̲⎽, 2016

                    UNITED STATES DISTRICT JUDGE

(12) **United States Patent**
(10) **Patent No.:** **US 8,586,610 B2**

Wolfgang et al.
(45) **Date of Patent:** *Nov. 19, 2013

| | | | |
|---|---|---|---|
| 2005/0032070 A1 | 2/2005 | Raimundo et al. | |
| 2008/0166357 A1 | 7/2008 | Golz et al. | |
| 2009/0298880 A1 | 12/2009 | Wolfgang et al. | |

(54) **METHODS FOR THE ADMINISTRATION OF ILOPERIDONE**

(75) Inventors: **Curt D. Wolfgang**, Germantown, MD (US); **Mihael H. Polymeropoulos**, Potomac, MD (US)

(73) Assignee: **Vanda Pharmaceuticals, Inc.**, Washington, DC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 763 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/576,178**

(22) PCT Filed: **Sep. 30, 2005**

(86) PCT No.: **PCT/US2005/035526**

§ 371 (c)(1), (2), (4) Date: **Mar. 28, 2007**

(87) PCT Pub. No.: **WO2006/039663**

PCT Pub. Date: **Apr. 13, 2006**

(65) **Prior Publication Data**

US 2009/0298880 A1    Dec. 3, 2009

**Related U.S. Application Data**

(60) Provisional application No. 60/614,798, filed on Sep. 30, 2004.

(51) **Int. Cl.**
*A61K 31/445* (2006.01)
*C12Q 1/68* (2006.01)

(52) **U.S. Cl.**
USPC .......................... **514/320**; 435/6.11; 435/6.18

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,965,188 A | 10/1990 | Mullis et al. | |
| 5,130,238 A | 7/1992 | Malek et al. | |
| 5,364,866 A | 11/1994 | Strupczewski et al. | |
| 5,846,717 A | 12/1998 | Brow et al. | |
| 5,981,174 A | 11/1999 | Wolf et al. | |
| 6,001,567 A | 12/1999 | Brow et al. | |
| 7,179,597 B2 | 2/2007 | Woosley | |
| 2001/0034023 A1 | 10/2001 | Stanton, Jr. et al. | |
| 2002/0022054 A1 | 2/2002 | Sawada et al. | |
| 2002/0127561 A1 | 9/2002 | Bee et al. | |
| 2003/0083485 A1 | 5/2003 | Milos et al. | |
| 2003/0091645 A1 | 5/2003 | Ahlheim et al. | |
| 2003/0144220 A1 | 7/2003 | Obach | |
| 2003/0170176 A1 | 9/2003 | Leyland-Jones | |
| 2004/0072235 A1 | 4/2004 | Dawson | |
| 2004/0091999 A1 | 5/2004 | Huang | |
| 2004/0096874 A1 | 5/2004 | Neville et al. | |
| 2004/0133352 A1 | 7/2004 | Bevilacqua et al. | |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| WO | 0055624 A2 | | 9/2000 | |
| WO | 0059486 A2 | | 10/2000 | |
| WO | 0149883 A2 | | 7/2001 | |
| WO | 0179554 A1 | * | 10/2001 | |
| WO | 0244994 A2 | | 6/2002 | |
| WO | 0250283 A2 | | 6/2002 | |
| WO | 02064141 A1 | | 8/2002 | |
| WO | 03017946 A2 | | 3/2003 | |
| WO | 03020707 A1 | | 3/2003 | |
| WO | 03038123 A2 | | 5/2003 | |
| WO | 03054226 A3 | | 7/2003 | |
| WO | 2004006886 A2 | | 1/2004 | |
| WO | 2004009760 A2 | | 1/2004 | |
| WO | 2004009760 A1 | | 1/2004 | |
| WO | 2006039663 A2 | | 4/2006 | |
| WO | 2008121899 A2 | | 10/2008 | |
| WO | 2008144599 A2 | | 11/2008 | |
| WO | 2010030783 A1 | | 3/2010 | |

OTHER PUBLICATIONS

Australian IP, Examination Report dated Nov. 13, 2009, Australian Application No. 2005292246, 2 pages.

Patent Cooperation Treaty, International Search Report and the Written Opinion of the International Searching Authority dated Nov. 27, 2009, International Application No. PCT/US2009/056517, 18 pages.

Caccia, "New Antipsychotic Agents for Schizophrenia: Pharmacokinetics and Metabolism Update", Jul. 2002, pp. 1073-1080, Current Opinion in Investigational Drugs, vol. 3, No. 7.

Subramanian, N. et al., "Receptor profile of P88-8991 and P95-12113, metabolites of the novel antipsychotic iloperidone," Progress in Neuro-Psychopharmacology & Biological Psychiatry, vol. 26, No. 3, Mar. 15, 2002, pp. 553-560, England.

Kelleher, J.P. et al., "Advances in Atypical Antipsychotics for the Treatment of Schizophrenia—New Formulations and New Agents," CNS Drugs, ADIS International, Auckland, NZ, vol. 16, No. 4, 2002, pp. 249-261.

Bradford, "CYP2D6 allele frequency in European Caucasians, Asians, Africans and their decendants," 2002, , pp. 229-243, Ashley Publications Ltd. ISSN 1452-2416,Pharmacogenomics 2002 3(2).

Bertilsson et al., "Molecular genetics of CYP2D6: Clinical relevance with focus on psychotropic drugs," 2002, pp. 111-122, 2002 Blackwell Science Ltd.

Chainuvati et al., "Combined phenotypic assessment of cytochrome p450 1A2, 2C9, 2C19, 2D6, and 3A, N-acetyltransferase-2, and xanthine oxidase activities with the"Cooperstown 5+1 cocktail, Nov. 2003, 2 pages, Clin Pharmacol Ther. Nov. 2003; 74(5), National Library of Medicine, abstract only.

Dahl et al., "Genetic analysis of the CYP2D locus in relation to debrisoquine hydroxylation capacity in Korean, Japanese and Chinese subjects," 1995, pp. 159-164, Pharmacogenetics 5.

(Continued)

*Primary Examiner* — Diana Johannsen

(74) *Attorney, Agent, or Firm* — Jayme M. Torelli; Hoffman Warnick LLC

(57) **ABSTRACT**

The present invention relates to methods for the identification of genetic polymorphisms that may be associated with a risk for QT prolongation after treatment with iloperidone and related methods of administering iloperidone to patients with such polymorphisms.

**16 Claims, No Drawings**

**JX-1**

*Vanda Pharmaceuticals Inc. v.*
*Roxane Laboratories, Inc.,*
C.A. No. 13-1973-GMS (D. Del.)

VNDA 00000001

US 8,586,610 B2

Page 2

(56)            **References Cited**

OTHER PUBLICATIONS

Gough et al., "Identification of the primary gene defect at the cytochrome P 450 CYP2D locus," Oct. 25, 1990, pp. 773-776, Nature, vol. 374.

Hanioka et al., "The Human CYP2D Locus Associated with a Common Genetic Defect in Drug Oxidation: A G1934-A Base Change in Intron 3 of a Mutant CYP2D6 Allele Results in an Aberrant 3′ Splice Recognition Site," 1990, pp. 994-1001, Am. J. Hum. Genet. 47.

Jaanson et al., "Maintenance therapy with zuclopenthixol decanoate: associations between plasma concentrations, neurological side effects and CYP2D6 genotype," 2002, pp. 67-73, Psychopharmacology 162.

Johannson et al., "Genetic Analysis of the Chinese Cytochrome P4502D Locus: Characterization of Variant CYP2D6 Genes Present in Subjects with Diminished Capacity for Debrisoquine Hydroxylation," Jun. 1994, pp. 452-459, Copyright by The American Society for Pharmacology and Experimental Therapeutics, Molecular Pharmacology, 46.

Kagimoto et al., "Multiple Mutations of the Human Cytochrome P450IID6 Gene (CYP2D6) in Poor Metabolizers of Debrisoquine," Oct. 1990, pp. 17209-17214, The Journal of Biological Chemistry, vol. 265, No. 28.

Lyamichev et al., "Polymorphism Identification and Quantitative Detection of Genomic DNA by Invasive Cleavage of Oligonucleotide Probes," Mar. 1999, pp. 292-296, Nature America Inc., Nature Biotechnology, vol. 17.

McElroy et al., "CYP2D6 Genotyping as an Alternative to Phenotyping for Determination of Metabolic Status in a Clinical Trial Setting," Oct. 2000, pp. 1-11, AAPS Pharmsci 2000; 2 (4) article 33 (http://www.pharmsci.org/).

Neville et al., "Characterization of Cytochrome P450 2D6 Alleles Using the Invader System," Jun. 2002, 9 pages, BioTechniques 32, pp. S34 -S43.

Yokota et al., "Evidence for a New Variant CYP2D Allele CYP2D6J in a Japanese Population Associated with Lower in Vivo Rates of Sparteine Metabolism," 1993, pp. 256-263, Pharmacogenetics 3.

Jain, "An Assessment of Iloperidone for the Treatment of Schizophrenia," Dec. 2000, 2 pages, Expert Opinion, Summary Expert Opinion on Investigational Drugs, vol. 9, No. 12, abstract only.

Mutlib et al., "Application of Liquid Chromatography/Mass Spectrometry in Accelerating the Identification of Human Liver Cytochrome P450 Isoforms Involved in the Metabolism of Iloperidone," May 1998, pp. 1285-1293, The Journal of Pharmacology and Experimental Therapeutics, Copyright 1998 by the American Society for Pharmacology and Experimental Therapeutics.

Unknown, "Home Page of the Human Cytochrome P450 (CYP) Allele Nomenclature Committee," from: http://www.cypalleles.ki.se/, May 2008 2 pages, printed May 28, 2008.

Wang et al., "G169R Mutation Diminishes the Metabolic Activity of CYP2D6 in Chinese," Mar. 1999, pp. 385-388, Drug Metabolism and Disposition, vol. 27, No. 3, XP-001036785, ISSN: 0900-9558.

European Patent Office, Examination Report for Application No. 05803436.1 dated Apr. 21, 2010, 8 pages.

Fuselli et al., "Molecular diversity at the CYP2D6 locus in the Mediterranean region," Nov. 2004, pages 916-924, European Journal of Human Genetics, vol. 12, No. 11, ISSN: 1018-4813.

Sachse et al., "Cytochrome P450 2D6 Variants in a Caucasian Population: Allele Frequencies and Phenotypic Consequences," Feb. 1997, pp. 284-295, American Journal of Human Genetics, vol. 60, No. 2, ISSN: 0002-9297.

Australian IP, Examination report dated Jan. 12, 2011, Australian Application No. 2005292246, 2 pages.

Patent Cooperation Treaty International Preliminary Report of the International Searching Authority dated Mar. 24, 2011, International Application No. PCT/US2009/056517, 10 pages.

Shimada et al., "Characterization of Bufuralol Hydroxylation Activities in Liver Microsomes of Japanese and Caucasian Subjects Genotyped for CYP2D6," 2001, pp. 143-156, Pharmacogenetics 2001.

Johannsen, Office Action Communication for U.S. Appl. No. 12/208,027 dated Mar. 30, 2011, 31 pages.

Patent Cooperation Treaty, Notification of Transmittal of the International Search Report and The Written Opinion of the International Searching Authority, or the Declaration for PCT/US2005/035526 dated Aug. 23, 2006, 11 pages.

Patent Cooperation Treaty, Notification of Transmittal of the International Preliminary Report on Patentability for PCT/US2005/035526 dated Jun. 8, 2007, 5 pages.

European Patent Office, Extended Search Report for Application No. 05803436.4 dated Feb. 25, 2008, 12 pages.

European Patent Office, Examination Report for Application No. 05803436.4 dated May 28, 2008, 1 page.

Johannsen, Office Action Communication Restriction Requirement for U.S. Appl. No. 12/208,027 dated Jan. 19, 2011, 9 pages.

Johannsen, Office Action Communication Restriction Requirement for U.S. Appl. No. 12/208,027 dated Aug. 31, 2011, 25 pages.

Johannsen, Diana B., U.S. Appl. No. 12/208,027, filed Sep. 10, 2008, Non-final Office Action Dec. 20, 2012, 19 pages.

Johannsen, Office Action Communication for U.S. Appl. No. 12/208,027, dated Jul. 3, 2012, 13 pages.

European Patent Office, European Search Report for Application No. EP12164353 dated Aug. 29, 2012, 13 pages.

Sheridan et al., "Empirical Regioselectivity Models for Human Cytochromes P450 3A4, 2D6, and 2C9," Jun. 2007, pp. 3173-3184, J. Med. Chem. vol. 50, American Chemical Society.

Ryan et al., "Non-PCR-Dependent Detection of the Factor V Leiden Mutation From Genomic DNA Using a Homogeneous Invader Microtiter Plate Assay," 1999, pp. 135-144, Molecular Diagnosis, vol. 4, No. 2.

* cited by examiner

VNDA 00000002

US 8,586,610 B2

1

# METHODS FOR THE ADMINISTRATION OF ILOPERIDONE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a 35 USC 371 national stage application of co-pending International Patent Application No. PCT/US2005/035526, filed Sep. 30, 2005, which claims the benefit of U.S. Provisional Application No. 60/614,798, filed Sep. 30, 2004, each of which is hereby incorporated herein.

## SEQUENCE LISTING

The sequence listing contained in the electronic file titled "VAND-0002-US_SeqID__2009-07-16.txt" created Jul. 16, 2009, comprising 4 KB, is hereby incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Several genes associated with drug metabolism have been found to be polymorphic. As a result, the abilities of individual patients to metabolize a particular drug may vary greatly. This can prove problematic or dangerous where an increased concentration of a non-metabolized drug or its metabolites is capable of producing unwanted physiological effects.

The cytochrome P450 2D6 gene (CYP2D6), located on chromosome 22, encodes the Phase I drug metabolizing enzyme debrisoquine hydroxylase. A large number of drugs are known to be metabolized by debrisoquine hydroxylase, including many common central nervous system and cardiovascular drugs. One such drug is iloperidone (1-[4-[3-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]propoxy]-3-methoxyphenyl]ethanone). Iloperidone and methods for its production and use as an antipsychotic and analgesic are described in U.S. Pat. No. 5,364,866 to Strupczewski et al. The diseases and disorders that can be treated by administration of iloperidone include all forms of schizophrenia (i.e., paranoid, catatonic, disorganized, undifferentiated, and residual), schizoaffective disorders, bipolar mania/depression, cardiac arrhythmias, Tourette's Syndrome, brief psychotic disorder, delusional disorder, psychotic disorder NOS (not otherwise specified), psychotic disorder due to a general medical condition, schizophreniform disorder, and substance-induced psychotic disorder.

P88 is an active metabolite of iloperidone. See, e.g., PCT WO2003020707, which is incorporated herein by reference.

Among the unwanted physiological effects associated with an increased concentration of iloperidone or its metabolites is prolongation of the electrocardiographic QT interval.

Mutations in the CYP2D6 gene have been associated with a number of drug metabolism-related phenotypes. These include the ultra rapid metabolizer (UM), extensive metabolizer (EM), intermediate metabolizer (IM), and poor metabolizer (PM) phenotypes. Where a particular drug is capable of producing unwanted physiological effects in its metabolized or non-metabolized forms, it is desirable to determine whether a patient is a poor metabolizer of the drug prior to its administration.

A number of references are directed toward the identification of CYP2D6 mutations and their corresponding phenotypes. For example, United States Patent Application Publication No. 2003/0083485 to Milos et al. describes a novel CYP2D6 variant associated with the PM phenotype and methods for assessing whether an individual possesses the

2

variant prior to the administration of a drug. United States Patent Application Publication No. 2004/0072235 to Dawson describes a primer set useful in identifying variants of the CYP2D6 gene. Similarly, United States Patent Application Publication No. 2004/0091909 to Huang describes methods for screening an individual for variants in the CYP2D6 gene and other cytochrome P450 genes and tailoring the individual's drug therapy according to his or her phenotypic profile. Finally, United States Patent Application Publication No. 2004/0096874 to Neville et al. describes methods for identifying cytochrome P450 variants.

## SUMMARY OF THE INVENTION

The present invention comprises the discovery that treatment of a patient, who has lower CYP2D6 activity than a normal person, with a drug that is pre-disposed to cause QT prolongation and is metabolized by the CYP2D6 enzyme, can be accomplishing more safely by administering a lower dose of the drug than would be administered to a person who has normal CYP2D6 enzyme activity. Such drugs include, for example, dolasetron, paroxetine, venlafaxin, and iloperidone. Patients who have lower than normal CYP2D6 activity are herein referred to as CYP2D6 Poor Metabolizers.

This invention also relates to methods for the identification of genetic polymorphisms that may be associated with a risk for QT prolongation after treatment with compounds metabolized by the CYP2D6 enzyme, particularly iloperidone or an active metabolite thereof or a pharmaceutically acceptable salt of either (including, e.g., solvates, polymorphs, hydrates, and stereoisomers thereof), and related methods of administering these compounds to individuals with such polymorphisms.

The present invention describes an association between genetic polymorphisms in the CYP2D6 locus, corresponding increases in the concentrations of iloperidone or its metabolites, and the effect of such increases in concentrations on corrected QT (QTc) duration relative to baseline. Any number of formulas may be employed to calculate the QTc, including, for example, the Fridericia formula (QTcF) and the Bazett formula (QTcB), among others. The present invention includes any such formula or method for calculating a QTc.

A first aspect of the invention provides a method for treating a patient with iloperidone or an active metabolite thereof or a pharmaceutically acceptable salt of either, comprising the steps of determining the patient's CYP2D6 genotype and administering to the patient an effective amount of iloperidone or an active metabolite thereof or a pharmaceutically acceptable salt of either based on the patient's CYP2D6 genotype, such that patients who are CYP2D6 poor metabolizers receive a lower dose than patients who are CYP2D6 normal metabolizers.

Another aspect of the invention provides a method for treating a patient who is a CYP2D6 poor metabolizer with iloperidone or an active metabolite thereof or a pharmaceutically acceptable salt of either, wherein the patient is administered a lower dosage than would be given to an individual who is not a CYP2D6 poor metabolizer.

Another aspect of the invention provides a method of treating a patient with iloperidone or an active metabolite thereof or a pharmaceutically acceptable salt of either comprising the steps of determining whether the patient is being administered a CYP2D6 inhibitor and reducing the dosage of drug if the patient is being administered a CYP2D6 inhibitor.

Another aspect of the invention provides a method for determining a patient's CYP2D6 phenotype comprising the steps of administering to the patient a quantity of iloperidone

VNDA 00000003

3

or an active metabolite thereof or a pharmaceutically acceptable salt of either, determining a first concentration of at least one of iloperidone and an iloperidone metabolite in the patient's blood, administering to the patient at least one CYP2D6 inhibitor, determining a second concentration of at least one of iloperidone and an iloperidone metabolite in the patient's blood, and comparing the first and second concentrations.

Another aspect of the invention provides a method for determining whether a patient is at risk for prolongation of his or her QTc interval due to iloperidone administration comprising the step of: determining a patient's CYP2D6 metabolizer status by either determining the patient's CYP2D6 genotype or CYP2D6 phenotype. In the case that a patient is determined to be at risk for prolongation of his or her QTc interval, the dose of iloperidone administered to the patient may be reduced.

Another aspect of the invention provides a method of administering iloperidone or an active metabolite thereof, or a pharmaceutically acceptable salt of either, for the treatment of a disease or disorder in a human patient comprising the steps of determining the activity of the patient's CYP2D6 enzyme on at least one of iloperidone and its metabolites relative to the activity of a wild type CYP2D6 enzyme and reducing the dose of at least one of iloperidone and its pharmaceutically acceptable salts if the patient's CYP2D6 enzyme activity is less than that of the wild type CYP2D6.

Another aspect of the invention relates to modifying the dose and/or frequency of dosing with iloperidone or a pharmaceutically acceptable salt thereof based on the P88:P95 ratio and/or the (P88+iloperidone):P95 ratio in a blood sample of a patient being treated with iloperidone or P88, especially patients susceptible to QT prolongation or to harmful effects associated with QT prolongation.

Another aspect of the invention provides a kit for use in determining a CYP2D6 genotype of an individual, comprising a detection device, a sampling device, and instructions for use of the kit.

Another aspect of the invention provides a kit for use in determining a CYP2D6 phenotype of an individual, comprising a detection device, a collection device, and instructions for use of the kit.

Another aspect of the invention provides a kit for use in determining at least one of a P88 to P95 ratio and a P88 and iloperidone to P95 ratio in an individual, comprising a detection device, a collection device, and instructions for use of the kit.

Yet another aspect of the invention provides a method for commercializing a pharmaceutical composition comprising at least one of iloperidone, a pharmaceutically acceptable salt of iloperidone, an active metabolite of iloperidone, and a pharmaceutically acceptable salt of an active metabolite of iloperidone, said method comprising: obtaining regulatory approval of the composition by providing data to a regulatory agency demonstrating that the composition is effective in treating humans when administered in accordance with instructions to determine whether or not a patient is a CYP2D6 poor metabolizer prior to determining what dose to administer to the patient; and disseminating information concerning the use of such composition in such manner to prescribers or patients or both.

The foregoing and other features of the invention will be apparent from the following more particular description of embodiments of the invention.

DETAILED DESCRIPTION OF THE INVENTION

Iloperidone is a benzisoxazole-piperidinyl derivative, currently in development for the treatment of CNS disorders.

4

Data from placebo-controlled Phase III studies of iloperidone showed a Fridericia correction of QT duration (QTcF) increase of 0.1 to 8.5 msec at doses of 4-24 mg, when comparing a single ECG at baseline to a single ECG at endpoint. At lower doses of iloperidone (4 mg-16 mg) QTcF prolongation was minimal (0.1-5 msec). In the most recent study, a greater prolongation was observed when higher doses of iloperidone (20-24 mg/day) were studied. The mean change in the QTcF at doses 20-24 mg/day was 8.5 msec, and 4.6 msec in the 12-16 mg/day dose range in this study. These data suggest that treatment with iloperidone can be associated with prolongation of the QT interval similar to other drugs in this class, and that the effect may be dose sensitive in the clinical dose range.

The research leading to the present invention was designed to examine the effect of different doses of iloperidone relative to the effect of ziprasidone and quetiapine on QTc duration under carefully controlled conditions. To further evaluate the possible relationship between exposure to iloperidone and the comparators to QTc duration, reassessment after pharmacological inhibition of the principle metabolic pathways for each drug, under steady-state conditions, was also planned.

Blood samples for pharmacogenetic analysis were collected at screening. Two polymorphisms previously associated with poor metabolizing status were genotyped in the CYP2D6 locus and 251 genotypes were collected. The individual genotypes were studied for detection of association between genotype class and concentrations of iloperidone and its metabolites P88 and P95. The functional effect of the polymorphisms was also evaluated by analyzing the effect of the addition of the CYP2D6 inhibitor paroxetine on the concentrations of the parent drug and its metabolites.

The research leading to the present invention identified a significant association between CYP2D6 genotype and concentrations of P88 before the addition of inhibitors as well as the effect of this association on QTc prolongation.

Iloperidone is a substrate for two P450 enzymes; CYP2D6 and CYP3A4. Most metabolic clearance of iloperidone depends on these two enzymes. CYP2D6 catalyzes hydroxylation of the pendant acetyl group to form metabolite P94, which is converted to P95 after some additional reactions. Addition of the CYP2D6 inhibitor fluoxetine, along with iloperidone resulted in increases of the area under the curve (AUC) for iloperidone and P88 of 131% and 119% respectively. Addition of the CYP3A4 inhibitor ketoconazole in interaction studies resulted in a 38-58% increase in the concentrations of iloperidone and its main metabolites P88 and P95. P88 has a pharmacological profile including affinity for the HERG channel similar to that of iloperidone. P95 is less lipophilic and is dissimilar in its binding profile compared to iloperidone, including having very low affinity for the HERG channel. For these reasons P95 is regarded as being pharmacologically inactive.

The addition of metabolic inhibitors in this study therefore allowed for an evaluation of the effect of increasing blood-concentration of iloperidone and/or its metabolites on QT duration. More specifically, this study allowed for an evaluation of the effect of iloperidone on QTc before and after the addition of the CYP2D6 inhibitor, paroxetine, as well as before and after the addition of the CYP3A4 inhibitor, ketoconazole.

The CYP2D6 gene is highly polymorphic, with more than 70 allelic variants described so far. See, e.g., http://www.imm.ki.se/CYPalleles/cyp2d6.htm. Most embodiments of the present invention concern the two most common polymorphisms within the CYP2D6 gene in Caucasian populations, CYP2D6G1846A and CYP2D6P34S (also referred to

VNDA 00000004

US 8,586,610 B2

| 5 | 6 |

as CYP2D6C100T. These polymorphisms correspond to nucleotides 3465 and 1719, respectively, in GenBank sequence M33388.1 (GI:181303). The CYP2D6P34S/CYP2D6C100T polymorphism also corresponds to nucleotide 100 in GenBank mRNA sequence M20403.1 (GI: 181349).

The CYP2D6G1846A polymorphism (known as the CYP2D6*4 alleles, encompassing *4A, *4C, *4D, *4E, *4F, *4G, *4H, *4J, *4K, and *4L) represents a G to A transition at the junction between intron 3 and exon 4, shifting the splice junction by one base pair, resulting in frameshift and premature termination of the protein (Kagimoto 1990, Gough 1990, Hanioka 1990). The CYP2D6P34S/CYP2D6C100T polymorphism (known as the CYP2D6*10 and CYP2D6*14 alleles) represents a C to T change that results in the substitution of a Proline at position 34 by Serine (Yokota 1993, Johansson 1994). Both of these polymorphisms have been associated with reduced enzymatic activity for different substrates (Johansson 1994, Dahl 1995, Jaanson 2002, see also review by Bertilsson 2002)

Methods

A. Samples

128 individuals consented to the pharmacogenetic study. Blood samples were collected according to the pharmacogenetics protocol and after the consent of patients. The DNA was extracted from whole blood by Covance using the PURE-GENE DNA isolation kit (D-50K).

The 128 individuals that participated were a good representation of the total sample of 165 individuals that participated in the trial. 22 of 29 total were from the iloperidone 8 mg bid group, 30 of 34 were from the iloperidone 12 mg bid group, 22 of 31 from the 24 mg qd group, 3 of 5 of the risperidone group, 28 of 33 of the ziprazidone group, and 23 of 33 of the quetiapine group.

B. Genotyping

Genotypes for the CYP2D6G1846A polymorphism were ascertained for 123 of the 128 consenting individuals, while genotypes for the CYP2D6C100T polymorphism were identified for all 128 participants. Genotyping was performed on amplified DNA fragments. The CYP2D6 genomic region was amplified using a triplex PCR strategy (Neville 2002). In brief, primers used were:

```
Exons 1 & 2    2D6L1P1:  CTGGGCTGGGAGCAGCCTC
               SEQ ID. 1
               2D6L1R1:  CACTCGCTGGCCTGTTTCATGTC
               SEQ ID. 2

Exons 3, 4, 5 & 2D6L2F:  CTGGAATCCGGTGTCGAAGTGG
6              SEQ ID. 3
               2D6L2R2:  CTCGGCCCCTGCACTGTTTC
               SEQ ID. 4

Exons 7, 8 & 9 2D6L3F:  GAGGCAAGAAGGATGTCAGGG
               SEQ ID. 5
               2D6L3R5B: AGTCCTGTGGTGAGGTGACGAGG
               SEQ ID. 6
```

Amplification was performed on 40-100 ng of genomic DNA using a GC-rich PCR kit (Roche Diagnostics, Mannheim, Germany) according to the manufacturer's recommendations. Thermocycling conditions were as follows: initial denaturation (3 min 95° C.), 10 cycles of 30 s of denaturation (30 s at 95° C.), annealing (30 s at 66° C.), and extension, (60 s at 72° C.) followed by 22 cycles: 30 s at 95° C., 30 s at 66° C., 60 s+5 s/cycle at 72° C. A final extension followed (7 min at 72° C.).

Third Wave Technologies, Inc (Madison, Wis.) developed the probe sets for genotyping. Genotyping was performed on

PCR products using the Invader® assay (Lyamichev 1999) (Third Wave Technologies, Inc) according to the manufacturer's recommendations.

The genotypes of individuals distributed among the three iloperidone groups were not significantly different (Table 1A and 1B).

TABLE 1A

Genotype frequencies by iloperidone dose class for CYP2D6C100T

| Iloperidone dose group | Genotype | | | |
| | CC | CT | TT | Total |
|---|---|---|---|---|
| Ilo 8 mg bid | 19[a] | 2 | 1 | 22 |
| Ilo 12 mg bid | 23 | 6 | 1 | 30 |
| Ilo 24 mg qd | 15 | 6 | 1 | 22 |
| Total | 57 | 14 | 3 | 74 |

[a]number of individuals

TABLE 1B

Genotype frequencies by iloperidone dose class for CYP2D6G1846A

| Iloperidone dose group | Genotype | | | |
| | AA | AG | GG | Total |
|---|---|---|---|---|
| Ilo 8 mg bid | 0 | 3 | 17 | 20 |
| Ilo 12 mg bid | 1 | 6 | 23 | 30 |
| Ilo 24 mg qd | 1 | 5 | 15 | 21 |
| Total | 2 | 14 | 55 | 74 |

C. Statistical Analysis

The genotype effect of the two CYP2D6 polymorphisms on period 1 concentrations was evaluated using the following ANOVA model. Concentrations of iloperidone, P88, and P95 at Period 1, without inhibitor, at the time at which maximum blood concentration of the parent compound or metabolite was reached (Tmax) were used as the dependent variable, the genotypes of each polymorphism as classes and the treatment as a covariate. In order to adjust for treatment effects after the single dose of iloperidone, the 8 mg bid was coded as 8, the 12 mg bid as 12 and the 24 mg qd as 24.

The function of these polymorphisms on the degree of inhibition of the CYP2D6 enzyme was calculated from the ratio of concentrations of P88 and P95 in period 2, after the addition of the inhibitor of CYP2D6. The concentrations of iloperidone and/or its metabolites (e.g., P88 and P95) may be determined in period 1 and/or period 2 by any known or later-developed method or device, including titration.

Results and Discussion

In order to understand the functional significance of the two CYP2D6 polymorphisms on the activity of the enzyme, we examined the association of the various genotypes with the relative concentrations of the metabolites P88 and P95. It is known that P88 is degraded by CYP2D6 and that CYP2D6 is involved in the synthesis of P95. The relative amounts of P88 and P95 would therefore be controlled by the activity of the CYP2D6 enzyme. We calculated the ratio of P88/P95 before inhibition in Period 1 and at the Tmax of the two metabolites, as well as the ratio of P88/P95 in Period 2 after the addition of the CYP2D6 inhibitor paroxetine. In individuals with the wild type enzyme the concentration of P88 is expected to increase in Period 2, while in the same period the concentration of P95 is expected to decline.

VNDA 00000005

US 8,586,610 B2

<table>
<tr><td>7</td><td>8</td></tr>
</table>

For Period 1 the mean P88/P95 ratio among the 91 iloperidone treated patients was equal to 1.0 with a range from 0.14 to 8.19. Among the same individuals for Period 2 the mean ratio was 2.4 with a range from 0.5 to 8.49. The mean ratio of the ratios Period 1/Period 2 was equal to 0.37 with a range from 0.11 to 2.75.

Among the genotyped individuals the values were similar with means of 1, 2.45 and 0.37 for Period 1, Period 2 and Period 1/Period 2 respectively, indicating no sample bias. For polymorphism CYP2D6G1846A the means were significantly different between the three-genotype classes AA, AG and GG. For AA the respective values were 6.1, 3.41, and 1.89, for AG they were 2.4, 4.2, and 0.52 and for GG 0.57, 1.94 and 0.28 (Table 2).

TABLE 2

| Ratios of P88, P95 concentrations according to genotype | | |
|---|---|---|
| Population | P88/P95 Period1 | P88/P95 Period 2 | P88/P95 (Period1/Period2) |
| All | 1.0 (0.14-8.19) | 2.45 (0.50-8.49) | 0.37 (0.11-2.75) |
| | CYP2D6G1846A | | |
| AA | 6.1 (3.96-8.19) | 3.41 (2.96-3.87) | 1.89 (1.0-2.75) |
| AG | 2.4 (0.44-7.0) | 4.20 (2.2-7.57) | 0.52 (0.14-1.28) |
| GG | 0.57 (0.14-2.2) | 1.94 (0.52-4.71) | 0.28 (0.11-0.61) |

The differences between genotype classes were significant at the p<0.0001 level in ANOVA test. These data suggest that the AA class represent a CYP2D6 poor metabolizer as indicated by the high ratio of P88/P95 in period 1 and the relatively small effect of the addition of the inhibitor in Period 2. The AG class seems to exhibit an intermediate phenotype between the poor metabolizer and the wild type with an approximately 2-fold reduction of the CYP2D6 activity after the addition of the inhibitor, as indicated by the ratio of the ratios (Table 2). This analysis provides a phenotypic characterization of the CYP2D6G1846A polymorphism as it relates to the metabolism of iloperidone.

Having established a functional role of this polymorphism, we calculated the concentrations of P88 at Period 1 at the Tmax of P88 for each genotype class. P88 concentrations were significantly (p<0.005) higher for the AA and AG classes as compared to the GG class for each of the three iloperidone dose groups (Table 3).

TABLE 3

| P88 concentrations in Period 1 according to CYP2D6 genotype | | | |
|---|---|---|---|
| Genotype | N obs | LSMeans | P value |
| AA | 2 | 62.70 | <0.0001 |
| AG | 14 | 31.40 | |
| GG | 55 | 21.03 | |
| TRT dose | | | 0.0015 |
| CYP2D6G1846A *TRT dose | | | 0.0058 |

Although the number of individuals carrying the A allele is limited, the results obtained in the study consistently suggest that individuals of the AA and AG class are expected to experience higher concentrations of P88 at Tmax as compared with GG individuals. Similar results were obtained with polymorphism CYP2D6C100T (Table 4 and 5).

TABLE 4

| Ratios of P88, P95 concentrations according to genotype | | |
|---|---|---|
| Population | P88/P95 Period1 | P88/P95 Period 2 | P88/P95 (Period1/Period2) |
| All | 1.0 (0.14-8.19) | 2.45 (0.50-8.49) | 0.37 (0.11-2.75) |
| | CYP2D6C100T | | |
| CC | 0.6 (0.14-2.28) | 1.93 (0.52-4.71) | 0.27 (0.11-0.61) |
| CT | 2.2 (0.44-7.0) | 4.14 (2.2-7.57) | 0.49 (0.14-1.28) |
| TT | 5.24 (3.56-8.19) | 4.19 (2.96-5.74) | 1.46 (0.62-2.75) |

TABLE 5

| P88 concentrations in Period 1 according to CYP2D6 genotype | | | |
|---|---|---|---|
| Genotype | N obs | LSMeans | P value |
| CC | 57 | 21.03 | |
| CT | 14 | 33.16 | <0.0001 |
| TT | 3 | 51.00 | |
| TRT dose | | | <0.0001 |
| CYP2D6C100T *TRT dose | | | 0.0015 |

This result is expected given the fact that this polymorphism is in almost complete linkage disequilibrium with the CYP2D6G1846A polymorphism.

In order to understand whether the difference in concentration of P88 at Period 1 Tmax was relevant to the increases in QTc after the addition of the inhibitors, we used the observed mean of P88 for the CYP2D6G1846A AG group to divide all individuals into two classes. The first includes individuals with P88 concentrations at Period 3, after the addition of both inhibitors, of equal to or less than 34 ng/mL and the second class includes individuals with P88 concentration greater than 34 ng/mL. We then compared the two classes in regards to the QTc change from baseline at Period 3. Using an ANOVA statistic for the first class P88>34 (n=55) the QTc mean change from baseline in Period 3 was 22.7 msec and that for P88≤34 (n=12) the mean QTc for the same period was 7.7 msec. The QTc changes from baseline for Period 1 and Period 2 according to genotype and iloperidone dose are given in Table 6 and 7.

TABLE 6

| QTc change at Period 1 according to CYP2D6 genotype and iloperidone dose | | |
|---|---|---|
| | iloperidone Dose | | |
| Genotype | 8 mg bid | 12 mg bid | 24 mg qd |
| | CYP2D6G1846A | | |
| AA | | 17.7 (1)[a] | 38.4 (1) |
| AG | −0.8 (3) | 5.8 (6) | 19.0 (5) |
| GG | 7.8 (17) | 11.8 (23) | 14.0 (14) |
| | CYP2D6C100T | | |
| TT | −8.4 (1) | 17.7 (1) | 38.4 (1) |
| CT | 2.9 (2) | 5.8 (6) | 19.0 (5) |
| CC | 7.8 (17) | 11.8 (23) | 9.5 (14) |

[a]number of individuals

US 8,586,610 B2

**9**

### TABLE 7

QTc change at Period 2 according to
CYP2D6 genotype and iloperidone dose

|  | iloperidone dose | | |
|---|---|---|---|
| Genotype | 8 mg bid | 12 mg bid | 24 mg qd |
| | CYP2D6G1846A | | |
| AA |  | 25.0  (1) | 28.4  (1) |
| AG | 8.1  (3) | 8.7  (6) | 20.6  (5) |
| GG | 11.7  (18) | 14.5  (21) | 16.4  (15) |
| | CYP2D6C100T | | |
| TT | −0.7  (1) | 25.0  (1) | 28.4  (1) |
| CT | 12.5  (2) | 8.7  (6) | 20.6  (5) |
| CC | 11.7  (16) | 14.5  (21) | 16.4  (15) |

These results however should be viewed with caution since the number of observations is small. If one was, however, to focus on the iloperidone 24 mg qd, there is a trend for higher QTc among AA, and AG individuals for CYP2D6G1846A as compared to GG. This difference disappears after the addition of the CYP2D6 inhibitor in Period 2.

These observations suggest that the differences in P88 concentrations during Period 1 between the different classes of genotypes may be relevant to QTc changes from baseline. Given the small number of observations and the unbalanced in regards to genotype design of the study, a confirmatory prospectively designed study may be required before any further interpretation of this data is warranted. Notwithstanding these caveats, the results discussed above show that patients can be more safely treated with iloperidone if the dose of iloperidone is adjusted based on the CYP2D6 genotype of each patient. For example, if a patient has a genotype which results in decreased activity of the CYP2D6 protein relative to the wild type CYP2D6, then the dose of iloperidone administered to such patient would be reduced to, for example, 75% or less, 50% or less, or 25% or less of the dose typically administered to a patient having a CYP2D6 genotype that results in a CYP2D6 protein that has the same or substantially the same enzymatic activity on P88 as the wild type CYP2D6 genotype/protein. For example, where the normal dosage of iloperidone or other CYP2D6-metabolized compound administered to an individual is 24 mg per day, an individual with a genotype associated with decreased CYP2D6 activity may receive a reduced dosage of 18, 12, or 6 mg per day.

Decreased CYP2D6 activity may be the result of other mutations, including those described at http://www.imm.ki.se/CYPalleles/cyp2d6.htm, which is incorporated herein by reference. In particular, it is noted that the CYP2D6*2A mutation includes a CYP2D7 gene conversion in intron 1. In some cases, the lower CYP2D6 activity in a CYP2D6 poor metabolizer may be due to factors other than genotype. For example, a patient may be undergoing treatment with an agent, e.g., a drug that reduces CYP2D6 activity.

QTc prolongation is correlated to the ratios of P88/P95 and (iloperidone+P88)/P95. The mean ratios among CYP2D6 extensive metabolizers were 0.57 and 1.00, respectively. As shown above in Tables 3 and 5, CYP2D6 poor metabolizers have elevated P88 levels compared to CYP2D6 extensive metabolizers.

As CYP2D6 poor metabolizers comprise approximately 15% of the population, it was found that approximately 15% of those studied exhibited a P88/P95 ratio greater than 2.0 while the remaining 85% exhibited P88/P95 ratios less than 2.0. Table 8 below shows the least squares mean change in

**10**

QTc for each dosage group. While the results for some groups are not statistically significant, they do indicate a trend supporting the hypothesis that QTc prolongation is correlated to P88/P95 ratio. Similar results were obtained when cutoff ratios of 3.0 and 4.0 were analyzed, providing further support to the hypothesis that the extent of QTc prolongation a patient may experience after treatment can be predicted by measuring P88 and P95 blood levels.

### TABLE 8

Mean QTc Prolongation According to P88/P95 Ratio

| P88/P95 Ratio | LSMean QTc change from Baseline 8 mg bid | LSMean QTc change from Baseline 12 mg bid | LSMean QTc change from Baseline 8 + 12 mg bid | LSMean QTc change from Baseline 24 mg | LSMean QTc change from Baseline All Treatment Groups |
|---|---|---|---|---|---|
| <2 | 7.2 (n = 23) | 8.7 (n = 31) | 8.3 (n = 54) | 13.9 (n = 24) | 10.244 (n = 78) |
| >2 | 21.3 (n = 5) | 17.4 (n = 3) | 18.3 (n = 8) | 29.4 (n = 5) | 21.111 (n = 13) |
| P value | 0.0725 | 0.392 | 0.0815 | 0.0329 | 0.0131 |

Similar results were observed when considering QTc correlation to the (iloperidone+P88)/P95 ratio. Again, as approximately 15% of the population are CYP2D6 poor metabolizers, it was found that approximately 15% of those studied exhibited (iloperidone+P88)/P95 ratios greater than 3.0 while the remaining 85% exhibited ratios less than 3.0. Table 9 below shows the least squares mean change in QTc for each dosage group. While the results for some groups are not statistically significant, they do indicate a trend supporting the hypothesis that QTc prolongation is correlated to (iloperidone+P88)/P95 ratio. Indeed, when cutoff ratios of 4 and higher were analyzed, similar results were obtained providing further support to the hypothesis that the extent of QTc prolongation a patient may experience after treatment can be predicted by measuring iloperidone, P88 and P95 blood levels.

### TABLE 9

Mean QTc Prolongation According to (iloperidone + P88)/P95 Ratio

| (ILO + P88)/P95 Ratio | LSMean QTc change from Baseline 8 mg bid | LSMean QTc change from Baseline 12 mg bid | LSMean QTc change from Baseline 8 + 12 mg bid | LSMean QTc change from Baseline 24 mg qd | LSMean QTc change from Baseline All Treatment Groups |
|---|---|---|---|---|---|
| <3 | 7.2 (n = 23) | 8.7 (n = 31) | 8.3 (n = 54) | 14.4 (n = 24) | 10.424 (n = 78) |
| >3 | 21.3 (n = 5) | 15.2 (n = 3) | 17.3 (n = 8) | 30.5 (n = 5) | 20.031 (n = 13) |
| P value | 0.0725 | 0.4223 | 0.0857 | 0.0522 | 0.0278 |

The starting point for determining the optimum dose of iloperidone is, as discussed above, a dose that has been shown to be acceptably safe and effective in patients having a CYP2D6 genotype that results in a protein having the same activity on iloperidone and P88 as the wild type CYP2D6 protein. Such doses are known in the art and are disclosed, for example, in U.S. Pat. No. 5,364,866 discussed above.

Generally, the dose of iloperidone administered to a patient will be decreased, as discussed above, if the enzymatic activity of the CYP2D6 enzyme on iloperidone and P88 is less than

VNDA 00000007

US 8,586,610 B2

11

about 75% of that of the wild type CYP2D6. Enzymatic activity may be determined by any number of methods, including, for example, measuring the levels of iloperidone and/or P88 in an individual's blood. In such a case, the iloperidone dose can be lowered such that measured levels of iloperidone and/or P88 are substantially the same as levels measured in the blood of individuals having normal CYP2D6 enzymatic activity. For example, if the CYP2D6 enzymatic activity of a patient is estimated by one or more methods (e.g., genotyping, determination of dextromorphan blood levels) to be 50% of the enzymatic activity normally observed in an individual having normal CYP2D6 enzymatic activity, the dose for the patient may need to be adjusted to one-half of the dose given to an individual having normal CYP2D6 enzymatic activity. Similarly, for ultrarapid metabolizers, an analogous calculation will lead to the conclusion that a dose adjustment of twice that given an individual having normal CYP2D6 enzymatic activity may be needed in order to achieve similar blood levels for the parent compound and active metabolites.

Alternatively, the dose of iloperidone administered to a patient may be decreased based upon the patient's CYP2D6 genotype alone, or upon the patient's P88:P95 or (iloperidone+P88):P95 ratios. For example, if a patient has a "poor metabolizer" genotype, or has a high P88:P95 or (iloperidone+P88):P95 ratio, the patient's dose of iloperidone may be reduced by, for example, 25%, 50%, or 75%. A patient's genotype can be readily determined using standard techniques on samples of body fluids or tissue. Such techniques are disclosed, e.g., in PCT Application Publication Number WO03054226.

While the CYP2D6G1846A (AA or AG) genotype and the CYP2D6C100T (CT or TT) genotype are illustrated herein, the method of the invention can employ other genotypes that result in decreased activity of the CYP2D6 protein on iloperidone and P88. It is within the skill of the art, based on the disclosure herein, to identify additional CYP2D6 genotypes that result in decreased enzymatic activity on iloperidone and P88.

Furthermore, while the disclosure herein focuses on genotype, it is apparent to one of skill in the art that phenotype can also be used as an indicator of decreased activity of the CYP2D6 protein on iloperidone and P88. For example, McElroy et al. describe a correlation between CYP2D6 phenotype and genotyping as determined by dextromethorphan/dextrorphan ratios. Therefore, although it is more convenient given the state of the art to look at genotype, if one were to determine that a given patient expressed a mutant CYP2D6 with lower activity on iloperidone and P88 than the wild type, or expressed abnormally low amounts of CYP2D6, then that patient would be given a lower dose of iloperidone than a patient with wild type CYP2D6, as discussed above. Alternative methods for determining the relative activity of a patient's CYP2D6 gene include biochemical assays to directly measure enzymatic activity, protein sequencing to examine the amino acid sequence of a patient's CYP2D6, monitoring transcription and translation levels, and sequencing the CYP2D6 gene mRNA transcript. For example, Chainuvati et al. describe assessment of the CYP2D6 phenotype using a multi-drug phenotyping cocktail (the Cooperstown 5+1 cocktail).

Iloperidone can be formulated into dosage units and administered to patients using techniques known in the art. See, e.g., PCT Application Publication Number WO03054226, US Patent Application Publication Number 20030091645, PCT Application Serial Number PCT EP03/

12

07619, and PCT Application Publication Number WO02064141, all of which are incorporated herein by reference as though fully set forth.

In addition, the present invention provides a kit for determining a patient's CYP2D6 genotype and/or phenotype. Such a kit may include, for example, a detection means, a collection device, containers, and instructions, and may be used in determining a treatment strategy for a patient having one or more diseases or disorders for which iloperidone treatment is indicated.

Detection means may detect a CYP2D6 polymorphism directly or may detect the characteristic mRNA of the polymorphic gene or its polypeptide expression product. In addition, as will be recognized by one of skill in the art, detection means may also detect polymorphisms in linkage disequilibrium with a CYP2D6 polymorphism. Accordingly, any polymorphism in linkage disequilibrium with the CYP2D6 polymorphisms disclosed in this application may be used to indirectly detect such a CYP2D6 polymorphism, and is within the scope of the present invention.

Detection means suitable for use in the methods and devices of the present invention include those known in the art, such as polynucleotides used in amplification, sequencing, and single nucleotide polymorphism (SNP) detection techniques, Invader® assays (Third Wave Technologies, Inc.), Taqman® assays (Applied Biosystems, Inc.), gene chip assays (such as those available from Affymetrix, Inc. and Roche Diagnostics), pyrosequencing, fluorescence resonance energy transfer (FRET)-based cleavage assays, fluorescent nonradiation, denaturing high performance liquid chromatography (DHPLC), mass spectrometry, and polynucleotides having fluorescent or radiological tags used in amplification and sequencing.

A preferred embodiment of a kit of the present invention includes an Invader® assay, wherein a specific upstream "invader" oligonucleotide and a partially overlapping downstream probe together form a specific structure when bound to a complementary DNA sequence. This structure is recognized and cut at a specific site by the Cleavase enzyme, releasing the 5' flap of the probe oligonucleotide. This fragment then serves as the "invader" oligonucleotide with respect to synthetic secondary targets and secondary fluorescently-labeled signal probes contained in a reaction mixture. This results in the specific cleavage of the secondary signal probes by the Cleavase enzyme. Fluorescence signal is generated when this secondary probe, labeled with dye molecules capable of fluorescence resonance energy transfer, is cleaved. Cleavases have stringent requirements relative to the structure formed by the overlapping DNA sequences or flaps and can, therefore, be used to specifically detect single base pair mismatches immediately upstream of the cleavage site on the downstream DNA strand. See, e.g., Ryan et al., Molecular Diagnosis, 4; 2:135-144 (1999); Lyamichev et al., Nature Biotechnology, 17:292-296 (1999); and U.S. Pat. Nos. 5,846,717 and 6,001,567, both to Brow et al., all of which are hereby incorporated herein by reference.

Another preferred embodiment of a kit of the present invention includes a detection means comprising at least one CYP2D6 genotyping oligonucleotide specific to alleles known to predict a patient's metabolizer phenotype. More particularly, the means comprises an oligonucleotide specific for the CYP2D6G1846A or CYP2D6C100T polymorphism. The means may similarly comprise oligonucleotides specific for each polymorphism as well as the wild type sequence.

Detection methods, means, and kits suitable for use in the present invention are described in International Publication Nos. WO 03/0544266 and WO 03/038123, each of which is

VNDA 00000008

US 8,586,610 B2

13

14

hereby incorporated herein by reference. It should also be understood that the methods of the present invention described herein generally may further comprise the use of a kit according to the present invention.

Collection devices suitable for use in the present invention include devices known in the art for collecting and/or storing a biological sample of an individual from which nucleic acids and/or polypeptides can be isolated. Such biological samples include, for example, whole blood, semen, saliva, tears, urine, fecal material, sweat, buccal smears, skin, hair, and biopsy samples of organs and muscle. Accordingly, suitable collection devices include, for example, specimen cups, swabs, glass slides, test tubes, lancets, and Vacutainer® tubes and kits.

The present invention encompasses treatment of a patient for any disease or condition that is ameliorated by administration of iloperidone. As discussed above, such diseases or conditions include, for example, schizoaffective disorders including schizophrenia, depression including bipolar depression, as well as other conditions such as cardiac arrythmias, Tourette's syndrome, psychotic disorders and delusional disorders.

A related aspect of the invention is a method for obtaining regulatory approval for a pharmaceutical composition comprising iloperidone or an active metabolite thereof, or a pharmaceutically acceptable salt of either, which comprises including in proposed prescribing information instructions to determine whether or not a patient is a CYP2D6 poor metabolizer prior to determining what dose to administer to the patient. In another related aspect, the invention is a method for commercializing (i.e., selling and promoting) pharmaceutical compositions comprising such compounds said method comprising obtaining regulatory approval of the composition by providing data to a regulatory agency demonstrating that the composition is effective in treating humans when administered in accordance with instructions to determine whether or not a patient is a CYP2D6 poor metabolizer prior to determining what dose to administer to the patient and then disseminating information concerning the use of such composition in such manner to prescribers (e.g., physicians) or patients or both.

Another aspect of the invention is a method for obtaining regulatory approval for the administration of iloperidone based, in part, on labeling that instructs the administration of a lower dose if the patient is already being administered a CYP2D6 inhibitor, e.g., paroxetine, etc.

REFERENCES

Bradford L D. CYP2D6 allele frequency in European Caucasians, Asians, Africans and their descendants. Pharmacogenomics 2002 March; 3(2):229-43.

Bertilsson L, Dahl M L, Dalen P, Al-Shurbaji A. Molecular genetics of CYP2D6: clinical relevance with focus on psychotropic drugs. Br J Clin Pharmacol 2002 February; 53(2): 111-22.

Bryan Campbell, Pharm. D., Jane Xu, Ph.D., Josephine Cucchiaro, Ph.D., Mila Etropolski, M. D., Mark Schmidt, M. D. Protocol No. CILO522A2328. 22 Oct. 2001.

Chainvuati S, Nafziger A N, Leeder J S, Gaedigk A, Kearns G L, Sellers E, Zhang Y, Kashuba A D, Rowland E, Bertino J S Jr. Combined phenotypic assessment of cytochrome p450 1A2, 2C9, 2C19, 2D6, and 3A, N-acetyltransferase-2, and xanthine oxidase activities with the "Cooperstown 5+1 cocktail." Clin. Pharmacol. Ther. 2003 November; 74(5):437-47.

Dahl M L, Yue Q Y, Roh H K, Johansson I, Sawe J, Sjoqvist F, Bertilsson L. Genetic analysis of the CYP2D locus in relation to debrisoquine hydroxylation capacity in Korean, Japanese and Chinese subjects. Pharmacogenetics 1995 June; 5(3):159-64.

Gough A C, Miles J S, Spurr N K, Moss J E, Gaedigk A, Eichelbaum M, Wolf C R. Identification of the primary gene defect at the cytochrome P450 CYP2D locus. Nature 1990 Oct. 5; 47(6295):773-6

Hanioka N, Kimura S, Meyer U A, Gonzalez F J. The human CYP2D locus associated with a common genetic defect in drug oxidation: a G1934—A base change in intron 3 of a mutant CYP2D6 allele results in an aberrant 3' splice recognition site. Am J Hum Genet. 1990 December; 47(6): 994-1001.

Jaanson P, Marandi T, Kiivet R A, Vasar V, Vaan S, Svensson J O, Dahl M L. Maintenance therapy with zuclopenthixol decanoate: associations between plasma concentrations, neurological side effects and CYP2D6 genotype. Psychopharmacology (Berl) 2002 June; 162(1):67-73.

Johansson I, Oscarson M, Yue Q Y, Bertilsson L, Sjoqvist F, Ingelman-Sundberg M. Genetic analysis of the Chinese cytochrome P4502D locus: characterization of variant CYP2D6 genes present in subjects with diminished capacity for debrisoquine hydroxylation: Mol Pharmacol 1994 September; 46(3):452-9.

Juif Jen, Sujata Vaidyanathan, Michael Hayes. Clinical Pharmacology Report: Protocol No CILO522A 2328: 12 Jul. 2002.

Kagimoto M, Heim M, Kagimoto K, Zeugin T, Meyer U A. Multiple mutations of the human cytochrome P450IID6 gene (CYP2D6) in poor metabolizers of debrisoquine. Study of the functional significance of individual mutations by expression of chimeric genes. J Biol Chem 1990 Oct. 5; 265(28):17209-14.

Lyamichev V, Mast A L, Hall J G, Prudent J R, Kaiser M W, Takova T, Kwiatkowski R W, Sander T J, de Arruda M, Arco D A, Neri B P, Brow M A. Polymorphism identification and quantitative detection of genomic DNA by invasive cleavage of oligonucleotide probes. Nat Biotechnol 1999 March; 17(3):292-6.

McElroy S, Richmond J, Lira M, Friedman D, Silber B M, Milos P M, Sachse C, Broehmöller, Roots I. CYP2D6 genotyping as an alternative to phenotyping for determination of metabolic status in a clinical trial setting. AAPS Pharmsci 2000; 2(4):article 33.

Nevilic M, Selzer R, Aizenstein B, Maguire M, Hogan K, Walton R, Welsh K, Neri B, de Arruda M. Characterization of cytochrome P450 2D6 alleles using the Invader system. Biotechniques 2002 June; Suppl:34-8, 40-3.

Yokota H, Tamura S, Furuya H, Kimura S, Watanabe M, Kanazawa I, Kondo I, Gonzalez F J. Evidence for a new variant CYP2D6 allele CYP2D6J in a Japanese population associated with lower in vivo rates of sparteine metabolism: Pharmacogenetics 1993 October; 3(5):256-63.

While this invention has been described in conjunction with the specific embodiments outlined above, it is evident that many alternatives, modifications and variations will be apparent to those skilled in the art. Accordingly, the embodiments of the invention as set forth above are intended to be illustrative, not limiting. Various changes may be made without departing from the spirit and scope of the invention as defined in the following claims.

VNDA 00000009

US 8,586,610 B2

**15**                                                                  **16**

SEQUENCE LISTING

<160> NUMBER OF SEQ ID NOS: 6

<210> SEQ ID NO 1
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Primer for amplifying CYP2D6 Exons 1 and 2

<400> SEQUENCE: 1

ctgggctggg agcagcctc                                                    19


<210> SEQ ID NO 2
<211> LENGTH: 23
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Primer for amplifying CYP2D6 Exons 1 and 2

<400> SEQUENCE: 2

cactcgctgg cctgtttcat gtc                                               23


<210> SEQ ID NO 3
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Primer for amplifying CYP2D6 Exons 3, 4, 5
      and 6

<400> SEQUENCE: 3

ctggaatccg gtgtcgaagt gg                                                22


<210> SEQ ID NO 4
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Primer for amplifying CYP2D6 Exons 3, 4, 5
      and 6

<400> SEQUENCE: 4

ctcggcccct gcactgtttc                                                   20


<210> SEQ ID NO 5
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Primer for amplifying CYP2D6 Exons 7, 8
      and 9

<400> SEQUENCE: 5

gaggcaagaa ggagtgtcag gg                                                22


<210> SEQ ID NO 6
<211> LENGTH: 23
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Primer for amplifying CYP2D6 Exons 7, 8 and 9

<400> SEQUENCE: 6

agtcctgtgg tgaggtgacg agg                                               23


**Appx45**
JX-1  p. 10 of 11

VNDA 00000010

US 8,586,610 B2

17

What is claimed is:

1. A method for treating a patient with iloperidone, wherein the patient is suffering from schizophrenia, the method comprising the steps of:

determining whether the patient is a CYP2D6 poor metabolizer by:

obtaining or having obtained a biological sample from the patient; and

performing or having performed a genotyping assay on the biological sample to determine if the patient has a CYP2D6 poor metabolizer genotype; and

if the patient has a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount of 12 mg/day or less, and

if the patient does not have a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount that is greater than 12 mg/day, up to 24 mg/day,

wherein a risk of QTc prolongation for a patient having a CYP2D6 poor metabolizer genotype is lower following the internal administration of 12 mg/day or less than it would be if the iloperidone were administered in an amount of greater than 12 mg/day, up to 24 mg/day.

2. The method of claim 1, wherein the performing or having performed the genotyping assay step comprises:

extracting or having extracted genomic DNA or mRNA from the biological sample, and

sequencing or having sequenced CYP2D6 DNA derived from the extracted genomic DNA or from the extracted mRNA,

wherein the sequencing or having sequenced step further comprises: amplifying or having amplified a CYP2D6 region in the extracted genomic DNA or mRNA to prepare a DNA sample enriched in DNA from the CYP2D6 gene region; and

sequencing or having sequenced the DNA sample by hybridizing the DNA sample to nucleic acid probes to determine if the patient has a CYP2D6 poor metabolizer genotype; and

wherein the CYP2D6 poor metabolizer genotype is one of the CYP2D6G1846A genotype or the CYP2D6C100T genotype.

3. The method of claim 2, wherein the CYP2D6 poor metabolizer genotype is one of the CYP2D6G1846A (AA) genotype or the CYP2D6G1846A (AG) genotype.

4. The method of claim 3, wherein the CYP2D6 poor metabolizer genotype is the CYP2D6G1846A (AA) genotype.

5. The method of claim 2, wherein the CYP2D6 poor metabolizer genotype is one of the CYP2D6C100T (TT) genotype or the CYP2D6C100T (CT) genotype.

6. The method of claim 5, wherein the CYP2D6 poor metabolizer genotype is the CYP2D6C100T (TT) genotype.

7. The method of claim 1, wherein the step of internally administering iloperidone to the patient in an amount of 12 mg/day or less comprises internally administering iloperidone to the patient in an amount of 6 mg or less b.i.d.

18

8. The method of claim 2, wherein, if the patient has a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount of 6 mg b.i.d.

9. A method of treating a patient who is suffering from a schizoaffective disorder, depression, Tourette's syndrome, a psychotic disorder or a delusional disorder, the method comprising:

determining if the patient is a CYP2D6 poor metabolizer by obtaining or having obtained a biological sample from the patient, and performing or having performed a genotyping assay on the biological sample to determine whether the patient has a CYP2D6 poor metabolizer genotype, and

if the patient is a CYP2D6 poor metabolizer, then internally administering iloperidone to the patient in an amount of up to 12 mg/day, and

if the patient is not a CYP2D6 poor metabolizer, then internally administering iloperidone to the patient in an amount of greater than 12 mg/day, up to 24 mg/day.

10. The method of claim 9, wherein the patient is at risk for a prolonged QT interval.

11. The method of claim 9, wherein the CYP2D6 poor metabolizer genotype is one of:

CYP2D6G1846A (AA), CYP2D6G1846A (AG), CYP2D6C100T (TT), or CYP2D6C100T (CT).

12. The method of claim 9, wherein the method comprises: if the patient is a CYP2D6 poor metabolizer, then internally administering the iloperidone to the patient in an amount of 6 mg b.i.d.

13. A method of treating a patient who is suffering from a schizoaffective disorder, depression, Tourette's syndrome, a psychotic disorder or a delusional disorder, the method comprising:

determining if the patient is at risk for iloperidone-induced QTc prolongation by obtaining or having obtained a biological sample from the patient, and performing or having performed a genotyping assay on the biological sample to determine whether the patient has a CYP2D6 poor metabolizer genotype, wherein the presence of a CYP2D6 poor metabolizer genotype indicates risk for iloperidone-induced QTc prolongation, and

if the patient is at risk for iloperidone-induced QTc prolongation, then internally administering iloperidone to the patient in an amount of up to 12 mg/day, and

if the patient is not at risk for iloperidone-induced QTc prolongation, then internally administering iloperidone to the patient in an amount of greater than 12 mg/day, up to 24 mg/day.

14. The method of claim 13, wherein the patient is at risk for iloperidone-induced QTc prolongation, and is a CYP2D6 poor metabolizer.

15. The method of claim 14, wherein the patient is a CYP2D6 poor metabolizer having a CYP2D6 genotype of one of: CYP2D6G1846A (AA), CYP2D6G1846A (AG), CYP2D6C100T (TT), or CYP2D6C100T (CT).

16. The method of claim 13, wherein the method comprises: if the patient is at risk for iloperidone-induced QTc prolongation, then internally administering the iloperidone to the patient in an amount of 6 mg b.i.d.

\* \* \* \* \*

VNDA 00000011

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2017, I electronically filed Confidential and Nonconfidential versions of the foregoing Principal Brief of Appellant with the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system.  All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

I further certify that on this same day a copy of the Confidential version of the foregoing Principal Brief of Appellant was delivered to counsel for Appellees via electronic transfer pursuant to agreement of the parties.

/s/ *Kenneth G. Schuler*
Kenneth G. Schuler

## CERTIFICATE OF COMPLIANCE WITH RULE 32

I hereby certify that this brief complies with the type-volume limitations of Fed. R. of App. P. 32(a)(7)(B) because the brief contains 13,977 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief was prepared using Microsoft Word 2010 in 14-point Times New Roman font.

*/s/ Kenneth G. Schuler*
Kenneth G. Schuler

## CERTIFICATE OF COMPLIANCE WITH RULE 28(d)

I hereby certify that this brief complies with the limitations set forth in Fed.

Cir. R. 28(d) and contains 15 words marked as confidential.

/s/ *Kenneth G. Schuler*
Kenneth G. Schuler

*Counsel for Defendant-Appellant*

Dated:  February 7, 2017